Oscar SALAZAR, Jr. et al., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

DISTRICT OF COLUMBIA et al., Defendants.

Civil Action No. 93–452 (GK).

United States District Court, District of Columbia.

Oct. 16, 1996.

Nancy S. Schultz, Assistant Corporation Counsel, Washington, D.C., for defendants.

Kathleen L. Millian, Terris, Pravlik & Wagner, Washington, D.C., for plaintiffs.

1. Plaintiffs requested, with the consent of Defendants, that the Court use initials rather than names, for four individuals who were members of the plaintiff class, but not named plaintiffs or witnesses, as required by 42 C.F.R. 431.306 and D.C.Code 1–2907. These technical amendments have been made.

2. The named Plaintiffs in this case are Oscar Salazar, Jr., by his parent and next friend Oscar Salazar, Sr.; Oscar Salazar, Sr.; Pausi Argueta, Jose Argueta, and Teresa Argueta, by their parent and next friend Mirna Paz; Mirna Paz; Irma Isabel Flores, Yanet Abigail Flores, Luis Alfredo Flores, Carlina Flores, Juan Antonio Flores Perez, and Ana Iris Flores, by their parent and next friend Abigail Flores; Abigail Flores; Nelson Alvarez, Jessica Cruz, and Katy Lisette Alvarez, by their parent and next friend, Sylvia Cruz–Diaz Alvarez; and Sylvia Cruz–Diaz Alvarez. Class Action Second Amended Complaint for Declaratory and Injunctive Relief ("Compl.") at 1–2.

3. Medicaid, a cooperative federal-state program, was established by Congress in 1965 with the enactment of Title XIX of the Social Security Act, 42 U.S.C. § 1396. The program is designed to provide necessary medical services to poor people who had previously been denied access to medical care. Like private insurance, Medicaid furnishes coverage to eligible individuals and

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW [1]

KESSLER, District Judge.

Plaintiffs [2] bring this action pursuant to 42 U.S.C. § 1983 on behalf of themselves and a class of needy children and adults who have applied for Medicaid [3] in the District of Columbia. After three years of pretrial litigation, including extensive, complex discovery generally conducted in good faith by both sides, several dispositive motions, and exhaustive settlement efforts,[4] this case proceeded to trial.

This Court conducted a seven-day bench trial on the four remaining claims [5] in the Complaint: Claim 4, which alleges that Defendants [6] do not issue decisions and provide Medicaid coverage within 45 days after initial applications are submitted; Claim 5, which alleges that Defendants do not provide advance notice of the discontinuance or suspension of Medicaid benefits; Claim 6, which alleges that Defendants do not provide or arrange for the provision of early and periodic screening, diagnostic and treatment

pays providers of health care for services rendered. 42 U.S.C. § 1396d(a) (1996).

4. These efforts resulted in a Partial Settlement Agreement, finalized June 28, 1996, regarding the first two claims in Plaintiffs' Complaint. Claim 1 alleged that Defendants fail to use the Medicaid numbers of the mothers of newborns to provide immediate Medicaid coverage for those newborns, in violation of federal law. Compl. ¶¶ 51, 64–66. Claim 2 alleged that Defendants illegally refuse to process Medicaid applications at hospitals treating a disproportionately high volume of Medicaid and low-income patients and "federally-qualified health centers," which are federally funded community and migrant health centers for homeless persons and other non-federally funded community clinics. Compl. ¶¶ 52, 67–68.

5. Claim 3 was dismissed for failure to allege a privately enforceable right of action under 42 U.S.C. § 1983. *Wellington v. District of Columbia*, 851 F.Supp. 1, 5 (D.D.C.1994).

6. Defendants are the District of Columbia, Marion Barry, Mayor of the District of Columbia, and Vernon Hawkins, who, at the time the Complaint was filed, was the Interim Director of the District's Department of Human Services. Compl. at 2.

("EPSDT") services to Medicaid recipients who request such services; and Claim 7, which alleges that Defendants do not effectively notify individuals of the availability of EPSDT services. During the trial, the Court heard testimony from 38 witnesses for Plaintiffs and 16 witnesses for Defendants; over 500 exhibits were admitted into evidence.

\* \* \*

This case is about people—children and adults who are sick, poor, and vulnerable—for whom life, in the memorable words of poet Langston Hughes, "ain't been no crystal stair". It is written in the dry and bloodless language of "the law"—statistics, acronyms of agencies and bureaucratic entities, Supreme Court case names and quotes, official governmental reports, periodicity tables, etc. But let there be no forgetting the real people to whom this dry and bloodless language gives voice: anxious, working parents who are too poor to obtain medications or heart catheter procedures or lead poisoning screens for their children, AIDS patients unable to get treatment, elderly persons suffering from chronic conditions like diabetes and heart disease who require constant monitoring and medical attention. Behind every "fact" found herein is a human face and the reality of being poor in the richest nation on earth.

## I. INTRODUCTION

Medicaid is the largest public assistance program in the District of Columbia, serving slightly over 25% of all District residents. From April 1995 to April 1996, an average of approximately 115,000 people per month were eligible for Medicaid. For example, in February 1996, 111,644 people were eligible for Medicaid. Of this total, 73,337, or 65.7%, qualified as categorically eligible for Medicaid through the Aid to Families with Dependent Children ("AFDC") program; 23,903, or 21.4%, qualified for Medicaid as a result of nursing home care, their enrollment in the General Public Assistance ("GPA") program, or their enrollment in the Supplemental Se-

curity Income ("SSI") program; 11,321, or 10.1%, qualified through the Non–Public Assistance ("NPA") program; and 3,083, or 2.8%, qualified because they were foster care children. Within NPA, the Multinational Program serves approximately 3,000 people, who constitute slightly over 2.5% of all Medicaid-eligible persons.[7] However, of the entire monthly Medicaid application workload, which is approximately 2,150 cases, the Multinational Program normally accounts for approximately 8% of all applications.[8] Testimony of John M. Bayne ("Bayne Test."), ¶ 6.

Upon Plaintiffs' motion, the court certified the following class pursuant to Fed.R.Civ.P. 23(b)(2):

All persons who have applied, have attempted to apply, or will apply in the future during the pendency of this litigation, for medical assistance pursuant to Title 19 of the Social Security Act ("Medicaid"), and all persons who have received, are receiving, or will receive in the future during the pendency of this litigation, Medicaid in the District of Columbia with respect to the following claims:

. . . . .

Any claims for declaratory, injunctive, or other relief premised on an alleged delay in excess of 45 days in the processing of Medicaid applications [Sub-class III]

Any claims for declaratory, injunctive, or other relief premised on an alleged lack of advance notice of the discontinuance, suspension or obligation to recertify Medicaid benefits, after being found eligible [Sub-class IV]

Any claims for declaratory, injunctive, or other relief premised on an alleged lack of effective notice of the availability of early and periodic screening, diagnostic and treatment ("EPSDT") services for children under 21 years of age, and/or an alleged lack of EPSDT services for eligible children under 21 years of age [Sub-class V].

*See* Orders of October 6, 1994 and November 3, 1994 (Kessler, J.).

---

**7.** Throughout this opinion, the terms "eligible" and "Medicaid-eligible" are used interchangeably to describe persons whom Defendants have found to be qualified for Medicaid.

**8.** As the contrast between the 2.5% and 8% figures shows, the NPA Multinational Program has many more applicants than persons ultimately deemed eligible.

The NPA program encompasses different categories of eligible persons, including non-SSI disabled and multinational persons and children in foster care. As the litigation developed, and as a result of obtaining discovery, Plaintiffs focused more and more narrowly on NPA applicants and recipients. At trial, Plaintiffs asserted Claim 4, regarding untimely processing of initial Medicaid applications, only on behalf of certain NPA applicants, i.e., non-disabled, non-foster care applicants. As to Claim 5,[9] Plaintiffs asserted the recertification component of that claim on behalf of all non-foster care NPA recipients. As to the EVS component of Claim 5 and the request for reimbursement for Plaintiffs' out-of-pocket expenses, Plaintiffs sued on behalf of all Medicaid applicants and recipients. As to Claims 6 and 7, Plaintiffs continued to seek relief on behalf of all Medicaid applicants and recipients.

On April 1, 1994, Defendants started implementing the District's Medicaid Managed Care Program, a health care delivery system for the 65.7% of all Medicaid recipients who receive AFDC benefits. Testimony of Terri Thompson ("T. Thompson Test."), ¶ 15. The Medicaid Managed Care Program allows patients to choose between prepaid, capitated managed care organizations and fee-for-service primary care providers. *Id.* Testimony of Paul Offner ("Offner Test."); Testimony of Jane E. Thompson ("J. Thompson Test.").

Mr. Paul Offner, Commissioner of Health Care Finance for the District of Columbia, and Ms. Jane Thompson, Chief of the Managed Care Program in the Commission on Health Care Finance ("CHCF"), testified at length regarding their plans for a major overhaul of the Medicaid Managed Care Program. This massive restructuring of the delivery of health care to poor people in the District of Columbia was to begin with a

Request for Proposals ("RFP"), which was issued shortly before trial, in early April 1996. Both Mr. Offner and Ms. Thompson testified that this restructuring of the Medicaid Managed Care Program would alleviate many of the problems they conceded existed in the District's EPSDT program. Defendants repeatedly relied upon the reforms embodied in the RFP to assure the Court that concrete steps were being taken to correct a system which was admittedly failing to operate efficiently, economically, and in accordance with federal law. After trial, however, the Court learned that this RFP has been withdrawn. *See* Pls.' Post–Trial Brief at 2, n. 1.[10]

## II. FINDINGS OF FACT

### A. Timeliness of Initial Application Processing

Defendants are required to send notices of decision on Medicaid applications within 45 days of receiving the applications. *See* 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.911(a); D.C.Code Ann. § 3–205.26. However, as discussed below, the record clearly establishes that NPA Medicaid applications are not processed in a timely manner.

1. Initial Medicaid applications are accepted and processed by the Income Maintenance Administration ("IMA"), a division of the Commission on Social Services within the D.C. Department of Human Services ("DHS"), at IMA's central intake offices at 645 H Street, N.E., Washington, D.C. ("645 H Street"), and at IMA's nine decentralized service centers located at various community locations. Bayne Test., ¶¶ 5 and 7. At 645 H Street, there are two separate sections that handle NPA applications: the Multinational Section and the NPA Intake Section.

---

9. Claim 5 alleges that Defendants have violated federal and District of Columbia law by failing to send recipients advance notice of the discontinuance or suspension of Medicaid benefits. In their efforts to prove this claim, Plaintiffs have focused on two separate problems: (1) Defendants' improper processing of eligible persons' recertification forms ("the recertification component of Claim 5"); and (2) the malfunctioning of

the Eligibility Verification System ("EVS"), which causes discontinuance or suspension of Medicaid benefits to eligible persons without advance notice ("the EVS component of Claim 5").

10. Significantly, the Court did not learn that the District had withdrawn the RFP from Defendants themselves, who clearly had a moral, if not an

Bayne Cross–Exam. Test.[11]

2. Medicaid applications are processed by IMA social service representatives ("SSRs"), who in turn rely upon the Automated Client Eligibility Determination System ("ACEDS"), a computer system used to determine eligibility for the many public assistance programs administered by IMA. Testimony of Arlene Conover ("Conover Test."), ¶¶ 3–4. An IMA SSR enters the application into ACEDS, determines from the automated ACEDS checklist which information is still needed to complete the application process, and gives the applicant that checklist with instructions to provide any missing, required information to the SSR. *Id.*, ¶ 6.

3. As the applicant provides the required information, the SSR updates the automated record of the checklist. *Id.* On the 10th and 30th days after an application is submitted, notices requesting any outstanding information are issued to the applicant automatically, without intervention by the SSR, to remind the applicant of the date of application and the data still needed to determine eligibility. *Id.* On the 15th day or on the next available workday following the issuance of the 30–day notice, ACEDS denies the application automatically if the checklist still contains outstanding items. If the applicant requests additional time to supply the required information and the SSR grants that request and enters an extension date, ACEDS will not automatically deny the application on the 45th day. *Id.*, ¶¶ 6–7. When ACEDS does deny the application automatically, it also issues a denial notice. If, during the application time frame, the applicant provides all of the information, no additional reminder notices are issued and the automatic denial does not occur. *Id.* Medicaid applications and notices generated by ACEDS are available in both English and Spanish; when applicants first apply for Medicaid, they are given the choice of having their ACEDS notices printed in either language. Bayne Test.; Conover Test.

### 1. Medical Eligibility Operations Reports

4. IMA's Medical Eligibility Operations ("MEO") reports, which provide information about non-disability NPA applications, clearly show that all Medicaid applications are not processed within 45 days. MEO reports are available for the period from January 1992 through February 1996. In every month for which MEO reports are available, the reports indicate that applications filed more than 45 days earlier were still pending at the end of the month. Pls.' Exs. 103, 104, 111. The December 1993 MEO report for the Multinational Section at 645 H Street reveals that at the end of that month, that section had 536 applications pending over 45 days, or 60% of all reported applications pending at the end of that month for that unit. Pls.' Exs. 104, 111. In the same month, the NPA Intake Section at 645 H Street had 517 applications pending over 45 days, or 54% of the total reported applications pending at the end of the month. Pls.' Exs. 103, 104.

5. Although Defendants managed to reduce that backlog by 1995, there were still substantial backlogs. Pls.' Exs. 4 at 199, and 19 at 100. The May 1995 MEO report shows 46 cases pending over 45 days for the Multinational Section, and 30 cases pending over 45 days for the NPA Intake Section. Pls.' Exs. 111, 103. These numbers represent 8% and 15% of the reported applications for the Multinational Section and the NPA Intake Section, respectively. The June 1995 MEO report for the Multinational Section shows 35 applications pending for more than 45 days, or 12.2% of the 288 total applications pending at the end of June; the same report for the NPA Intake Section shows 33 applications pending at the end of June, or 7.8% of the 425 total applications pending at the end of June. Pls.' Exs. 103, 104, and 111. Finally, the MEO report for July 1995 shows that 73 applications were pending for over 45 days in

---

ethical, obligation to inform the Court of such a major factual development.

11. Applications for NPA Medicaid are assigned to the Multinational Section if the applicant's primary language is not English, if the applicant is not a U.S. citizen, or if a non-U.S. citizen applies on behalf of a child who is a U.S. citizen. Rule 30(b)(6) Deposition of Grace Howard, 11–8–94, at 8–9. The NPA Intake Section handles all other non-disability applications for NPA Medicaid submitted to the 645 H Street office.

the Multinational Section, or 24.7% of the total number of applications pending at the end of July. Pls.' Ex. 111. The NPA Intake Section had 135 applications pending for more than 45 days, or 28.6% of the 472 Medicaid applications pending at the end of July. Pls.' Ex. 103.

6. For the 12–month period from March 1995 until February 1996, the average monthly number of applications pending for more than 45 days was 67.8 for the Multinational Section, or 19.8%, and 49.6 for the NPA Intake Section, or 10.6%. In the Multinational Section, the percentages of applications pending for more than 45 days were 25% or greater in five out of twelve months, including three of most recent months for which data is available—December 1995 and January and February 1996. In the NPA Intake Section, the percentages of applications pending for more than 45 days were 11% or lower for all months except July and August 1995. Pls.' Ex. 104.

7. The MEO reports actually undercount the number of applications that IMA fails to process within 45 days, because they only count applications that are still pending at the end of the month. Thus, they do not capture applications that were processed before the end of a particular month, but which took more than 45 days to process. The MEO reports also do not account for delays in application processing caused by applicants' failure to submit complete documentation, changes of address, or death, nor do they account for transfers of applicants to different categories of eligibility or Defendants' procedure for counting 45 days. Finally, the available MEO reports only show application processing rates for two NPA application processing sections: the NPA Intake Section and the Multinational Section, both located at 645 H Street.[12]

## 2. Plaintiffs' Statistical Sample

### a. Nature of the Study

Plaintiffs retained the Center for Forensic Economic Studies, Inc. ("CFES") to analyze IMA's timeliness in processing applications. CFES began by selecting samples of five groups of Medicaid recipients in the District of Columbia: (1) all active, non-disability, NPA cases [13]; (2) all active, non-categorically eligible disability cases; (3) all active cases involving newborns born to mothers receiving Medicaid at the time of the newborns' birth; (4) all active, AFDC Medicaid cases; and (5) NPA cases processed by IMA's Multinational Section ("NPA–Multinational cases"). Siskin Test. at 3.[14]

CFES and Plaintiffs then received from IMA four computer data files corresponding to the above requests. *Id.* at 4.[15] Each data file contained thousands of individual case records. *Id.* at Table 1. From these data files, CFES selected systematic random samples for each of the five Medicaid populations: (1) 300 NPA case records involving cases not processed by the Multinational Section ("NPA–Nonmultinational"), (2) 100 non-

---

**12.** Two witnesses for Defendants testified that MEO reports for application processing are also kept by four of the decentralized service centers located at various community sites throughout the District. Bayne Cross–Exam. Test.; Jesberg Cross–Exam. Test. This testimony contradicted Defendants' earlier assertions. Plaintiffs originally requested MEO reports for all Medicaid service centers, not just for the two sections at 645 H Street. Defendants' initial document production included some MEO reports for other units, and Plaintiffs moved to compel production of reports for other units. In response, Defendants stated that they did not have any additional documentation regarding other units. Pls.' Mot. for Part.Summ.Judg. and Perm.Inj. at 15, Ex. 23.

**13.** Plaintiffs chose cases that Defendants had identified as currently active during the months of November and December 1994. Testimony of

Dr. Bernard Siskin ("Siskin Test."), ¶ 16. An active case was defined as a case in which an application for Medicaid had been granted. Plaintiffs did not study applications that were considered by IMA but were denied. *See, e.g.,* Jesberg Test. About 50% of all NPA Medicaid applications are denied. *Id.*

**14.** Plaintiffs decided from the outset not to study the timeliness of eligibility processing for Supplemental Security Income ("SSI") recipients who seek Medicaid, because once SSI applicants are found eligible for SSI by the Social Security Administration, they are automatically eligible for Medicaid. Bobroff Cross–Exam. Test. SSI is a federal program of cash assistance for the aged, blind, and disabled. Defs'. Ex. 2, § 1620.

**15.** The data file for NPA cases encompassed the Multinational Section cases.

categorically eligible disability ("disability") case records, (3) 100 case records of newborns born to mothers receiving Medicaid at the time of the newborns' birth, (4) 100 AFDC or AFDC-related case records, and (5) 100 NPA–Multinational case records, for a total of 700 Medicaid case records. Plaintiffs' counsel then requested and received the actual case files corresponding to the case records. *Id.*

Plaintiffs' counsel reviewed the IMA case files, recorded relevant information onto database entry forms, reviewed the database entry forms for accuracy, and reviewed the computer database for accuracy. Testimony of Rochelle Bobroff ("Bobroff Test.") at 5–7. In conducting their review of the case files, Plaintiffs' counsel found that only 97 of the requested 300 NPA–Nonmultinational case files were relevant for purposes of application processing. Siskin Test. at Table 2. The remainder of the case files received were considered irrelevant for several reasons. First, 112 of the records received from IMA were merely case profiles rather than actual case files. Bobroff Test. at 3; Bobroff Cross–Exam. Test. The case profiles lacked crucial information, such as the dates of Medicaid applications and the dates of notice of decision. Bobroff Test. at 3; *see also* Pls.' Ex. 180 (examples of case profiles provided to Plaintiffs). Second, 56 of the NPA case files concerned foster care children. Bobroff Test. at 3. Plaintiffs' counsel considered these case files irrelevant because children in foster care are automatically eligible for Medicaid and thus do not undergo the application process that NPA applicants undergo. *Id.* Third, the NPA case files supplied by IMA to Plaintiffs' counsel contained 42

AFDC case files. *Id.* at 4; Bobroff Cross-exam. Test. If persons apply for and are found eligible for AFDC, they also become automatically eligible for Medicaid.[16] Defs.' Ex. 2 (D.C. Medical Assistance Policy Handbook), § 1610.[17] Thus, Plaintiffs' counsel excluded the AFDC case files from their study also.

The fourth Medicaid population Plaintiffs excluded was the group of non-categorically eligible, disabled applicants for Medicaid.[18] Although such persons submit Medicaid applications to IMA, their case files were irrelevant, in Plaintiffs' estimation, because IMA has an additional 15 days in which to process their applications. Bobroff Cross–Exam. Test. Finally, some case files lacked relevant data, such as an application form, or information about the time in which the application was processed. *Id.* at 5. These case files were also excluded from the sample. *Id.*

Plaintiffs' counsel identified 188 relevant NPA–Multinational case files by supplementing the original sample of 100 case files with 88 case files drawn from other samples. These 88 additional case files included 70 case files that initially appeared in the general NPA sample of 300 but contained information about NPA–Multinational applications. *Id.* at 5.[19]

After Plaintiffs' counsel determined which case files contained relevant information, they presented the computer database containing all such files to CFES for statistical analysis. Siskin Test. at 2. Using a 95% confidence interval, CFES found that applications were improperly processed[20] approximately 42.3% of the time by IMA units that

**16.** The AFDC application process has also been challenged in a separate lawsuit in this Court, *Motley v. Yeldell,* Civil Action No. 74–13 (D.D.C. 1974).

**17.** If a person submits a joint application for Medicaid and AFDC, and is found ineligible for AFDC, then that application should be directly forwarded to an NPA unit for automatic consideration. Jesberg Test.

**18.** This group includes individuals whom the District of Columbia determines are disabled, even though they have not been found eligible for SSI.

**19.** CFES was not involved in Plaintiffs' counsel's decision to exclude some of the NPA–Nonmultinational case files supplied by IMA, such as the foster care and SSI cases. Siskin Cross-exam. Test. CFES was involved in the decision to supplement the originally selected 100 NPA–Multinational case files with case files that initially appeared in other samples, however. *See* Siskin Test. at 8, 10; Siskin Cross–Exam. Test.

**20.** An application was considered improperly processed if either "no notice of decision was ever sent or no notice was sent within 45 days of the date of application." Siskin Test., ¶ 22.

processed NPA–Nonmultinational applications (41 out of 97 applications) and 69.7% of the time by the Multinational Section (131 out of 188 applications). Pls.' Ex. 5 at 8; Siskin Test. at 2 and 10.

### b. Defendants' Objections to the Study

Defendants have strenuously challenged these findings. Mr. Bayne testified that CFES' study was not useful from a managerial perspective, because it did not measure IMA's overall timeliness in processing Medicaid applications; it did not study processing of AFDC–Medicaid applications; and it did not study applications that were ultimately denied. A typical, and more useful, study, according to Mr. Bayne, would be one that measured timeliness of all Medicaid application processing within a particular time frame, e.g., one month. Bayne Cross–Exam. Test. Mr. Bayne also criticized the study for focusing only on the universe of active cases, i.e., cases in which applications were granted, and for including cases from 1993 and 1994.

Rebecca Klemm, Ph.D., an expert witness retained by Defendants, similarly criticized Plaintiffs' failure to measure timeliness of all applications being processed within a particular time period. According to Dr. Klemm, the best and most accurate method for studying the Medicaid application process is "to identify cases as they arrive for processing and then follow them through the entire process until a decision is reached." Klemm Test., ¶ 4a. This way, both the timeliness or untimeliness of the processing and the reasons for the timeliness or untimeliness [21] can be understood. Klemm Test., ¶ 4.

Additionally, Dr. Klemm objected to the title of CFES' study, "untimely processing of applications for Medicaid," as too broad, because CFES actually studied only a discrete subgroup of Medicaid eligibility determinations, i.e., non-disability, non-foster care NPA Medicaid applications. Id. ¶ 5. Dr. Klemm asserted that IMA's timeliness in making initial Medicaid eligibility decisions should be measured by considering not only how quickly IMA processes non-disability NPA applications, but also by considering how quickly IMA makes eligibility determinations for NPA-disability applicants and other Medicaid "applicants," i.e., children in foster care, AFDC recipients, and SSI recipients. Id., ¶ 5 and Table 2A. With respect to foster care cases, Dr. Klemm testified that the time period between commitment of children to the District of Columbia's custody and commencement of those children's Medicaid eligibility could be measured. Similarly, with respect to SSI cases, the time period between IMA's receipt of a computer tape identifying SSI recipients and commencement of Medicaid eligibility for those recipients could be measured. With respect to disability NPA applications, Plaintiffs could have assessed IMA's compliance with the 60–day requirement for application processing. In sum, Dr. Klemm testified, a study of the timeliness of application processing should consider all of the ways in which Medicaid eligibility is determined. Klemm Cross–Exam.Test. Finally, Dr. Klemm also criticized CFES' failure to study applications that were denied. Id. ¶ 5.[22]

Finally, Dr. Klemm provided tables purporting to show updated percentages of improperly processed cases. Klemm Test., ¶ 5e and Tables 4A, 6A, and 8A. This data is based on IMA's study of CFES' findings. Klemm Cross–Exam.Test. Out of the 41 NPA–Nonmultinational cases in which Plaintiffs alleged improper processing, IMA re-

---

**21.** Reasons for untimeliness include IMA's own delay in requesting required information or in making a decision once the information is received; an applicant's failure to provide required information in a timely and complete manner; or delay on the part of an external source of information, such as a hospital providing medical records. Klemm Test., ¶ 4.

**22.** Dr. Klemm conceded that if Plaintiffs had decided to focus on only one subgroup of Medicaid applicants, such as NPA–Multinational applicants, then examination of other Medicaid populations—such as SSI and AFDC—would not necessarily be required. She also stated, however, that Plaintiffs did not properly study processing of NPA–Multinational applications, because they included information from case files that had been drawn from categories other than NPA, such as AFDC. In Dr. Klemm's view, Plaintiffs should have explained how and why they included information from each of the case files drawn from separate population samples. Klemm Cross–Exam. Test.

viewed 27. Klemm Test., Table 4A. Using the number of cases in which IMA refuted Plaintiffs' findings (4) as the numerator and the total number of IMA-reviewed cases (27) as the denominator, Dr. Klemm calculated a percentage, or error rate, of 14.8%. She applied that percentage to the total number of cases in which Plaintiffs alleged improper processing (41), to estimate the number of cases IMA would have refuted had it reviewed all 41 instances of alleged improper processing. This number (roughly 6) was then subtracted from 41, to reflect Defendants' view of the number of actual instances of improper processing (35). This analysis resulted in 35 instances of improper processing out of 97 non-disability NPA–Nonmultinational cases studied, or 36.0%. Klemm Cross–Exam.Test. and Table 4A.

Dr. Klemm used a similar analysis with Plaintiffs' NPA–Multinational findings. Considering the 16 refutations Defendants made after actually reviewing 99 of Plaintiffs' cases, she estimated that out of the 188 NPA–Multinational cases studied by Plaintiffs, IMA improperly processed 110, or 58.4%, of the applications. *See id.*

With respect to six of Defendants' actual refutations, Plaintiffs conceded timely processing of applications. Plaintiffs also agreed with Defendants that two had been processed in 46 days; an additional seven had been processed in 46 days due to IMA's allowance of a full 15–day period following the issuance of the 30–day notice, where the date of the 30–day notice was delayed because it fell on a non-business day; and one had been ignored because the applicant had already been found eligible for Medicaid. Two of the refutations have been withdrawn by Defendants. Stipulation of the Parties Concerning Siskin Test., Jesberg Test., and CFES Study, 5–30–96 ("Joint Stipulation") at 5. However, because neither party has identified the categories from which the agreed-upon applications were drawn (*i.e.*, non-disabled NPA–Nonmultinational or NPA–Multinational), the Court cannot incorporate this information into the percentages offered by either Plaintiffs or Defendants.

### c. The Court's Findings

8. Defendants contend that Plaintiffs' study should be excluded from evidence in this case, because it failed to encompass eligibility determinations for the groups identified by Dr. Klemm, *i.e.*, NPA-disability applicants, children in foster care, AFDC recipients, GPA recipients, and SSI recipients. *See* Defs.' Post–Trial Brief at 7. Such eligibility determinations should not have been included in Plaintiffs' statistical sample, however, because they are outside the scope of the Court's November 3, 1994 Class Certification Order. In that order, the Court certified plaintiff subclass III, which was defined as

> [a]ll persons who have applied, have attempted to apply, or will apply in the future during the pendency of this litigation, for [Medicaid] ... with respect to ... [a]ny claims ... for declaratory, injunctive, or other relief premised on an *alleged delay in excess of 45 days in the processing of Medicaid applications.*

November 3, 1994 Class Certification Order (emphasis added). SSI recipients—persons whose eligibility for SSI is determined by the federal Social Security Administration—and foster care children are automatically eligible for Medicaid in the District of Columbia; consequently they do not submit Medicaid applications to IMA and IMA makes no independent Medicaid eligibility determination for them. Defs.' Ex. 2 (D.C. Medical Assistance Policy Handbook), § 1620; Bobroff Test. at 3. Similarly, AFDC recipients and GPA recipients are automatically eligible for Medicaid, Defs.' Ex. 2, §§ 1610 and 1630, and thus do not submit separate Medicaid applications to IMA.[23] Finally, applications for NPA-disability Medicaid must be processed within 60 days, rather than 45 days. D.C.Code Ann. § 3–205.26 (1994). Thus, the groups about whose exclusion Dr. Klemm complained simply do not belong to a plaintiff

---

**23.** There are existing court orders requiring Defendants to process AFDC applications on a timely basis, *see Motley v. Yeldell*, Civil Action No. 74–13 (D.D.C. Nov. 8, 1974), and to process GPA applications on a timely basis, *see Jones v. Barry*, Civil Action No. 82–419 (D.D.C. June 25, 1982).

subclass alleging "delay in excess of 45 days in the processing of Medicaid applications."

9. Even before the Court defined subclass III in its November 3, 1994 Order, Defendants knew that Claim 4 only encompassed applicants for NPA Medicaid. In June 1994, Defendants responded to Plaintiffs' First Set of Interrogatories, which asked Defendants for "the number of applicants for Medicaid benefits in the District of Columbia." Pls.' Ex. 101 at 2. Defendants responded that "this information can be derived from the available statistical reports prepared by each intake center handling *NPA Medicaid applications*." *Id.* at 3 (emphasis added). Similarly, when Defendants were asked to supply the number of Medicaid applicants who were denied benefits, their response "assum[ed] [that] this interrogatory actually seeks information on *NPA Medicaid applicants* who were ultimately denied Medicaid eligibility ..." *Id.* at 5–6 (emphasis added).

■ 10. Defendants' argument that Plaintiffs also should have studied denied applications is more compelling. *See* Defs.' Post–Trial Brief at 7. The case of *Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), is instructive on this issue, however. The court of appeals had upheld the district court's exclusion of expert statistical analyses purporting to show salary disparities between white and black workers, on the ground that the analyses did not incorporate "all measurable variables thought to have an effect on salary level." *Id.* at 399, 106 S.Ct. at 3008. The Supreme Court rejected this conclusion as "plainly incorrect," and ruled that "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Id.* at 400, 106 S.Ct. at 3009. The Court further noted that at trial, the defendants had merely "declare[d] ... that many factors go into making up an individual employee's salary; they made no attempt—statistical or otherwise—to demonstrate that when these factors were properly organized and accounted

for there was no significant disparity between the salaries of blacks and whites." *Id.* at 404, 106 S.Ct. at 3010.[24]

11. It is true that IMA's timeliness in processing applications that were denied would be one relevant factor for determining its timeliness in processing all non-disability, non-foster care NPA applications. However, the Court has no reason to assume that applications resulting in denial are processed more quickly than applications resulting in a finding of eligibility and, therefore, no reason to assume that Defendants are prejudiced by exclusion of such applications from the study. For example, the inherent difficulties in processing NPA–Multinational applications promptly, which are described in Finding No. 34, would apply with equal force to applications which are both accepted and denied. Thus, the Court finds that Plaintiffs' omission of denied applications is a weakness which merely "render[s] the analysis less probative that it otherwise might be"; it does not affect the study's admissibility. *Bazemore,* 478 U.S. at 400, 106 S.Ct. at 3008–09.

The Court further notes that Defendants' criticism of Plaintiffs' failure to measure application processing for denied applications is similar to the criticisms of the *Bazemore* regression analyses. Like the defendants in *Bazemore,* Defendants in this case merely pointed to the denied applications, without ever attempting to show, statistically or otherwise, that when denied applications are considered, IMA's rate of proper application processing improves. *See Bazemore,* 478 U.S. at 404, 106 S.Ct. at 3010. In short, no evidence suggests that if Plaintiffs had statistically analyzed denied applications as well as accepted applications, the results would be any different.

12. The Court accepts the numerical corrections to CFES' study made by Dr. Klemm in reliance on Ms. Jesberg's refutations. Thus, the final results of the study, as corrected by Dr. Klemm, are that Defendants failed to decide applications within 45 days in 35 out of the 97 non-disability NPA–Nonmul-

**24.** While the regression analyses considered in *Bazemore* do differ from Plaintiffs' statistical sample study in this case, the Supreme Court's discussion is still helpful, because it directly addresses the validity of an expert statistical analysis that fails to incorporate all relevant information.

tinational applications, or 36.0%, and in 110 out of 188 NPA–Multinational cases studied, or 58.4%.[25]

### 3. Hospital Evidence

13. Hospitals frequently treat patients who, at the time of hospitalization or outpatient treatment, qualify for but are not currently receiving Medicaid. In order to ensure their own reimbursement, many hospitals have retained private firms to help patients who have already received hospital services complete their Medicaid applications. Testimony of David Sparks ("Sparks Test."), ¶ 5; Testimony of Helen Green ("Green Test."). To receive Medicaid reimbursement for services already rendered, the applications must be submitted within 90 days of treatment. Testimony of Timothy B. Sheridan ("Sheridan Test.").

14. Georgetown University Medical Center ("GUMC") submits Medicaid applications on behalf of its patients on a rolling basis. In other words, as soon as patients complete Medicaid applications, GUMC has a messenger deliver them to IMA. For the period from August 1, 1995 to March 26, 1996, GUMC sent 136 Medicaid applications to IMA on behalf of its patients, and IMA issued 70 eligibility decisions. As of March 28, 1996, 66 applications were still pending, 55 of which (83%) had been pending over 45 days. In 23 out of the 70 decided applications (33%), IMA issued a decision within 45 days. In 47 out of 70 (67%), however, IMA issued a decision more than 45 days after IMA received the application. Of the 47 decisions that took longer than 45 days, 18 (26%) were decided more than 60 days after IMA received the application; 15 (21%) were decided more than 90 days after IMA received the application; and 14 (20%) were decided more than 120 days after IMA received the application. Sheridan Test., ¶¶ 4–7; Sheridan Cross–Exam.Test.

15. As of March 28, 1996, of the 107 Medicaid applications submitted by Providence Hospital on behalf of its patients in November and December 1995, 58 had been decided, and 49 had not yet been decided. Thus, 45.8% of the applications had been pending for between three and four months. Sparks Test. ¶ 7.

### 4. Class Members' Experiences

Many individual class members testified regarding IMA's failure to process Medicaid applications within 45 days.

16. Ms. Josefa Alvarez submitted a Medicaid application on or about April 1993 for her children, but did not receive a notice of decision until October 1993, nearly six months later. By the time she received this notice, her Medicaid eligibility had already expired. Testimony of Josefa Alvarez ("J. Alvarez Test.") at 1.

17. Ms. Sylvia Cruz–Diaz Alvarez applied for Medicaid on August 31, 1992, for herself and her children, Nelson and Jessica, after Ms. Alvarez was informed that Nelson needed a hernia operation. Ms. Alvarez did not receive any decision until on or about November 30, 1992, approximately 90 days after she applied. Moreover, the November 30, 1992 determination notice only covered herself and Nelson; Ms. Alvarez received no determination notice concerning Jessica until May 25, 1994, approximately 21 months after she applied. Jessica's notice, furthermore, stated that Jessica was eligible for Medicaid from June 1992 to August 1993, a period that had already expired by the time the notice was received. Ms. Alvarez applied a second time for Medicaid on or about June 13, 1994; she received a determination notice about two months later, on August 8, 1994, after her lawyer intervened. Testimony of Silvia Alvarez ("S. Alvarez Test.") at 1–5.

18. In April 1993, Ms. Blanca Arce applied for Medicaid at 645 H Street, N.E. for herself and her four children. Ms. Arce never received any notice regarding their

---

**25.** Ms. Bobroff provided two specific examples of IMA's untimely processing, both of which were included in the CFES study as cases of improper application processing. Ms. T.S.R. applied for Medicaid on October 4, 1993, but was not sent a decision notice until January 1, 1994. Bobroff Test. at 8. Ms. B.B. applied for Medicaid on June 1, 1993, but was not sent a decision notice until September 15, 1993. *Id.* Defendants have conceded improper processing in both of these cases. Pls.' Ex. 253 at 204012 and 203208.

eligibility periods, but she did receive Medicaid cards for herself and her children in March or April 1994, after her legal representative intervened. During September and October 1993, while her application was still pending, Ms. Arce suffered headaches so severe that on or about November 13, 1993, she had to visit the emergency room at the Washington Hospital Center. Testimony of Blanca Arce ("Arce Test.") at 1–2. Ms. Arce was diagnosed with a sinus infection, and was sent a bill for her treatment for $1,241.92, but she has failed to provide DHS with a copy of that bill. *Id.*; Arce Cross–Exam. Test.

19. Ms. Mirna Argueta submitted a Medicaid application on or about December 13, 1994. She did not receive a determination until late February 1995, over two months later. At that time, she received a notice of approval for her two children, but did not receive Medicaid cards for them until March 1995. Testimony of Mirna Argueta ("Argueta Test.") at 3–4.

20. Ms. Hilda Avelar applied for Medicaid on January 6, 1994, at 645 H Street, N.E., and, in February 1994, informed DHS of her son's birth on January 29, 1994. On or about August 3, 1994, about eight months after she had applied, Ms. Avelar received a notice of decision indicating that her children were Medicaid-eligible from January 1994 through December 1994; however, she did not receive Medicaid cards until August 31, 1994, after her legal representative intervened. Testimony of Hilda Avelar ("Avelar Test.") at 1–3.

21. In August 1992, Ms. Abigail Flores applied for Medicaid on behalf of four of her children. She did not receive IMA's notice of decision until March 31, 1993, after the intervention of her legal representative. Testimony of Abigail Flores ("Flores Test.") at 1–2; Green Test., ¶¶ 43–47.

22. Ms. Orbelina Guardado applied for Medicaid when she was pregnant on or about early April 1993. Four months later, in August 1993, her legal representative learned, from Ms. Jesberg, that Ms. Guardado's son, who had been born in June 1993, was eligible for Medicaid from June 1993 to August 1994. Testimony of Orbelina Guardado ("Guardado Test.") at 1–3.

23. Ms. Patricia Harden applied for Medicaid on May 9, 1994, and received a notice of eligibility dated July 13, 1994. Testimony of Patricia Harden ("Harden Test.") at 1. Thus, DHS took approximately 60 days to process Ms. Harden's application.

24. Ms. Irma Hernandez applied for Medicaid on behalf of her children in April 1993, and received a notice of approval on or about November 23, 1993, approximately eight months after her application was submitted. While awaiting her application decision, Ms. Hernandez frequently had trouble obtaining medicine for her children. Testimony of Irma Hernandez ("Hernandez Test.") at 1–2.

25. Ms. Maria Mendoza applied for Medicaid on behalf of herself and her three children in April 1994, when her son was hospitalized at D.C. General Hospital. Ms. Mendoza's sister inquired at IMA about the status of the application in September 1994, and learned that the application had been denied for failure to submit necessary documentation. Ms. Mendoza had not received the three notices requesting further information which IMA allegedly sent. Ms. Mendoza re-applied for Medicaid in January 1995; her family was found eligible and was issued Medicaid cards in February 1995. However, she is now being sued by D.C. General Hospital to collect the $20,000 hospital bill incurred for her son's April 1994 hospitalization. Ms. Mendoza's caseworker informed Ms. Mendoza's sister that Medicaid would not pay for the April 1994 hospitalization. Testimony of Maria Mendoza ("Mendoza Test.") at 1.

26. On April 27, 1993, Ms. Maria Moreno applied for Medicaid for her family. On May 6, 1993, she received a request for employment verification, and submitted the necessary information on May 20, 1993. Ms. Moreno then received a second letter dated May 26, 1993, in which IMA again requested the same information. Ms. Moreno received a denial notice dated June 10, 1993, which stated that Ms. Moreno had failed to provide information to IMA. The same month, however, after her legal representative intervened, Ms. Moreno received an approval no-

tice for her two sons, stating that they were eligible retroactively from January 1, 1993 until October 31, 1993. Testimony of Maria Moreno ("Moreno Test.") at 1–2.

27. On or about March 14, 1995, Ms. Rosa Rivas submitted a Medicaid application at 645 H Street, N.E. for her son, Joaquin. Ms. Rivas received a notice from IMA on April 3, 1995, which, she thought, stated that all necessary information had been received. In late April 1995, however, she received a denial notice for failure to submit necessary information. Rivas Test. at 4–5.

28. On or about June 17, 1992, Ms. Adela Salazar applied for Medicaid on behalf of her son, Oscar, Jr., who suffers from spastic quadriplegia. She received no response until January 1993, approximately seven months later, when IMA informed the Salazars that their income was too high for Medicaid, but that they could "spend down" that income in order to qualify.[26] During the summer of 1993, IMA informed the Salazars that Oscar was eligible. By that time, they had incurred medical bills of over $5,000 for Oscar, Jr., and had spent $1,604 in out-of-pocket costs for his care. Testimony of Oscar Salazar, Sr. ("Salazar Test.") at 1–2; Salazar Cross–Exam.Test.

29. Ms. Miriam Turcios applied for Medicaid in person at 645 H Street, N.E. on or about September 27, 1995, while she was pregnant with her daughter Tania. While waiting for IMA's decision, she gave birth to her daughter on January 14, 1996, and received bills from Mary Center for prenatal care and medical care for Tania, and a $10,000 bill from Providence Hospital for charges associated with the birth. During the week of April 8, 1996, she received a notice of approval for Medicaid dated April 2, 1996. The notice stated that she was eligible from September 1, 1995 to August 31, 1996, as well as for three months before September 1,

1995. Testimony of Miriam Turcios ("Turcios Test.") at 1–2; Pls.' Ex. 314.

30. Mr. Karl Von Faust submitted a Medicaid application to IMA which was received on December 7, 1993. After submitting additional information in May 1994, he received a determination of eligibility on June 23, 1994. During the time in which his application was pending, Mr. Von Faust spent $832 of his own funds to obtain prescriptions and pain medications, volunteered for 10 different drug trials in two years in order to receive free medical treatment, and could not afford to visit the doctor. He also spent $434.10 in Medicare premiums and $20 on care for his foot after surgery. Testimony of Karl Von Faust ("Von Faust Test.") at 2–4.

31. Ms. April Land, an attorney at the Neighborhood Legal Services Program from 1991 through 1995, has provided legal assistance to at least 20 additional families who did not receive decisions on their Medicaid applications within 45 days. Testimony of April Land ("Land Test."), ¶ 3. According to Ms. Land, IMA requested the same information five times from Mr. Roosevelt Abrego and his wife, who applied for Medicaid on behalf of their daughter. *Id.* ¶¶ 5–7. Although the Abregos provided the requested information each time, they received a notice that their application had been denied for failure to provide information. *Id.*[27] In general, Ms. Land testified, by the time many people are notified of their eligibility for Medicaid, that eligibility has expired or is about to expire. Land Test.

### 5. Defendants' Knowledge of Untimely Processing

32. Since January 1990, Defendants have known about IMA's failure to process large numbers of NPA Medicaid applications within 45 days. In January 1990, Mr. Ronald Lewis, then manager of 645 H Street, N.E.,

---

26. A Medicaid applicant whose income is initially determined to be over Medicaid income limits may subsequently qualify for Medicaid if she pays or incurs medical expenses sufficient to bring her income within the Medicaid limits. Testimony of Helen B. Green ("Green Test."), ¶ 5.

27. A DHS Appeals Officer found that DHS had had sufficient information to render a decision and had failed to do so in a timely manner. *Id.* ¶ 8. Following the officer's remand, IMA awarded the Abregos' child continuing Medicaid benefits in May 1995. *Id.*

wrote Mr. Bayne, then IMA's Acting Chief of Program Operations:

> This is a follow-up memorandum to the one I wrote you on December 13, 1989. The crisis in the Hispanic Unit [Multinational Section] with the [M]edicaid backlog continues and the overtime project is not solving it.

Pls.' Ex. 285. In September 1990, Mr. Lewis again wrote Mr. Bayne to inform him that "the backlog in NPA Medicaid continue[s] to grow." Pls.' Ex. 283. Again, in April 1991, Mr. Lewis reported to Mr. Bayne that there were 75 NPA–Multinational applications that had been pending for over 45 days. Pls.' Ex. 280.

33. On or about February 1993, DHS studied the causes of the application backlog in the Multinational Section, and found, in a written report entitled "Program Analysis: Multinational Medicaid," that "50% of all applications [were] backlogged over 180 days." Pls.' Ex. 292. The report concluded that the Multinational Section was "ineffective in providing timely medical assistance to community residents." *Id.*

34. At trial, Defendants conceded that prompt processing of applications has been an ongoing struggle for the Multinational Section. Bayne Test., ¶ 13.[28]

## B. Termination of Benefits

Plaintiffs challenge two different systemic problems: (1) IMA fails to act promptly on Medicaid recipients' recertification requests, thereby terminating or causing temporary lapses in Medicaid benefits; and (2) IMA's Eligibility Verification System ("EVS") malfunctions, thereby preventing eligible Medicaid recipients from obtaining needed medical services and medications.

### 1. Recertification Processing

35. The period of Medicaid eligibility is generally one year. Green Test., ¶ 23. At the end of the applicable period, each recipient must be recertified in order to maintain her eligibility. All recertifications are handled exclusively by the central service site at 645 H Street, N.E. At that site, the Multinational Section handles recertifications for NPA–Multinational Medicaid recipients, and the Recertification and Spenddown Section handles recertifications for all other Medicaid recipients, including NPA–Nonmultinational recipients. Bayne Cross–Exam. Test.; Green Test., ¶ 23. ACEDS automatically generates recertification forms to be sent to current Medicaid recipients generally 90 days, but occasionally 60 days, before the end of the previously established certification period. Conover Test., ¶ 11; Green Test., ¶ 23.[29]

36. When the recertification form is returned by the recipient, an IMA SSR enters the receipt date into ACEDS. Conover Test., ¶ 12. If ACEDS does not reflect receipt of a recertification form by 30 days

---

**28.** Certain factors which are unique to the population served by the Multinational Section make speedy processing of those applications more difficult. In particular, many applications processed by that section are submitted by people who are not U.S. citizens. *See supra* note 9. Under federal regulations, such applicants may be eligible for Medicaid if they fall into one of at least 16 different immigration categories, and if they present one of at least 20 different types of immigration documentation. Jesberg Test., ¶ 7.A. Unlike other Medicaid populations, separate eligibility determinations are required for each member of a family, or assistance group, because each member of an assistance group may have a different immigration status. *Id.*

In addition, complicated income formulas must be applied for children whose parents are ineligible due to excess earned income or immigration status. Additionally, with applicants in the Multinational Section, there is a high propor-

tion of adults who have multiple income sources, each of which must be verified. Such verification is not always forthcoming, furthermore, from the applicants' employers. *Id.* ¶¶ 7.B, 7.C and 7.E. Finally, an additional factor is the mobility of the population, due to the fact that many households live with relatives and frequent moves are common. *Id.* ¶ 7.D.

**29.** ACEDS does not automatically generate a recertification form, however, to any Medicaid recipient whose eligibility has initially been determined when there are fewer than 60 days remaining before the end of the eligibility period. Rule 30(b)(6) Deposition of Arlene Conover, 1–24–95, at 52–54. For example, if an application submitted on June 1 is approved on November 15 for an eligibility period of June 1 to December 31, no recertification form will be generated by ACEDS, because fewer than 60 days remain in the eligibility period (*i.e.*, November 15 to December 31, which is 46 days).

before the end of the certification period, ACEDS automatically generates an advance termination notice ("30–day termination notice") for the recipient, which states that termination will be effective on the last day of the certification period. *Id.* If, however, the recertification form is returned by the recipient and entered into ACEDS by 30 days before the end of the certification period, no 30–day termination notice is issued. *Id.*

37. IMA SSRs review the returned recertification forms for completeness and verify the information provided. Green Test., ¶ 26. If additional information is required, ACEDS generates an appropriate letter on the basis of the eligibility worker's entry, and the recipient is usually given 15 days to submit the supplemental documentation. *Id.* This 15–day period can be extended by the SSR, with supervisory authorization, if the recipient has submitted at least some of the documentation and is actively trying to complete the recertification form. *Id.* Finally, once all necessary documentation has been received and reviewed, ACEDS generates a notice of denial or approval on the basis of the data entered by the worker. All denials and approvals must be authorized by a supervisor. *Id.* ¶ 27. No recipients should be terminated without first receiving notice 30 days in advance. *Id.*

38. IMA's stated policy is to process recertifications before the date on which recipients' eligibility expires. However, it often fails to do so, as Plaintiffs vividly demonstrated.

### a. MEO Reports

39. IMA's Medical Eligibility Operations ("MEO") reports for the Multinational Section demonstrate that IMA frequently fails to

process NPA–Multinational recipients' recertification forms before their Medicaid eligibility expires.[30] The MEO reports for the Multinational Section contain, on line B.7, data entitled "number of recerts due for the month." Pls.' Ex. 111. According to Ms. Grace Howard, Chief of the Multinational Section for several years before her retirement in March 1995, line B.7 indicates the *number of recertifications in the unit for whom eligibility will expire at the end of the* reporting period month. Howard Test.; Pls.' Ex. 111 at 1523 (MEO report for November 1993).[31]

40. Thus, according to Ms. Howard, in November 1993, there were 99 people whose Medicaid eligibility would expire at the end of the month, and whose "recerts" were therefore "due for the month." Howard Test. Line B.9 indicates the number of recertifications that were processed during the reporting month. *Id.* In November 1993, the recertification forms of only 30 people, out of the 99 people whose eligibility was scheduled to expire, were processed. *Id.* Therefore, 69 *Medicaid recipients that month may have suffered at least a temporary lapse in benefits* due to the fact that their eligibility expired before their recertifications were processed, *i.e.,* before IMA determined whether they were still eligible. *See* Bayne Cross–Exam. Test.

41. The Multinational Section failed to process as many recertifications as were due in many months during the period from January 1992 to February 1996. *See* Pls.' Ex. 111. During the 12–month period from March 1995 through February 1996, the most recent months for which MEO reports were available, the Multinational Section processed as many recertifications as were due in only

---

**30.** Neither Plaintiffs nor Defendants introduced MEO reports for the Recertification and Spenddown Section, which processes recertifications for all NPA Medicaid recipients except NPA–Multinational recipients.

**31.** Mr. Bayne and Ms. Green testified that line B.7, despite its clear wording, actually means the number of recertification forms received for a particular month, not the number of recertification forms due for that month. This interpretation is utterly illogical, and does not comport with line 10.a of the same form which records

the "total number of recerts pending at the end of the month [for] less than 30 days.". Specifically, considering the MEO report for June 1995, *see* Pls.' Ex. 111, if line B.7 means, as Defendants argue, recertifications received in June 1995, then the section would have received 147 recertifications in June, and it would have been impossible for the section to have had 199 recertifications pending for less than 30 days, as line 10.a states. The testimony of Mr. Bayne and Ms. Green is not credited on this point.

four out of twelve months. *See* Pls.' Ex. 111 (MEO reports for May 1995, September 1995, November 1995, and February 1996). In each of the remaining eight months, the Multinational Section did not process all recertifications for which eligibility was due to expire that month. In March, April, June, July, August, October, and December of 1995, and January 1996, 138, 129, 147, 128, 228, 200, 148, and 129 recertifications were due, respectively, but only 76, 89, 71, 66, 119, 143, 144, and 98 were processed, respectively. *Id.* Considering the entire 12–month period, the average number of recertifications pending for recipients whose eligibility would expire at the end of the month was 146 per month, but IMA failed to process an average of 37 recertifications per month, or 25%. Thus, 37 people per month suffered temporary lapses in Medicaid.

42. Medicaid recipients whose recertifications are not processed before their eligibility is scheduled to expire experience lapses in Medicaid coverage because when recertification forms are received and logged into ACEDS, but are not processed by an IMA SSR, ACEDS does not automatically adjust the eligibility period. Rule 30(b)(6) Deposition of Arlene Conover ("Rule 30(b)(6) Conover Dep."), 1–24–95, at 43. In general, Medicaid recipients in this situation receive no notice of the fact that their recertifications have not been processed and that their benefits will lapse. Howard Test. There are two exceptions, however. First, IMA may, on an individual, *ad hoc* basis, contact such Medicaid recipients to inform them of this lapse in benefits. Howard Test. Second, Medicaid recipients who do not submit recertification forms by 30 days before the end of the certification period are automatically sent the

ACEDS 30–day termination notice discussed in Finding No. 36.

If a recertification form is processed after a recipient's eligibility has expired, IMA provides benefits retroactively for the period during which benefits lapsed. Deposition of Grace Howard ("Howard Dep."), 11–8–94, at 53–56.

43. It is IMA's policy to extend Medicaid benefits automatically for those people who, after submitting recertification forms, happen to call IMA to inquire about their recertifications. Howard Cross–Exam. Test.; Green Test.; *cf.* Jackson Dep., 11–3–94, at 328–29 (stating that IMA has an unwritten practice of extending benefits for one month when a recertification is not processed by the end of the eligibility period, in order to prevent a lapse in coverage). However, it is not IMA's policy to extend Medicaid benefits automatically for all recipients who submitted recertification forms, *i.e.*, those who did not know to, could not, or did not happen to call IMA to inquire about their recertifications. Howard Test.; Green Test. Nor does IMA take any steps to inform recipients about the importance of such telephone inquiries.[32]

### b. Plaintiffs' Statistical Sample [33]

44. Plaintiffs retained CFES to measure the frequency of the following four problems with IMA's recertification processing: (1) IMA failed to give the recipient any advance notice whatsoever of a lapse or termination, including the 30–day termination notice, (2) IMA terminated eligibility for failure to return a recertification form, even though it had failed to send the recipient a recertification form, (3) IMA issued a termination notice for failure to return a recertification form, but the recipient subsequently submit-

---

32. Those Medicaid recipients who do not submit recertification forms by 30 days before the end of the eligibility period receive the ACEDS 30–day termination notice, however, which does inform recipients of their right to request a hearing and to call their social worker if they have questions. *See, e.g.,* Pls.' Ex. 113 (ACEDS termination notice issued to Ms. Josefa Alvarez on January 31, 1994).

33. Defendants again complained that CFES' database improperly excluded the AFDC, GPA, and SSI Medicaid populations. For the same rea-

sons discussed in Findings No. 8–10, however, the Court finds that Plaintiffs' statistical sample of recertifications is sufficiently complete. As noted above, AFDC, SSI, and GPA recipients, and foster care children, are automatically eligible for Medicaid. Thus, they continue to receive Medicaid as long as they remain eligible for AFDC, SSI, or GPA, or remain in foster care. Moreover, terminations of GPA benefits are the subject of another lawsuit. *See Jones v. Barry,* Civil Action No. 82–419; Consent Order of June 25, 1982 (D.D.C.) (Green, June L., J.) at 5.

ted a recertification form before the end of the eligibility period, or (4) the recipient's eligibility lapsed because IMA failed to process the recertification form before the end of the eligibility period. Siskin Test., ¶ 27.[34] CFES statistically analyzed 122 NPA–Nonmultinational recertifications, including NPA–disability recertifications, and 199 NPA–Multinational recertifications.

45. Using a 95% confidence interval, CFES found that one of the above scenarios occurred, resulting in a termination or temporary lapse of Medicaid benefits, an estimated 34.4% of the time in the non-disability NPA–Nonmultinational cases, an estimated 47.2% of the time in the NPA–Multinational cases, and an estimated 26.4% in the NPA–disability cases. Siskin Test., ¶ 28.[35]

46. Again extrapolating from the number of cases IMA had actually reviewed, see supra § II.A.2.b, Dr. Klemm recalculated the percentages of improperly processed recertifications to be 19.5% for the non-disability NPA–Nonmultinational cases, 33.4% for the NPA–Multinational cases, and 21.1% for the NPA-disability cases. See Klemm Test., Table 6A.[36]

47. The Court accepts Dr. Klemm's modifications to CFES' findings. Thus, the Court finds that IMA improperly allowed Medicaid benefits to lapse or to be terminated in an estimated 19.5% of the non-disability NPA–Nonmultinational cases, an estimated 33.4% of the NPA–Multinational cases, and an estimated 21.1% of the NPA-disability cases.

### c. Class Members' Experiences

48. Numerous class members who were covered by Medicaid experienced terminations or lapses in benefits either because they were never sent recertification forms, or because they received them and returned them but IMA failed to approve their recertifications before expiration of their Medicaid eligibility.

49. In or about October 1993, Ms. Josefa Alvarez received a notice of Medicaid eligibility for a period which had already expired. Ms. Alvarez completed a recertification form in or about January 1994. IMA did not receive the recertification form until February 17, 1994, however. Green Test., ¶ 31. On or about January 31, 1994, Ms. Alvarez received a letter which stated that her children's benefits would expire on February 28, 1994, because she had not returned the recertification form. See Pls.' Ex. 113.[37] In March 1994, her legal representative spoke

34. In his testimony, Dr. Siskin consolidated these failures into only two categories. Analytically, however, there are actually four separate problems at issue.

35. Ms. Bobroff provided two specific examples of IMA's improper termination of Medicaid benefits, both of which were included in the CFES study as examples of improper recertification processing. See Pls.' Ex. 92, App. 3, at 1–2. In the case of Ms. B.B., who had already experienced delay in the processing of her application, see supra Finding No. 9, IMA neglected to send her a recertification form or to apprise her of her eligibility beyond the initial eligibility period. Bobroff Test. at 9. Thus, Ms. B.B. lost her Medicaid benefits without any form of notice. Id.

Ms. G.C., a disabled Medicaid recipient, was sent a termination notice for failure to complete and return a recertification form, even though she had not yet received such a form from IMA. Id. Although Ms. G.C. completed a recertification form on November 3, 1993, before her eligibility was due to expire on November 30, 1993, she was not sent an approval notice until February 3, 1994. This notice stated that benefits would be retroactive to December 1, 1993. Id. at 9–10.

Finally, Ms. Bobroff testified regarding Ms. F.H., who returned a recertification form to IMA with a signature date of October 7, 1993, well before Ms. F.H.'s Medicaid eligibility was set to expire on December 31, 1993. Ms. F.H. was never sent any notice regarding her eligibility for the period beginning January 1, 1994. Id. at 10. Defendants have conceded improper recertification processing in all three of these cases. Pls.' Ex. 253, bates stamp nos. 203208, 203320, and 203537.

36. In making these determinations, Dr. Klemm again relied on Ms. Jesberg's refutations, seven of which have been accepted by Plaintiffs, and 14 of which have been withdrawn by Defendants. Joint Stipulation at 6. Again, the information in the Joint Stipulation does not affect either side's percentages of improper processing, because neither party has stated the categories from which the agreed-upon recertifications were drawn (i.e., NPA disability, non-disabled NPA–Nonmultinational, or NPA–Multinational).

37. This is consistent with IMA's policy of issuing a 30-day notice of termination before the end of a recipient's certification period if a recertification form has not yet been received.

with Ms. Jesberg and wrote to Mr. Bayne, and learned that Ms. Alvarez' children were eligible for Medicaid until August 31, 1994. Ms. Alvarez received a notice of approval for Medicaid at the end of March 1994. J. Alvarez Test. at 1–4.

50. In early January 1996, Ms. Alvarez received a recertification form and a letter stating that her children's benefits were due to expire on February 29, 1996. Ms. Alvarez submitted the completed recertification form in person at 645 H Street, N.E.; however, on March 26, 1996, she was told by a pharmacist that her children's Medicaid cards were not working, so she had to pay for their medications herself. Supplemental Testimony of Josefa Alvarez ("J. Alvarez Supp. Test.") at 1–2. According to Ms. Green, ACEDS would have revealed her Medicaid coverage, even though EVS incorrectly reported that her family was not enrolled in Medicaid. Green Cross–Exam. Test.

51. On December 27, 1995, Katy Lisette Alvarez became ill and was admitted to Children's Hospital, which informed her mother, Ms. Silvia Alvarez, that Katy's Medicaid had expired. Ms. Alvarez contacted IMA and learned that Katy's eligibility had expired because no recertification form had been submitted. However, Ms. Alvarez had never received a recertification form from IMA. Ms. Alvarez submitted all necessary recertification information in January 1996, and received a notice dated February 29, 1996, stating that her children were Medicaid-eligible until May 31, 1996. When Ms. Alvarez took Katy to the Adams–Morgan Clinic for a checkup on March 13, 1996, she was informed that Katy's Medicaid card was working. Supplemental Testimony of Silvia Alvarez ("S. Alvarez Supp. Test.") at 1–2.

52. On or about July 22, 1993, Ms. Reina Aparicio received a notice for her son Brian stating that Brian was eligible for Medicaid from April 1993 to September 1993. On or about August 19, 1993, Ms. Aparicio returned a recertification form to DHS via certified mail. On or about October 13, 1993, Ms. Aparicio received a notice from IMA indicating that Brian was eligible from October 1993 to September 1994. Therefore, Brian experienced a lapse in Medicaid benefits for 13 days in October 1993. Testimony of Reina Aparicio ("Aparicio Test.") at 1–2. Eligibility begins on the first day of the first month of the eligibility period, and ends on the last day of the last month. Green Test., ¶ 34. Thus, Brian did receive retroactive coverage for early October 1993. Id.

53. In March 1994, Ms. Blanca Arce received a recertification form, which she returned in person to the DHS office at 645 H Street, N.E. Ms. Arce never received a response to this recertification form. In July 1994, she received another recertification form, which she also returned in person to 645 H Street, N.E. Arce Test. at 2.

54. On or about November 30, 1994, Ms. Mirna Argueta, who had been receiving Medicaid for her children, was informed by the Adams Morgan Clinic that her children's Medicaid benefits had expired. Ms. Argueta had not received a recertification form in the mail advising her of her obligation to recertify the benefits or any advance notice that the benefits would be terminated. Argueta Test. at 3.

55. In or about April 1994, Ms. Abigail Flores received a recertification form for an eligibility period expiring on May 31, 1994. She completed and hand-delivered the recertification form to DHS, although the date of delivery is not clear. She received a notice of eligibility on or about July 25, 1994. Her children experienced a lapse in benefits from June 1, 1994 to July 25, 1994, during which time Ms. Flores was told by the Adams Morgan Clinic that her daughter Irma was not Medicaid-eligible. Flores Test. at 2–4.

56. Subsequently, Ms. Flores' children's Medicaid benefits were due to expire on December 31, 1995. Ms. Flores completed their recertification forms and delivered them to 645 H Street, N.E., in early September 1995. On March 22, 1996, Ms. Flores visited the office at 645 H Street, N.E., in person, and learned that the recertifications still had not been processed. As of March 27, 1996, she had still not received any response to the recertifications; however, when she recently took her son Alfredo to Children's Hospital for emergency treatment, she was informed by hospital staff that her son was Medicaid-

eligible. Supplemental Testimony of Abigail Flores ("Flores Supp.Test.") at 1–2.

57. Ms. Orbelina Guardado submitted a recertification form on or about January 5, 1995 for an eligibility period ending February 28, 1995. Ms. Guardado then submitted information requested by IMA in person on or about February 16, 1995. She did not receive a notice of approval concerning the recertification until April 14, 1995, however. Thus, she experienced a lapse in benefits for her family from March 1, 1995 until on or about April 14, 1995. During that period, in March 1995, she had to pay a deposit to have her son Mauricio treated at Children's Hospital when he was ill, and had to pay for his prescription. Ms. Guardado was unable to purchase a prescription for her son Edwin in March because she lacked the money. Guardado Test. at 4–7.

58. In January or February 1995, Ms. Patricia Harden received a Medicaid recertification form. She completed the form and had it delivered to IMA by courier. On November 27, 1995, Ms. Harden suffered a heart attack and was taken to Georgetown University Medical Center, where she underwent double bypass surgery and remained until December 4, 1995. On December 4, 1995, Ms. Harden's son attempted to fill her prescriptions with her Medicaid card; however, the pharmacist said that the card was invalid. Thus, Ms. Harden had to pay approximately $150 for the prescriptions.

59. When Ms. Harden called IMA, she was informed that her benefits had been terminated because IMA had never received her recertification form. Ms. Harden had never received any notice of termination of benefits, however. Ms. Harden called an official in Mayor Barry's office, who told her that he would look into the matter. Within a few days, Ms. Green and her assistant visited Ms. Harden's apartment with a blank recertification form, had her sign it, and promised that they would begin processing it immediately. Ms. Harden then received a notice dated January 2, 1996, stating that her Medicaid eligibility would not expire until April 30, 1996. During the period when IMA did not consider her to be Medicaid-eligible, Ms.

Harden spent several hundred dollars on prescription medicine. Harden Test. at 2–3.

60. Ms. Irma Hernandez was not sent a recertification form for Medicaid benefits due to expire at the end of August 1994. Pls.' Ex. 160, bates stamp no. 201978. She went to the DHS office and requested a recertification form, and submitted it on or about July 27, 1994. Hernandez Test. at 4–5. An approval notice was generated by ACEDS on October 24, 1994. Pls.' Ex. 160, bates stamp no. 201978. Thus, the Hernandez family experienced a lapse in Medicaid benefits from September 1, 1994, to October 24, 1994.

61. In mid-January 1996, Ms. Adriana Lopez took her daughter Maria, who has a heart condition, to Children's Hospital for a checkup. Maria's eligibility had been scheduled to expire in December 1995, but Ms. Lopez had sent a recertification form to IMA in October 1995. At the hospital, Ms. Lopez was informed that Maria's Medicaid card was not working, and that verification through an IMA caseworker was not possible that day. Therefore, Maria did not receive her checkup until January 20, 1996. Testimony of Adriana Lopez ("Lopez Test.") at 1, 3; Lopez Cross–Exam. Test.

62. In February 1995, Ms. Mendoza and her three children received Medicaid cards. In January 1996, Ms. Mendoza's sister called IMA to make sure that the children's Medicaid cards were valid before taking them to the dentist. An IMA SSR informed her that the children's eligibility had expired on December 31, 1995, and that she should wait to hear further from IMA. In February 1996, Ms. Mendoza's sister returned to IMA, and was told that the Mendozas' Medicaid had expired on January 31, 1996, and that they should wait to be contacted by IMA. On March 18, 1996, Ms. Mendoza's sister called IMA once again, and was informed that IMA was still processing the Mendozas' recertification. Mendoza Test. at 1–2.

63. On or about mid-October 1992, Ms. Rosa Rivas submitted a recertification form for her son, Joaquin, whose benefits were scheduled to expire on October 31, 1992. In November 1992, Ms. Rivas took her son to the Adams Morgan Clinic several times because he was ill. She was informed that

Joaquin was not Medicaid-eligible. On or about February 1993, Ms. Rivas received a letter from IMA requesting information which she had already provided. During April 1993, Ms. Rivas provided the information once again. On or about February or March 1993, while Ms. Rivas was waiting for a decision on Joaquin's recertification, Joaquin's teacher told her that he needed speech therapy. Ms. Rivas could not afford to pay for speech therapy; thus, Joaquin did not obtain speech therapy during the period when his recertification was pending.

64. Two or three months later, Ms. Rivas took Joaquin to the Children's Hospital emergency room because he had a fever and was vomiting. She was told that he was not Medicaid-eligible. The recertification form was not processed until September 1993, after the intervention of Ms. Rivas' legal representative. Thus, Joaquin had no Medicaid coverage from November 1992 until September 1993. Rivas Test. at 1–3.

65. In early August 1994, Ms. Rivas received, completed, and returned another recertification form. She never received any response concerning this form. On March 14, 1995, she visited the DHS office at 645 H Street, N.E., and learned that the case had been closed. Ms. Rivas had received no notice of this action. *Id.* at 2–4.

66. Ms. Yadira Silva requested a recertification form for her son Michael, because she knew that his Medicaid eligibility was due to expire in November or December 1995 and she had not received a recertification form by September 1995. In March 1996, Ms. Silva still had not received a recertification form for Michael. At trial, in April 1996, Ms. Silva still did not know if Michael was Medicaid-eligible because he had not visited a doctor since early 1995. Silva Supp. Test. at 1.

67. In July 1992, Mr. Karl Von Faust, who has AIDS, submitted a recertification form to DHS. On September 15, 1992, he received a letter from IMA, dated September 2, but postmarked September 14, which directed him to submit certain information by September 14, 1992. When Mr. Von Faust contacted his IMA SSR, he was told that his case was already closed and that he would

need to reapply. Ms. Von Faust did reapply on December 7, 1993, but did not receive a decision notice on his application until June 23, 1994. During the period when Mr. Von Faust was deemed ineligible for Medicaid, he could not obtain many needed prescriptions. He volunteered for experimental drug trials so that he could obtain medical treatment. Von Faust Test. at 1–3.

68. Ms. Mary Williams, an 82–year old woman who is disabled and suffers from diabetes, ulcers and a heart condition, received a recertification form in the fall of 1993, which she promptly returned to IMA with the requested documentation. However, in the summer of 1994, Ms. Williams received a notice of termination for failure to return a recertification form. After Ms. Land wrote a letter to Mr. Bayne on Ms. Williams' behalf, a new recertification form was sent to Ms. Williams, which Ms. Williams again promptly completed and mailed back to IMA. Ms. Williams was finally informed by Mr. Bayne that her benefits would not be terminated, but not until after Ms. Land wrote a second letter to Mr. Bayne on August 29, 1994. Land Test., ¶¶ 26–28.

### 2. EVS Malfunctioning

69. The Eligibility Verification System ("EVS") is the primary method by which health care providers can determine whether a person with a Medicaid card is currently eligible for Medicaid. Testimony of Theresa Cullinane ("Cullinane Test.") at 2; Testimony of Pearl Edwards ("Edwards Test.") at 1. EVS is a telephonic verification system that is ostensibly accessible 24 hours per day, seven days per week. Once a health care provider calls EVS, he or she hears a recorded message that indicates whether the patient is eligible for Medicaid. Rule 30(b)(6) Deposition of A. Sue Brown ("Rule 30(b)(6) Brown Dep."), 5–2–95, at 11.

70. EVS is administered by the District of Columbia Commission on Health Care Finance ("CHCF"). T. Thompson Test., ¶ 4. EVS obtains its information from ACEDS, through the Medicaid Management Information System ("MMIS"). Rule 30(b)(6) Brown

Dep. at 18; Offner Cross–Exam. Test.[38] Specifically, once an eligibility determination has been completed by a worker using ACEDS and authorized by a supervisor, the eligibility data is transmitted from ACEDS to MMIS. Conover Test., ¶ 10. Transmissions to MMIS are scheduled for every work day. Id.

71. EVS frequently provides erroneous information about patients' Medicaid eligibility. This problem was described in detail by several health care providers who serve Medicaid recipients.

72. Dr. Janet Adams is a pediatrician in southeast Washington. About 50% of her practice is devoted to Medicaid recipients. Testimony of Carolyn Roberts ("Roberts Test.") at 3. Dr. Adams frequently encounters eligibility verification problems when using EVS. Testimony of Dr. Janet Adams ("Adams Test.") at 6. On some occasions, she has provided medical care to patients whom EVS had indicated were Medicaid-eligible, only to learn later that they were not eligible; in such instances, she does not get paid for her services. Id. Dr. Adams described recent episodes where she saw patients in the morning who, at that time, were identified by EVS as Medicaid-eligible. Id. at 7. Later that same day, however, EVS was either not functioning at all or indicated that those very patients were ineligible for Medicaid. Id. Thus, she has had patients who, a few hours after visiting her, were unable to fill their prescriptions. Id. In 1993 and 1994, in approximately 10% of the instances in which EVS informed Dr. Adams' office that a patient was ineligible, IMA eligibility workers later stated to her or her office staff that EVS was incorrect, and that the patient was eligible. Roberts Test. at 3.[39]

73. Providence Hospital has experienced the same problems with EVS. For many patients seeking treatment there, EVS has also incorrectly indicated ineligibility for Medicaid. Cullinane Test., ¶¶ 11–12. Mr.

Timothy Sheridan, Director of Patient Financial Services at Providence Hospital from 1989 to 1995, and his staff used EVS to verify Medicaid eligibility for hundreds of patients per week. Whenever EVS reported that a patient was ineligible, Providence Hospital would contact DHS to determine whether EVS was correct. During that time period, approximately 20 times per week, when EVS reported that a patient was ineligible, the subsequent check with DHS revealed that the patient was, in fact, eligible. Sheridan Test., ¶¶ 10–11. Because of this track record, staff at Providence Hospital now contact the Managed Care Helpline for verification whenever EVS indicates ineligibility for Medicaid. Cullinane Test., ¶ 12.[40] When EVS falsely indicates that a patient is eligible, however, the financial burden is borne by the hospital, which will then not be paid by Medicaid for health care services rendered. Id. ¶ 13. In 1994 and 1995, this problem became so severe for Providence Hospital—23% of whose patients are on Medicaid—that it began recording EVS calls to establish a record. Id. ¶¶ 3, 14. In fact, Ms. Cullinane, Director of Providence Hospital's Admitting Office, has instructed her staff to reconfirm with the Managed Care Helpline all EVS information for the hundreds of Medicaid registrations the hospital has received since March 19, 1996. Id. ¶ 15.

74. Shortly before the trial in this case, Mr. David Sparks, Vice President for Finance at Providence Hospital, reviewed 20 EVS determinations; six of the 20 reflected inaccurate information about the patient's primary care provider or enrollment in Medicaid. Sparks Test.

75. Ms. Pearl Edwards, Medical Service Coordinator of the HIV Women's Program of the Infectious Disease Unit at Georgetown University Medical Center ("HIV Women's Program"), uses EVS five times per week in order to determine the Medicaid eligibility of the HIV Women's Program patients, and

---

**38.** MMIS, which is administered by the Office of Information Systems, a separate branch of DHS, processes requests for reimbursement from health care providers that serve Medicaid recipients. Rule 30(b)(6) Brown Dep. at 20.

**39.** From November 1995 to April 1996, aside from the time in March 1996 when EVS was not functioning at all, EVS' reliability improved. Roberts Test., ¶ 13.

**40.** The Managed Care Helpline is discussed in greater detail below.

verifies all EVS statements of ineligibility with DHS. Edwards Test., ¶ 3. Before the fall of 1995, she called IMA directly to determine patients' eligibility, and was able to reach someone at DHS only about one-third of the time. *Id.* When she was able to reach someone, she learned that EVS' information that patients were not Medicaid-eligible was incorrect more than half the time. *Id.* Since the fall of 1995, Ms. Edwards calls CHCF directly for eligibility information without using EVS at 202–727–0725. *Id.* Over the past three years, Ms. Edwards has seen dozens of cases in which patients with HIV or AIDS were unable to obtain their medication, because EVS indicated ineligibility for Medicaid and she was unable to verify the EVS information with CHCF or IMA. *Id.* ¶ 4.

76. Ms. Sarah Shapiro, Administrator of Community Connections, an agency providing case management services for mentally ill clients, calls EVS about five times per week on behalf of Community Connections' clients, SSI recipients who are automatically eligible for Medicaid. Shapiro Test. at 1–2. During the period from October 1995 to March 1996, CHCF staff informed Ms. Shapiro that EVS was incorrect, and the patient was actually eligible, about four to six times per month. When this occurred, Community Connections would either ask IMA to verify eligibility to the health care provider or, if it was a provider whom Community Connections knew, the provider would accept Community Connections' assurance that the client was eligible. *Id.*[41]

77. From March 1–March 19, 1996, EVS stopped all functioning. Edwards Test. at 2. During this period, many providers were forced to rely on one of the three alternative methods for verifying Medicaid eligibility.

78. The first alternative, First Health Services Corporation ("First Health"), a private CHCF contractor, began operating a Managed Care Helpline in 1994. Cullinane Test. at 2 and Cross–Exam. Test.; T. Thompson Test., ¶ 10. Like EVS, the Managed Care Helpline is a 24–hour–per–day, seven-day-per-week telephone system. The Helpline differs from EVS, however, in that it is staffed by First Health employees who provide information to both Medicaid recipients and health care providers serving those recipients. Rule 30(b)(6) Deposition of Linda Piraido ("Rule 30(b)(6) Piraido Dep."), 1–26–95, at 64–65. The Managed Care Helpline handles about 350–425 calls per day. *Id.* at 80. It has several limitations, not the least significant of which is that Managed Care Helpline operators may only verify a maximum of three people per call.[42] Nonetheless, the Managed Care Helpline is still considered an extremely helpful supplement to EVS. Cullinane Cross–Exam. Test.

79. As a second alternative to EVS, providers may call CHCF staff or specific employees at IMA with whom they are personally acquainted. Rule 30(b)(6) Deposition of Grace Howard ("Rule 30(b)(6) Howard Dep."), 4–25–96, at 85–86; Shapiro Test. at 2–3 and Cross–Exam. Test.; T. Thompson Test., ¶¶ 10 and 12. When providers or pharmacies call IMA's NPA Branch and state that EVS is reporting a client as ineligible, the IMA employee verifies that client's eligibility with ACEDS. If the employee learns that the client is in fact eligible, she so informs the provider or pharmacy and directs it to state, in its payment request form, that eligibility was confirmed by an IMA supervisor. Green Test.

80. A third method of verifying eligibility is the ACEDS computer system. Georgetown University Medical Center has access to ACEDS; thus, it verifies eligibility directly through that system without relying on EVS. Sheridan Test., ¶ 12. All other Dis-

---

41. On March 18, 1996, Ms. Shapiro spoke with Ms. Sandra Hagen at CHCF after a client had been told by the Washington Hospital Center that her Medicaid card was invalid. Ms. Hagen confirmed the client's eligibility and offered to fax Ms. Shapiro information not only confirming that particular client's eligibility, but also confirming eligibility for any Community Connections clients who planned to visit health care providers, in order to obviate future problems with EVS. *Id.* at 3.

42. For large health care institutions such as Providence Hospital, the three-person limit is a significant problem, because Providence may register over 50 people per day who believe they are Medicaid-eligible. Cullinane Test. at 2.

trict of Columbia hospitals have access to ACEDS. Sheridan Test.[43] However, access to ACEDS may be impractical for some hospitals. In order to access ACEDS, one must be authorized as a "security sign-on," and DHS only grants a limited number of security sign-ons to each hospital. For example, there are only 10 security sign-ons for all of Providence Hospital, and only two for its admitting office. The admitting office has 42 staff members who register patients; therefore, it does not use ACEDS very often. Cullinane Test.; Sheridan Test.

81. Defendants have no method for ensuring that Medicaid providers or pharmacies know about or use the three alternatives to EVS. The EVS Provider User Manual does not mention any of the EVS alternatives. T. Thompson Cross–Exam. Test.; Pls.' Ex. 88. The D.C. Medicaid Managed Care Physician Handbook directs managed care providers to verify patients' Medicaid eligibility by checking EVS or calling First Health; however, this handbook is not issued to all Medicaid providers. Pls.' Ex. 73 at 10. CHCF did notify all Medicaid providers on or about January 27, 1994 that it was experiencing eligibility verification problems with EVS, and that it was therefore "requesting providers to please call (202) 727–0725 [CHCF] for verification of current eligibility status." Pls.' Ex. 90; Rule 30(b)(6) Brown Dep. at 39. However, Defendants do not know whether Medicaid providers have any obligation to utilize a back-up system when EVS supplies incorrect information about eligibility. Rule 30(b)(6) Brown Dep. at 53–54.

82. Moreover, Defendants have no reports and have not conducted any studies regarding how frequently EVS provides incorrect information about Medicaid recipients' eligibility. Id. at 59. Defendants usually "become aware of a problem [through] call[s] from a provider or a recipient." Id. at 35.

83. At trial, Defendants conceded that the EVS system breakdown in March 1996 was a serious problem. Offner Cross–Exam. Test.[44] Even before that breakdown occurred, CHCF had hired computer consultants to investigate problems with the system; after the breakdown, the consultants worked on EVS for about three weeks. The consultants finally repaired EVS in April 1996, and left DHS a report on avoiding similar problems in the future. Id.[45] Although CHCF is allegedly planning to procure a replacement system for EVS, no RFP has even been issued. Bayne Cross–Exam. Test. Moreover, Ms. Green still frequently receives calls from providers and pharmacies describing problems with EVS. Green Cross-exam. Test.

84. Defendants have been aware that EVS inaccurately informs providers that Medicaid recipients are ineligible since at least February 1993, when A. Sue Brown assumed her position as Deputy Commissioner of the Commission on Health Care Finance. Rule 30(b)(6) Brown Dep. at 6, 30–31. On or about January 27, 1994, Defendants issued a notice to all Medicaid providers, which admitted that Defendants were "experiencing difficulty with the Medicaid Eligibility Verification System (EVS)." Pls.' Ex. 90; Rule 30(b)(6) Brown Dep. at 39. The notice further stated that EVS was "unable to verify current eligibility status for some Medicaid recipients, even though the recipient's eligibility [was] current." Id.

---

**43.** Access to ACEDS requires a substantial investment in computer hardware and a dedicated telephone line. Sheridan Test.

**44.** During the EVS breakdown, Providence Hospital staff relied on the Managed Care Helpline, but were inconvenienced by (1) the Helpline operators' refusal to verify more than three people per call; (2) a busy signal during peak hours; and (3) the Helpline's failure to provide all of the information that is available from EVS, such as whether patients have other forms of insurance, and whether Medicaid-eligible patients have already been assigned to a managed care provider. Cullinane Test. at 2–3.

At the same time, Ms. Edwards received 55 calls from pharmacies or patients at pharmacies who asked her how to confirm eligibility. Edwards Test. at 5. In such cases, Edwards "either called [CHCF] and then called the pharmacy back, or did a conference call with the pharmacy and [CHCF]." Id.

**45.** Defendants concede that the MMIS system is 20 years old, and that it is not a state-of-the-art system. Offner Cross–Exam. Test.

85. Ms. Doris Jackson, who at the time of her deposition was Branch Chief for the entire NPA Medicaid program, received telephone inquiries about problems with EVS "all day long." Rule 30(b)(6) Deposition of Doris Jackson, 10–5–94 ("Rule 30(b)(6) Jackson Dep."), at 4, 369. From October 1993 to October 1994, she received an average of 20 calls per day from Medicaid recipients who were reported as ineligible by EVS when they were actually eligible. *Id.* at 371.

86. At her deposition in April 1995, Ms. Grace Howard, Chief of the Multinational Section, was asked if she recalled intervening for a Medicaid recipient when EVS incorrectly informed a pharmacy that the recipient was ineligible. Ms. Howard replied, "I do it so often." Rule 30(b)(6) Howard Dep., 4–25–95, at 86.

87. While the erroneous information imparted by EVS may not always preclude access to necessary or emergency medical services,[46] it often prevents class members from obtaining needed prescriptions. In May 1994, at a time when her two daughters were eligible for Medicaid, Ms. Blanca Arce attempted to fill their prescriptions for a special fluoride toothpaste. CVS pharmacy, however, informed her that the children's Medicaid cards were not working. Because Ms. Arce did not have money to pay for the prescriptions, she could not obtain them. Arce Test. at 2.

88. On March 15, 1996, a time when Victoria Dorsey was eligible for Medicaid, Ms. Dorsey's mother tried to fill a prescription for her, but was told by the pharmacist that Ms. Dorsey's Medicaid number was not working. Ms. Dorsey's mother paid $356.86 out of her own funds for the medication; however, the pharmacy refunded this money after a conference call among an IMA supervisor, the pharmacy, and Ms. Dorsey's mother. Dorsey Test. at 2.

89. From October 21 through November 16, 1994, a time in which Ms. Christina Duncan and her family had recently been found eligible for Medicaid, Ms. Duncan attempted to obtain necessary medications for herself (high blood pressure medicine and foot cream), her husband (medicine for a urological problem), and her daughter (allergy medicine). She was initially unable to do so, however, because EVS informed the pharmacies she visited that her family was ineligible for Medicaid. Finally, between November 16 and December 12, 1994, Ms. Duncan's family did obtain the medicines, from a pharmacy that was willing to rely on verbal assurances of eligibility from a DHS supervisor. Duncan Test. at 1–3.

90. On or about January 26, 1994, at a time when he was eligible for Medicaid, Roberto Hernandez, Jr. visited the Adams Morgan Clinic with his mother, Irma Hernandez. Ms. Hernandez was informed that her son's Medicaid card was not working. Only after her attorney arranged a conference call with Ms. Jesberg and a pharmacy, three weeks after that visit, did Roberto obtain his prescriptions. Hernandez Test., ¶¶ 10–14; Pls.' Ex. 133.

91. On October 8, 1993, at a time when he was eligible for Medicaid, Eric Moreno had an asthma attack. He was unable to obtain medicine, however, because his Medicaid card did not work. On December 29, 1993, Eric again suffered from asthma, and was again unable to obtain medicine because his Medicaid card was not working. Moreno Test. at 2–3; Green Test., ¶ 55.

92. Ms. Yadira Silva was initially unable to obtain her son Michael's prescriptions for antibiotics and painkillers, because the pharmacy she visited relied on EVS' incorrect report of ineligibility. After Ms. Silva's lawyer and Ms. Jesberg intervened, and Ms. Jesberg assured the pharmacy that Michael was eligible for Medicaid, the pharmacy did fill the prescriptions. Silva Test. at 1–2.

93. Mr. Karl Von Faust received a notice of approval for Medicaid on June 23, 1994, which confirmed his eligibility from December 1, 1993 to November 3, 1994. However, Mr. Von Faust was unable to obtain prescrip-

---

**46.** Providence Hospital admits indigent patients for emergency or necessary treatment, regardless of whether they are covered by Medicaid. Cullinane Test.; Sparks Cross–Exam. Test. George- town University Medical Center similarly admits patients for necessary or emergency treatment, regardless of EVS problems or patients' ability to pay. Sheridan Test.

tions or medical treatment until July 13, 1994, when, according to a pharmacy, his Medicaid number was finally activated. Von Faust Test. at 2–3.

94. As noted above, Dr. Adams has had patients who, on the morning of their visit, were reported eligible for Medicaid by EVS, but later that same day, were reported ineligible by EVS. Adams Test. at 7. As a result, these patients were unable to have their prescriptions filled. *Id.*

## C. Claim 6: EPSDT Service Delivery

The District must provide early and periodic screening, diagnostic, and treatment ("EPSDT") services to persons under age 21 who are eligible for Medicaid and who request such services. 42 U.S.C. § 1396a(a)(43) (1996). Federal law sets forth the minimum services which the District must provide: 1) screening services, including comprehensive health and developmental histories, comprehensive unclothed physical exams, appropriate immunizations, laboratory tests (including appropriate lead blood level assessments), and health education; (2) vision services, including diagnosis and treatment for vision defects; (3) dental services, including "relief of pain and infections, restoration of teeth, and maintenance of dental health"; (4) hearing services, including diagnosis and treatment for defects in hearing; and (5) "such other necessary health care ... to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered by the State plan." 42 U.S.C. § 1396d(r) (1996).

The purpose of the EPSDT program is to ensure that poor children receive comprehensive health care at an early age, so that they will develop fewer health problems as they get older. EPSDT, therefore, is designed to provide health education, preventive care, and effective follow-up care for conditions identified during check-ups. Preventive health care identifies health problems that may respond to early treatment but, if left undiagnosed and untreated, may instead lead to serious disorders or conditions. For example, a heart murmur detected during an EPSDT screen, if untreated, could lead to heart failure. Poor hearing, if untreated, could result in a lack of language development and poor school performance. Severe anemia, if untreated, could result in behavioral problems and reduced mental capacity. In sum, "some problems that are quite serious in older children can be prevented if the children are treated ... at a very young age." Hutchins Test. at 5–8 [47]; Paulson Test. at 5–7. Immunizations, parent education, assistance with scheduling appointments and transportation assistance, and coordination of EPSDT and other programs serving Medicaid-eligible children are also critical components of EPSDT. Hutchins Test. at 8–12; Paulson Test. at 6–7; Pls.' Ex. 75 (Sample Provider Agreement), at 11, ¶¶ III.E and III.F.

The Health Care Finance Administration ("HCFA"), a division of the U.S. Department of Health and Human Services, establishes guidelines in its State Medicaid Manual, which set forth in detail the basic services which should be provided by the states, and the District of Columbia, under the EPSDT program. Pls.' Exs. 167, 178, 232, 243, and 287; Rule 30(b)(6) Davidson Dep., 9–12–94, at 134.

> The guidelines [in *Bright Futures*] are not intended to serve as the standard of health care per se. Variations of these guidelines that respond to individual differences and circumstances are appropriate. In the case of public agencies or programs at federal, state, and local levels, other considerations ... may affect the degree to which the *Bright Futures* content and periodicity recommendations can be fully implemented.
>
> Pls.' Ex. 300 at xvi.

---

47. Dr. Vince L. Hutchins, former director of the Maternal and Child Health Bureau ("MCHB") at the U.S. Department of Health and Human Services, testified at length regarding *Bright Futures*, a 1994 publication of the National Center for Education in Maternal and Child Health in Arlington, Virginia. *Bright Futures* was sponsored by both HHS's Maternal and Child Health Bureau and HCFA's Medicaid Bureau. Pls.' Ex. 300. According to Dr. Hutchins, HCFA and the American Academy of Pediatrics accept *Bright Futures* as the national standard for good pediatric care. However, *Bright Futures* itself explicitly states:

95. In the District of Columbia, there is only one person—CHCF's EPSDT coordinator—who is directly responsible for all implementation and administration of the EPSDT program. Davidson Cross–Exam. Test.; Rule 30(b)(6) Davidson Dep., 9–12–94, at 51–52. Plaintiffs have produced significant evidence to show that Defendants have failed to deliver EPSDT services to eligible poor children.

### 1. Screening Services

#### a. The District's Participant Ratios

96. HCFA's State Medicaid Manual sets forth, *inter alia*, state participation goals for EPSDT screening services, and directs states to report their progress in achieving these goals to HCFA. Pls.' Ex. 167. For purposes of HCFA reporting, one screening service must consist of all of the following components: a comprehensive health and developmental history, a comprehensive unclothed physical exam, appropriate immunizations according to age and health history, laboratory tests (including lead blood level assessment appropriate for age and risk factors), and health education. *Id.*, § 5360.D.

97. In reporting its progress, the District must compute an annual participant ratio. This ratio is calculated by dividing the number of Medicaid-eligible children who received at least one initial or periodic screening service in a given year by the number of Medicaid-eligible children who should have received at least one initial or periodic screening service in that year. *Id.*, § 5360.B. HCFA expected each state (including the District of Columbia) to achieve an 80% EPSDT participant ratio by 1995. *Id.* Furthermore, each state was expected to reduce the difference between its current performance and the 80% goal by one-fifth each year from fiscal year 1991 through fiscal year 1995. *Id.* For the District of Columbia, this meant attaining "interval goals," *i.e.*, participant ratios of 35%, 46%, 58%, and 69% for fiscal years 1991, 1992, 1993, and 1994, respectively. *Id.*, Ex. A.

98. In 1989, the District's estimated participant ratio was 24%, instead of the 35% goal set by HCFA. *Id.*, Ex. A. For fiscal year 1992, the District's participant ratio was 26%, Pls.' Ex. 222, line 5, a little more than half of HCFA's stated interval goal of 46%, and well below the national average participant ratio of 36%. Pls.' Ex. 242, bates stamp no. 10316. For fiscal year 1993, the District's participant ratio was 30%, Pls.' Ex. 6, line 5, a little more than half of HCFA's stated interval goal of 58%, and well below the national average participant ratio of 39%. Pls.' Ex. 230 at 1.[48] For fiscal year 1994, the District's participant ratio was 43%, Pls.' Ex. 223, line 8, which was below HCFA's stated interval goal of 69%. Finally, for fiscal year 1995, the District's participant ratio was 64%, which was still well below HCFA's stated goal of 80%. Pls.' Ex. 306, line 8; Davidson Cross–Exam. Test.[49] Thus, for every fiscal year from 1992 to 1995, the District's participant ratios lagged at least 15 percentage points behind HCFA's expected participant ratios.

#### b. Separate Evidence of Immunizations

99. Free immunizations are provided to children through the federal Vaccines for Children program. In the District of Columbia, this program is administered by DHS' Commission of Public Health. Levy Test. That program currently uses over 100 participating physicians at approximately 100 sites in the District. *Id.* Sixty-five of those physicians serve only Medicaid patients. Levy Cross–Exam. Test. Thus, it is clear that many EPSDT-eligible children receive their immunizations through the Vaccines for Children program. However, Defendants were unable to provide estimates of either the actual number or percentage of EPSDT-eli-

---

**48.** 1993 is the most recent year for which national average data is available.

**49.** Separate participant ratios are calculated for both the categorically needy, who include AFDC and AFDC-related Medicaid recipients, and the medically needy, who are NPA Medicaid recipients. Davidson Cross–Exam. Test. For FY 1995, 67% of the former group received at least one EPSDT screening service, while only 31% of the latter group received at least one EPSDT screening service. Pls.' Ex. 306, line 8; Davidson Cross–Exam. Test.

gible children who receive vaccines through this program.

100. Plaintiffs attempted to show that immunizations are not being provided to a sufficient number of EPSDT-eligible children. Specifically, Plaintiffs pointed out that the number of immunizations for which Medicaid payment claims were made in 1994 and 1995 was relatively low. *See* Levy Cross–Exam. Test.; Pls.' Ex. 303. However, the figures relied upon by Plaintiffs, *see* Pls.' Ex. 303, undercount the number of EPSDT-eligible children who have actually received immunizations, because a significant number of free immunizations are available independently from the Medicaid program. For example, the 65 physicians who participate in the Vaccines for Children program, and who serve only Medicaid patients, provide free vaccines to children and therefore do not seek reimbursement from Medicaid, even if their patients are Medicaid-eligible. Levy Cross–Exam. Test. Thus, both the percentage and the number of EPSDT-eligible children who have been immunized are still unclear. Moreover, Defendants do not know the number of EPSDT-eligible children who have received a full set of age-appropriate immunizations. Pls.' Ex. 101 at 51–52.

101. Immunization assessments performed by the Division of Immunization within the Commission of Public Health indicate that for the 1994–1995 school year, 96.5% of all school entrants at the pre-kindergarten and kindergarten levels,[50] 98.1% of all children in Head Start programs, and 93.5% of all children in licensed child care centers received their immunizations in accordance with the minimum national standards established by the federal Center for Disease Control. Levy Test., ¶ 8. With respect to all children aged two, and again using CDC's minimum national standards, the immuniza-

tion rate in 1994 was 78%, slightly lower than the national average of 81%. *Id.* ¶ 16.

102. Neither Plaintiffs nor Defendants provided estimated immunization rates for children under age two. DHS admitted, in an Executive Staff Briefing Book, prepared for the City Administrator on July 15, 1992, that there was "underimmunization of children age two and under." Pls.' Ex. 201, bates stamp no. 6922.

103. Defendants produced evidence of other immunization programs in the District. The Public Health Commission's Division of Immunization provides free immunization services at four walk-in clinics: Reeves Municipal Center, which immunizes over 3,000 children annually, 20% of whom are under age two; Hadley Memorial Hospital; Purity Baptist Church; and Israel Baptist Church. The Division of Immunization also distributes brochures, available in both English and Spanish, on the importance of immunization and disease prevention. *See* Campbell Redirect and Defs.' Exs. 27–29, 31, 33–44, 46–68, and 72–74.[51]

#### c. Separate Evidence of Blood Lead Screening

Appropriate lead screening is a necessary component of a screening service. 42 U.S.C. § 1396d(r) (1996). All children ages six months to five years are considered at risk and must be screened for lead poisoning. Pls.' Ex. 232 (HCFA State Medicaid Manual), § 5123.2D1. The frequency of lead screenings for each child depends upon whether the child is identified as high risk or low risk for exposure to lead poisoning. *Id.* Low risk children must be tested when they are one and two years old; high risk children who are found to have a certain quantity of lead must be tested until the age of five at

---

**50.** In order to attend public school in the District, children must receive proper immunizations. Bradshaw Test. at 4. School nurses review all children's immunization records and send children home with written referrals where such records appear incomplete. Bradshaw Test. This procedure is obviously effective and produces the 96.5% figure.

**51.** During National Infant Immunization Week, from April 21–27, 1996, the Division of Immunization sponsored a "New Moms" project. As part of this project, the Division offered immunization information and follow-up reminder telephone calls to mothers who delivered children at major D.C. hospitals, and sponsored a festival at which free immunizations and immunization information was available. Campbell Test. at 2–3.

every visit prescribed in the state EPSDT periodicity schedule. *Id.*[52]

104. Defendants do not know the number of EPSDT-eligible children who have received all age-appropriate lead blood screenings. Pls.' Ex. 101 at 55.

105. In fiscal year 1995, there were 32,579 EPSDT-eligible children in the District of Columbia between the ages of one and five. Pls.' Ex. 306 (HCFA Form 416), line 1. For the same fiscal year, only 5,395 payment claims for lead blood screening tests were submitted to CHCF. Plaintiffs estimate that 40% of the 32,579 children between ages one and five in 1995 were one or two years old (the ages at which lead blood tests are mandatory). In other words, Plaintiffs offer a rough estimate of 13,031 children in the District of Columbia who were one or two years old in 1995. Therefore, even though roughly 13,031 children should have received lead blood tests, only 5,395 lead blood tests were performed for which Medicaid reimbursement claims were submitted. *See* Pls.' Ex. 307; Davidson Cross–Exam. Test. While these figures are only rough estimates of the number of children who should have been screened for lead, they are fairly reliable estimates of the number of children who were actually screened,[53] and they clearly show that a grossly insufficient number of EPSDT-eligible children (approximately 16%) were screened for lead poisoning in 1995.

106. A particularly compelling case history is presented by Ms. Moreno, a class member, who actually requested lead blood tests for her children whenever she took them to a doctor. Her children did not receive such tests on a regular basis, however. Ms. Moreno's son Walter now suffers from lead poisoning, and needs special education because of his condition. Moreno Test. at 4–5.

#### d. Class Members' Testimony

107. Numerous parents of EPSDT-eligible children testified that those children had not received complete EPSDT screening services: Argueta Test. at 5–6 (no lead blood screening services); J. Alvarez Test. at 4–5 (no complete EPSDT screening services)[54]; Aparicio Test. at 2 (no lead blood screening services); Arce Test. at 3 (no EPSDT screening services, though children had received some health screens in school); Avelar Test. at 3 (no complete EPSDT screening services); Flores Test. at 4 (same); Guardado Test. at 7 (no complete EPSDT screening services or immunizations); Hernandez Test. at 5 (no regular physical or mental examinations; no lead blood screenings); Ayala Test. at 3 (no regular physical examinations; no mental health screenings); Moreno Test. at 4–5 (no physical examinations, dental services, or vision, hearing or lead blood screenings); Rivas Test. at 3, 5 (no regular physical or mental examinations; no developmental assessment); Silva Test. at 2 (no full EPSDT screening services).

### 2. Dental Services

108. The number of preventive dental services provided to EPSDT-eligible children in the District of Columbia decreased in each year from 1992 to 1994. In fiscal year 1992, 18,052 preventive dental services were received by the 67,789 EPSDT-eligible children in the District. Pls.' Ex. 222, lines 1 and 10.

---

**52.** The District's EPSDT periodicity schedule requires lead blood tests for all EPSDT–eligible children who are one and two years old. Pls.' Ex. 305, App.F (D.C. Medicaid Well–Child Program Schedule of Preventive Pediatric Health Care). It also provides for optional lead blood tests at other intervals depending upon clinical indicators and observations. *Id.*

**53.** It is reasonable to assume that the vast majority of EPSDT-eligible children would have had payment claims submitted by providers of lead poisoning screens. Ms. Davidson testified that one physician, Dr. Ella Witherspoon, provides lead blood screenings to children free of charge without billing Medicaid. Davidson Cross– Exam.Test. However, Defendants presented no evidence of any other providers who screen children for lead without charge, nor did they provide an estimate of the number of children served by Dr. Witherspoon.

**54.** Ms. Alvarez did testify, however, that her children had received many health examinations, including vision and dental examinations at the recommendation of her children's doctor. Ms. Alvarez also testified that she understood the importance of immunizations for her children, and that her children's school had informed her in writing about the need for blood screening and physical examinations. Alvarez Cross– Exam.Test.

In other words, only 26.6% of the EPSDT-eligible children in the District received dental services. In fiscal year 1993, only 11,800 preventive dental services were received by the 73,837 EPSDT-eligible children in the District. Pls.' Ex. 6, lines 1 and 10. Thus, only 15.9% of the EPSDT-eligible children in the District received dental services. Finally, in fiscal year 1994, only 10,659 preventive dental services were received by the 84,593 EPSDT-eligible children in the District, which means that only 12.6% of the EPSDT-eligible children in the District received dental services. Pls.' Ex. 223, lines 1 and 14. Therefore, from 1992 to 1994, the percentages of EPSDT-eligible children receiving dental services declined from 26.6% to 12.6%.

109. Several class members who are EPSDT-eligible have not received dental services. J. Alvarez Test. at 4–5; Moreno Test. at 4–5; Rivas Test. at 5.

### 3. Vision and Hearing Services

110. Neither Plaintiffs nor Defendants presented any system-wide data regarding vision and hearing services provided to EPSDT-eligible children in the District of Columbia. Several parents of children on Medicaid testified that their children had not received any vision or hearing screenings. Argueta Test. at 5 (no hearing screenings); Hernandez Test. at 5 (no vision or hearing screenings); Ayala Test. at 3 (no regular vision or hearing screenings); Moreno Test. at 5 (no vision or hearing screenings); Rivas Test. at 5 (no regular vision or hearing screenings).

111. It is true that the District of Columbia Public Schools ("DCPS") provide visual and hearing examinations for all children in certain grades, as part of their legal requirement to provide 20 hours of nursing services per week to DCPS students. Testimony of Dr. Mary Ellen Bradshaw ("Bradshaw Test."). Again, however, no estimate was provided of the percentage of EPSDT-eligible children served by the DCPS visual and

55. The EPSDT coordinator has completed a draft of the D.C. Medicaid Well–Child Program (EPSDT) Provider Manual, which incorporates

hearing examinations, or whether the examinations are provided in accordance with the District's periodicity schedule.

112. In short, the Court lacks the most basic data about whether EPSDT-eligible children are being tested for eyesight and hearing problems, whether existing problems are being addressed, and whether children are being tested routinely at the times called for in the District's periodicity schedule.

### 4. Monitoring to Ensure that Children Receive Complete, Up–to–Date EPSDT Services

113. Defendants have no procedures to determine whether children receive the full battery of EPSDT screening services. Deposition of David Coronado, 7–5–94 ("Coronado Dep."), at 127. Defendants do not know the number of EPSDT-eligible children who have received a full battery of age-appropriate EPSDT screening services. Pls.' Ex. 101 at 53. If a child has an EPSDT screening service one year and is due for another screening service the next year, Defendants take no action to ensure that the child receives the second screening service. Coronado Dep. at 5, 101–102. Furthermore, when Defendants receive an EPSDT invoice which indicates that a child has not received a full EPSDT screening service, they take no follow-up action to ensure that the child obtains a complete screening service. Rule 30(b)(6) Davidson Dep., 9–12–94, at 171. If a Medicaid applicant informs IMA that she desires EPSDT services for her child, Defendants do not ensure that the child is provided with such services. *Id.* at 51–52.

114. As of September 1994, CHCF had not provided any oral or written information to EPSDT providers about the EPSDT screening requirements since July 1992. Rule 30(b)(6) Davidson Dep., 9–12–94, at 100–102.[55] At trial, Ms. Thompson claimed that CHCF sends transmittals, or official policy notifications, to managed care provid-

the principles of *Bright Futures*. Defs.' Ex. 20; Davidson Test., ¶ 22. The manual has not been

ers [56] to advise them of EPSDT requirements, but Defendants provided no evidence to support this other than two transmittals issued in 1995 and 1996. J. Thompson Cross–Exam. Test.[57]

115. Although the managed care agreements between CHCF and fee-for-service providers do describe EPSDT service delivery requirements, they do not specifically require providers to deliver EPSDT services—other than immunizations—to their patients in accordance with the District's EPSDT periodicity schedule. Pls.' Ex. 75 at 11; Sherman Cross–Exam. Test.; Rule 30(b)(6) Davidson Dep., 1–23–95, at 8–12.[58] Significantly, fee-for-service providers are not required to submit any periodic reports on EPSDT services rendered, although they

do submit bills to CHCF for such services. Sherman Cross–Exam. Test.

116. While the managed care agreements between CHCF and capitated providers generally describe the EPSDT services that providers are required to render, they do not specifically require providers to deliver EPSDT services to their patients according to the District's EPSDT periodicity schedule. See Pls.' Ex. 77; Rule 30(b)(6) Davidson Dep., 1–23–95, at 8–12.[59] Capitated providers are required to report all EPSDT screening services performed and to state whether children are referred for corrective treatment. Pls.' Ex. 308; J. Thompson Cross–Exam. Test. However, they are not required to specify whether they have provided complete screening services, including appropriate immunizations and laboratory tests, or

finalized or disseminated, however. Davidson Test.

**56.** As described above, the District of Columbia currently has a managed care system, known as the D.C. Medicaid Managed Care Program, for its AFDC and AFDC-related Medicaid recipients, which it began implementing on April 1, 1994. T. Thompson Test., ¶ 15. The current system allows patients to choose between prepaid capitated managed care organizations ("capitated providers") and fee-for-service primary care providers ("fee-for-service providers"). *Id.*

As of May 1, 1995, there were approximately 84,000 Medicaid recipients enrolled in the D.C. Medicaid Managed Care Program. At that time, 55% of Medicaid recipients were enrolled in one of the four capitated providers—Chartered Health Plan, Prudential Health Plan, George Washington Health Plan, or D.C. Health Cooperative—as their primary care provider. The remaining 45% had selected fee-for-service providers. Pls.' Ex. 301 at 9.

**57.** In February 1995, CHCF issued Medicaid Transmittal 95–06, which informed participating Medicaid providers of the required screening schedule for Medicaid recipients under age 21 and directed them to perform screenings on time. Davidson Test., ¶ 23. In April 1996, CHCF sent Transmittal No. 96–04 to Medicaid primary care providers, obstetricians and gynecologists. This transmittal directed providers to read certain vaccine information and to read and implement the "Standards for Pediatric Immunization Practices." *Id.* ¶ 30.

**58.** The managed care agreements require fee-for-service providers to provide, or arrange for, "annual examination[s] and evaluation[s] of [EPSDT-eligible children's] general physical and mental health and growth, development and nu-

tritional status." *Id.* ¶ E. Such examinations must, at a minimum, include

a comprehensive health and developmental history; a comprehensive unclothed physical examination; vision testing; hearing testing; appropriate laboratory testing (including lead blood levels); and dental screening services furnished by a dentist for children three years of age or older.

*Id.* Additionally, the agreement requires fee-for-service providers to "provide immunizations to enrolled children in accordance with the schedule published by the program or by the American Academy of Pediatrics." *Id.* ¶ F.

**59.** The agreement requires capitated providers to provide:

preventive care including medical examination and treatment, routine immunizations and well baby care and the following screening services which are to be provided to enrollees age 20 and under: a comprehensive health and developmental history, a comprehensive unclothed physical examination, vision and hearing tests, laboratory tests (including lead blood levels), [and] tracking and reporting dental screenings for children between the age of three and eighteen.

*Id.*, Addendum I at 2. With respect to dental services, the agreement further provides:

Dental services are limited to recipients under 21 years of age in fulfillment of the treatment requirements under the … EPSDT Program and defined as routine diagnostic, preventive, or restorative procedures necessary for oral health, as detailed in the State Plan.

*Id.*, Addendum I at 5. The agreement also requires capitated plans to provide enrollees with high quality health care, and to comply with applicable federal and local Medicaid standards. Pls.' Ex. 77 at 1 and 9.

whether each child screened is up-to-date with respect to her screening services. J. Thompson Cross–Exam.Test. Like the fee-for-service provider agreement, the capitated provider agreement does not include the District's EPSDT periodicity schedule, which describes when children should receive EPSDT services. *Cf.* Defs.' Ex. 7B, App. IX.

117. Up until July 1992, CHCF conducted site visits to inform participating EPSDT providers of EPSDT requirements and to monitor compliance with those requirements. Davidson Cross–Exam. Test. From 1985 to July 1992, Ms. Davidson, the EPSDT coordinator, personally visited physicians who wished to be Medicaid EPSDT providers. The purpose of the site visit was to inform the provider of her obligations under the EPSDT program, and to ensure that the provider had adequate equipment and knowledge to perform the comprehensive EPSDT screenings. For example, Ms. Davidson would make sure the provider knew how to assess a child's mental health and development at various ages, had procedures for checking hearing and vision, and knew the requirements for blood and urine laboratory testing for children. Rule 30(b)(6) Deposition of Sarah Davidson ("Rule 30(b)(6) Davidson Dep."), 9–12–94, at 71–76, 78–79; Pls.' Exs. 236, 268, 269, 272.[60]

118. Those visits were discontinued in July 1992, however. *Id.* at 72–73. Since then, CHCF has taken no action to ensure that the District's EPSDT providers know their EPSDT obligations, are able to provide EPSDT screening services, and actually do provide them. *Id.* at 93, 96. In fact, the EPSDT coordinator has not spoken to any health care providers about the EPSDT program since July 1992. *Id.* at 104. In Ms.

Davidson's view, training for prospective EPSDT providers is still necessary, in light of the detailed screening requirements in the HCFA State Medicaid Manual. For example, general practitioners who participate in EPSDT, unlike pediatricians who participate in EPSDT, are sometimes unaware of the current methods for detecting developmental delays in children. Davidson Cross–Exam. Test.

119. Furthermore, although CHCF receives data from some managed care providers regarding EPSDT services performed,[61] it does not use that data to monitor whether managed care providers deliver complete EPSDT services to EPSDT-eligible children in accordance with the District's periodicity schedule. Davidson Cross–Exam. Test. CHCF does virtually nothing with the EPSDT data it receives from managed care providers. In fact, CHCF does not monitor whether managed care providers deliver any EPSDT screening services at all. Rule 30(b)(6) Davidson Dep., 1–23–95, at 16–17.

120. Chartered Health Plan ("Chartered") serves the largest number of Medicaid recipients who are enrolled in capitated programs. In 1995, it was the assigned or selected provider for 32% of the entire Medicaid managed care program. Pls.' Ex. 301 at 8. In 1991, HCFA conducted a review of the District's EPSDT program ("1991 HCFA EPSDT Review"), and recommended that CHCF "ensure that EPSDT screens are provided to Chartered[′s] .... under 21–year old population." Pls.' Ex. 5 at 17. In April 1992, CHCF responded with an EPSDT corrective action plan, stating that it would "ensure that Chartered ... receives updates on the EPSDT program." *Id.* HCFA, however, specifically found that action plan defi-

---

**60.** Providers were supplied with the EPSDT provider screening requirements in the HCFA State Medicaid Manual before the EPSDT coordinator visited them. Pls.' Ex. 236. During the visits, providers were also given written materials about EPSDT, including information on screening requirements. Rule 30(b)(6) Davidson Dep., 9–12–94, at 79–80.

**61.** Capitated providers are contractually required to have quality assurance programs that provide for "systematic data collection on performance, utilization and treatment outcomes."

Pls.' Ex. 77 at 11, ¶¶ K and M. Capitated providers are also required to submit reports of "program utilization, costs, and other information necessary to assess the [capitated provider's] performance," in the format "detailed in Addendum III." *Id.* at 20, ¶ G. This reporting requirement includes documentation of EPSDT screening services using the specific forms provided in Addendum III. J. Thompson Redirect Test.; Pls.' Ex. 308, Addendum III. Defendants take no action to enforce these data collection requirements, however.

cient. Pls.' Ex. 202, bates stamp no. 7276. Specifically, HCFA pointed out, the plan lacked a methodology for ensuring that Chartered provide EPSDT screening services. *Id.*

121. As of April 1995, however, Defendants still had not monitored Chartered to determine whether it was following federal EPSDT requirements. Rule 30(b)(6) Davidson Dep., 4–20–95, at 34–35. Moreover, as of April 1996, the month this case went to trial, Defendants had not monitored Chartered, any other capitated providers, or any fee-for-service providers, to ascertain whether those providers deliver, to EPSDT-eligible children in their care, complete EPSDT screening services in accordance with the District's periodicity schedule. Davidson Cross–Exam. Test.[62]

### 5. Assignment of Managed Care Patients

122. Under the District's Medicaid Managed Care Program, many patients have been assigned to new doctors whom they did not select. Sherman Test. at 9. During the AFDC recertification process, AFDC and AFDC-related Medicaid recipients are sent notices informing them of their enrollment in managed care and offering them a choice of managed care providers. The notices state that if the recipient fails to choose a provider and communicate that choice to CHCF within a stated period of time, she will be automatically assigned to one of the four capitated providers. Sherman Cross–Exam. Test.; Green Test. In its Managed Care Review, HCFA found these notices to be "lengthy and difficult to read for the average Medicaid recipient." Pls.' Ex. 301 at 11. As a result, Medicaid recipients are not being clearly informed of their ability to choose providers. *Id.* at 10. HCFA recommended that CHCF ensure that Medicaid recipients in the managed care program be made aware of their right to choose a primary care provider. *Id.* at 11–12.[63]

123. As a physician affiliated with a capitated provider from late 1994 to January 1996, Dr. Adams experienced significant problems with the District's method of assigning patients to providers. Dr. Adams' patients were sent to other doctors whom they did not know, whereas she was sent patients who had had long-standing relationships with other doctors and did not know her. Adams Test. at 3. These patient assignments were made without advance notice to Dr. Adams. *Id.*

124. This confusing assignment process also caused delays in access to new patients' medical records. *Id.* These delays, in turn, resulted in many Medicaid patients experiencing serious delays in receiving EPSDT services. *Id.* In the fall of 1994, a few children were unable to start school at all or on time because of delays in obtaining physicals and immunizations. *Id.* at 5.

**62.** In May 1995, HCFA reviewed the District's Medicaid Managed Care Program ("1995 HCFA Managed Care Review"). *In its report dated* January 30, 1996, HCFA found that CHCF "provided no documentation to show that the District is monitoring quality ... [and] it has not arranged for an independent external quality review of its HMOs as required by 1902(a)(30)(C) of the Social Security Act." Pls.' Ex. 301 at 15. HCFA recommended that CHCF "routinely (on a quarterly basis) monitor all Medicaid Managed Care providers to determine that quality standards are being met." *Id.* at 15–16. HCFA also directed CHCF to "obtain the services of an independent contractor to conduct an External Quality Review for its HMOs as required." *Id.*

By April 1996, when this case went to trial, Defendants had finally contracted with a private firm, Delmarva Foundation for Medical Care, Inc., to review the four capitated providers with which CHCF contracts, including Chartered. J. Thompson Redirect Test. Defendants claim that this review will encompass capitated providers' quality assurance programs, orientation programs, health education programs, and follow-up procedures for missed appointments. *Id.* The extent to which this review will focus on capitated providers' delivery of EPSDT services is unclear, however.

**63.** To address this recommendation, CHCF planned to contract with an enrollment broker to facilitate the enrollment of Medicaid recipients into capitated plans. J. Thompson Crss–Exam. Test. and Test. at 2, ¶ 4; Adams Cross–Exam. Test. The purpose of hiring an enrollment broker is to assist recipients in personally selecting their HMOs, and thereby decrease the District's automatic enrollment rate, which is currently about 65%. *Id.* Since CHCF has not yet issued an RFP for the enrollment broker, it is entirely speculative as to whether, and when, this solution to the problem will be implemented. Offner Test.

125. Moreover, many of Dr. Adams' patients were assigned to doctors in different parts of the city, and many "simply did not want to go to another doctor and stopped seeing any doctor." *Id.* at 4. Additionally, some children in the same family were assigned to different doctors, which greatly inconvenienced parents and discouraged some from obtaining proper medical care for their children. *Id.; cf.* Paulson Test. at 8 (testifying that families with children on Medicaid appear to have no input in choosing their providers, and that children in the same family are assigned to different providers, both of which factors inhibit children's access to EPSDT services); Sherman Test. at 9 (testifying that the confusion surrounding the assignment process caused some patients to postpone health appointments until they suffered from acute illnesses or conditions).

126. HCFA's Managed Care Review addressed the same problems outlined above. *See* Pls.' Ex. 301 at 6. HCFA found:

> The District's computer system auto-assignment process "randomly" assigns recipients to various providers without any logical sequence, except the recipient's "last name." Specifically, the system is unable to link a family with one provider or unable to assign a recipient to a provider in the ward in which they live. For example, twins were assigned to two different providers, and a family of eight had all of its children assigned to different providers. Also recipients are assigned to providers across town though they have a provider across the street from their residence. While this situation should be corrected by calling the Helpline, we found through monitoring telephone conversations that it is very time consuming for families, and many times they were not successful.

Pls.' Ex. 301 at 6. Consequently, HCFA directed CHCF to "correct[ ] the deficiencies with the auto-assignment process so that families are kept together and special-needs recipients are taken into consideration," and suggested that the District assign recipients based on provider history and location of residence. Pls.' Ex. 301 at 8.

127. In its Corrective Action Plan, CHCF responded that the enrollment process was overhauled in the Spring of 1995, so that family members are now enrolled with the same provider. Pls.' Ex. 302 at 3. CHCF did not specifically address the recommendation that the District assign recipients according to provider history and location of residence. *Id.* at 3–4; Offner Test.[64]

**6. Case Management Services**

128. States are given the option of providing case management services. 42 U.S.C. § 1396n(g)(1) (1996). These are "services which will assist individuals eligible under the plan in gaining access to needed medical, social, educational, and other services." *Id.* § 1396n(g)(2). Some case management services are mandatory, however. Defendants were specifically informed in HCFA Regional Medicaid Letter No. 13–90:

> [T]o the extent that case management services are medically necessary *to provide assistance in gaining access to ... services required to diagnose and/or treat a condition found during a screening service,* states must provide case management services to EPSDT participants.

Pls.' Ex. 240.

129. As of October 1994, 29 states had formal case management components in their EPSDT programs. Pls.' Ex. 204 at 2 and Table 2. Case management activities in these states include assisting families with scheduling appointments, reminding families about appointments, ensuring that children receive regular and preventive health screening services, following up on missed appointments and referrals for further medical care, and assisting families in need of other social services. *Id.*

130. The District of Columbia does not have a formal case management program. *Id.* The 12 DHS neighborhood clinics run by the D.C. Commission on Public Health do not provide advance notice to EPSDT patients

---

**64.** Dr. Paulson testified that the capitated plan with which he is affiliated, GW Health Plan, is not close to where his patients live. Some of the patients assigned to him must take three buses and the Metro to reach his office.. Paulson Test. at 9.

that they should come in for their next EPSDT screening service. Rule 30(b)(6) Deposition of Peter Coppola ("Rule 30(b)(6) Coppola Dep."), 4–18–95, at 14.[65] Similarly, IMA SSRs do not inform Medicaid recipients of dates upon which EPSDT screening services are due. Rule 30(b)(6) Deposition of Sandra Wallace ("Rule 30(b)(6) Wallace Dep."), 4–21–95, at 42–43.

131. The EPSDT coordinator takes no action when she receives forms indicating that Medicaid applicants or recipients desire EPSDT services for their children. Davidson Cross–Exam. Test.[66] When a Medicaid recipient indicates on her recertification form that she desires EPSDT services, she receives no reply from DHS, and DHS takes no action to deliver EPSDT services to the child. Rule 30(b)(6) Cephas Dep., 4–21–95, at 6–7; Rule 30(b)(6) Davidson Dep., 9–12–94, at 51–52; see also Aparicio Test. at 1–2 (testifying that she received no reply to her request for EPSDT services on the recertification form); cf. Pls.' Ex. 197, bates stamp no. 10152 (Defendants' representation to HCFA in March 1990 that when recipients requested EPSDT services on DHS Form 1544—Form 1209's predecessor—they were "mailed a form letter acknowledging their request and informing them of the location of EPSDT providers in their community.").

132. Finally, Defendants do not pay providers for case management services as part of EPSDT. Rule 30(b)(6) Davidson Dep., 9–12–94, at 245.

133. Defendants did present evidence of the District of Columbia Linkage and Tracking System ("DCLTS"), a program run by the Commission of Public Health, which identifies and monitors children from birth to age eight who are disabled or have certain at-risk conditions.[67] These children are enrolled in a centralized registry, and are referred to appropriate services. Testimony of Eleanor Elaine Vowels, Ph.D. ("Vowels Test.") at 2.[68] DCLTS itself does not provide any EPSDT services. Vowels Cross–Exam. Test. Additionally, the District's Office of Maternal and Child Health ("OMCH"), which is also within the Commission of Public Health, attempts to ensure that EPSDT-eligible children obtain access to pediatric services. Testimony of Barbara A. Hatcher, Ph.D. ("Hatcher Test.") at 6.[69] Defendants provided no evidence or specific data on how many EPSDT-eligible children are served by OMCH's programs, however.

### 7. Referrals for Treatment of Conditions Discovered During EPSDT Screenings

134. EPSDT-eligible children enrolled in the District's Medicaid Managed Care Program experience considerable difficulty in receiving necessary follow-up care from specialists, because physicians lack information about available specialists. For example, as a contractor with Prudential Health Plan, a capitated provider, Dr. Adams was unable to obtain a list of approved medical specialists

---

**65.** Dr. Marlene N. Kelley, Deputy Commissioner of Public Health, testified that the clinics do call patients to remind them of previously-scheduled appointments, however. She further testified that one clinic has developed a program to encourage patients to keep their appointments. At that clinic, a patient earns points for every kept appointment, and can redeem a certain number of points for children's articles. Testimony of Dr. Marlene N. Kelley ("Kelley Test.") at 3:

**66.** DCPS provides visual, hearing, and physical examinations to children in selected grades; if problems are identified during these examinations, DCPS physicians or nurses notify the child's family, provide written referrals for treatment, and then follow up with three phone calls and, where necessary, home visits to the child's family. Bradshaw Test. at 5 and Resp. to J. Kessler.

**67.** Dr. Eleanor Elaine Vowels, director of DCLTS, testified that approximately 70% of the children served by DCLTS are on Medicaid. Because no estimate of the number of children served by DCLTS was provided, however, it is impossible to know the number or percentage of EPSDT-eligible children who are served by DCLTS.

**68.** DCLTS identified Oscar Salazar, Jr. as an at-risk child after his birth in October 1991, and called his parents several times to offer services. His parents failed to follow through, however. Vowels Test. at 3, 5.

**69.** OMCH's programs include door-to-door transportation, 24–hour hotlines which provide information about available services and schedule appointments for families in need of assistance, dissemination of written materials, and other outreach. Id.

to whom she could refer her patients for various follow-up care needs. Adams Test. at 5–6. Although she had contracted with Prudential in late 1994, she did not receive a directory containing the names of Prudential-approved specialists until late 1995, despite her requests to Prudential staff over many months for such a list. *Id.* at 6. As a result of this delay, Dr. Adams' Medicaid patients were delayed in obtaining the specialized care that they needed. *Id.*

135. Similarly, Dr. Paulson was never informed about how Medicaid-eligible children should be referred to specialists. Paulson Test. at 8–9. As a result of these problems, his child patients have experienced delay in obtaining specialized follow-up treatment. *Id.*

136. Fee-for-service providers have experienced similar difficulties, prompting the following corrective action recommendation in HCFA's Managed Care Audit:

[CHCF] must ensure referrals are made by fee-for-service providers for specialty care. [CHCF] must also give instructions to providers on making referrals ...

Pls.' Ex. 301 at 8. In its Corrective Action Plan, CHCF responded that it planned to send a letter by March 7, 1996 to all providers explaining procedures for referrals to specialists. Pls.' Ex. 302 at 5. There is nothing in the record to indicate that such letter was ever sent.

137. Pursuant to managed care agreements with CHCF, the four capitated providers should submit data on the number of children they refer for corrective treatment following EPSDT screening services. *See* Pls.' Ex. 77 at 20, ¶ G; Pls.' Ex. 308.[70] Fee-for-service providers, however, are not obligated, contractually or otherwise, to report such data. Instead, CHCF has retained First Health Services Corporation to compile information from the Medicaid billing claims of fee-for-service providers for use on the HCFA Form 416. Rule 30(b)(6) Davidson Dep., 9–12–94, at 157. Line 8 on the FY 1993 HCFA Form 416 and line 12 on the FY 1994 HCFA Form 416 are entitled "Number of Eligibles Referred for Corrective Treat-

ment." Pls.' Exs. 6, 223. HCFA has stated that these lines require the reporting of

the unduplicated count of individuals who, as the result of at least one health problem identified during an EPSDT child health screening, *excluding* vision, dental, and hearing services, were scheduled for another appointment with the screening provider or referred to another provider for further needed diagnostic or treatment service.

Pls.' Ex. 166 (HCFA State Medicaid Manual, § 2700.4) (emphasis in original); *accord* Pls.' Ex. 64 at 2–219.

138. In completing line 8 and line 12 for fiscal years 1993 and 1994, respectively, First Health did not actually count the number of children who were scheduled for further appointments following the identification of health problems during EPSDT screening services. Instead, First Health merely "count[ed] claims for services other than an assessment or screening, when the services [were] provided after an assessment or screening (up to six months after the fiscal year)." *See* Pls.' Ex. 169 (letter from Erica Birath of First Health to EPSDT Coordinator); Pls.' Ex. 170 (letter from A. Sue Brown, Acting Commissioner of CHCF, stating that First Health's method was acceptable).

139. Defendants' lack of proper referral records demonstrates the absence of procedures for ensuring that EPSDT-eligible children receive treatment for conditions discovered during the course of EPSDT screening services.

140. This problem is exemplified by the case of Ms. Rosa Rivas, a class member, who was informed in mid–1994 by her son Joaquin's speech therapist at Children's Hospital that Joaquin needed two additional hours per week of speech therapy. Joaquin was not referred for the further speech therapy through the EPSDT program; instead, he was referred to his school. Although Ms. Rivas requested the additional speech therapy in September 1994, Joaquin did not receive the additional therapy until early 1995. When Joaquin did finally receive the addi-

---

**70.** As discussed in Findings No. 119 and 121, Defendants do nothing to enforce this reporting requirement, and do nothing with whatever data they do receive.

tional therapy, his mother learned that his speech level was three years below the normal level for a child of his age. Rivas Test. at 3–4.

### 8. Scheduling and Transportation Assistance

141. Scheduling assistance is a required part of the EPSDT program. Davidson Test., ¶ 16. Defendants have provided virtually no scheduling assistance to parents of EPSDT-eligible children, however. If a person who is EPSDT-eligible speaks English, knows the "system," and happens to call the EPSDT coordinator, she will be assisted by the coordinator in locating a provider. Rule 30(b)(6) Davidson Dep., 9–12–94, at 155–156.[71] However, the EPSDT coordinator no longer even schedules appointments for those few people who may call. *Id.* at 153–155. Similarly, IMA SSRs do not schedule EPSDT appointments. Rule 30(b)(6) Wallace Dep. at 20. If a Medicaid applicant informs an SSR that she wants an EPSDT referral to a doctor or clinic, the SSR fills out a Form 612 and forwards it to the EPSDT coordinator. Rule 30(b)(6) McNair Dep. at 24. As noted earlier, the EPSDT coordinator takes no action in response to Form 612s. Rule 30(b)(6) Davidson Dep., 9–12–94, at 51–52.

142. The Office of Maternal and Child Health ("OMCH") does operate two hotlines which provide necessary scheduling assistance to families (547–BABY and 1–800–MOM–BABY).[72] Hatcher Test. at 6. Defendants provided no estimate, however, of the number of EPSDT-eligible children served by these hotlines.[73]

143. Transportation assistance is also required under EPSDT. Davidson Test., ¶ 21. Transportation services are theoretically available to any Medicaid recipient who has received a physician's certification that transportation services are medically necessary. Pls.' Ex. 244. Plaintiffs' Exhibit 85 sets forth the current procedures for obtaining transportation assistance for taxicabs. Rule 30(b)(6) Deposition of Carmen Vega ("Rule 30(b)(6) Vega Dep."), 4–21–95, at 9. In order to be eligible for transportation to a medical appointment in a taxicab, a Medicaid recipient's provider must conclude that "use of bus transportation would cause undue hardship." Pls.' Ex. 85 at 1.[74] First Health arranges transportation assistance "only for Medicaid-eligible recipients [who] are confined to wheelchairs, walkers, canes, or are classified as weak and frail." Rule 30(b)(6) Deposition of Samuel Young, Jr., 1–24–95, at 3, 11.

144. Defendants have no method of ensuring that Medicaid recipients who need transportation assistance in order to obtain EPSDT services actually receive such assistance. Medicaid recipients must request bus or Metro tokens—if they know of their availability—from providers in order to obtain them for medical appointments. Rule 30(b)(6) Vega Dep. at 12–13. If a provider has tokens, it can provide them to Medicaid recipients; the decision as to whether or not to provide bus or Metro tokens to Medicaid recipients lies with the provider. *Id.* at 18–20. Defendants take no steps to ensure that providers have an adequate supply of bus or Metro tokens. *Id.* at 24–25.

145. For example, Dr. Adams' office has never been given bus tokens or other trans-

---

**71.** The EPSDT coordinator receives approximately five to six calls per month requesting scheduling assistance. *Id.* Before the establishment of managed care in 1994, Medicaid recipients were given plastic medical assistance cards which contained CHCF's telephone number. If enrollees called that number, Ms. Davidson or other CHCF staff provided names of medical providers in their geographic area. Davidson Test., ¶ 16. Ms. Davidson rarely received requests for assistance in scheduling appointments, but when she did, she assisted by calling the provider and making an appointment. *Id.*

**72.** Shortly before trial, the 1–800–MOM–BABY line was turned off because the telephone bill

had not been paid. Hatcher Cross–Exam. Test. The bill was paid shortly thereafter, and thus the line may be operative again. *Id.*

**73.** Dr. Sherman was unaware of any scheduling assistance program until March 1996. Sherman Test. at 6.

**74.** A finding of undue hardship, in turn, requires a finding of medical necessity, which is established when a Medicaid recipient is in a debilitated condition or is aged; uses a wheelchair, walker, or cane; or is in leg or body casts, such that bus transportation is impractical. Pls.' Ex. 85, at 1; *accord* Rule 30(b)(6) Vega Dep. at 14–15.

portation assistance for her patients. Adams Test. at 8. To her knowledge, no system exists within Prudential, the capitated provider with which she was formerly affiliated, to provide transportation services to doctors' offices. *Id.* Many of Dr. Adams' patients rely on public transportation to get to the office; Dr. Adams' office manager has "never heard of any program where doctors provide bus or Metro fare to patients and are then reimbursed by DHS or Medicaid." Roberts Test. at 4.

146. Staff at GUMC's Mobile Clinic, on the other hand, are given taxi vouchers for patients who are unable to use any form of public transportation. Sherman Test. at 6.

147. Dr. Paulson's patients have experienced difficulty in traveling to his office, which is located at the George Washington University School of Medicine, on 22nd and I Streets, N.W. Paulson Test. at 9. While his office formerly provided bus tokens to families on Medicaid who brought their children in for medical care, it does not do so currently. *Id.* To Dr. Paulson's knowledge, "transportation assistance is not available as part of Medicaid at the present time in the District, other than for disabled children." *Id.*

148. The DHS neighborhood health clinics provide transportation assistance to Medicaid recipients if they have tokens available. The clinics have no specific policy for informing patients about the availability of transportation assistance, and they do not always have tokens available. Kelley Test. at 3. In connection with its hotline program, OMCH operates two vans which are used to transport patients to doctors' appointments. Davidson Test., ¶ 21; Hatcher Test. at 8–9. Defendants have provided no estimate of the number of people transported in these vans, however.

149. If a Medicaid applicant informs her IMA SSR that she wants transportation assistance, the SSR fills out a DHS Form 612 and forwards it to the EPSDT coordinator. Rule 30(b)(6) Deposition of Rosetta McNair ("Rule 30(b)(6) McNair Dep.") at 11–12, 25. However, as noted earlier, no action is taken by the EPSDT coordinator. Rule 30(b)(6) Davidson Dep., 9–12–94, at 51–52.

**9. Other Evidence Regarding EPSDT Services**

150. In a DHS Executive Staff Briefing Book, dated July 15, 1992, prepared for the City Administrator, Defendants admitted that there was "limited penetration of the Medicaid EPSDT program." Pls.' Ex. 201, bates stamp no. 6922.

151. A number of programs other than EPSDT provide health services to poor children. For example, a private organization under contract with CHCF, Health Services for Children, Inc., administers a voluntary managed care program for children who receive SSI. *Id.* ¶ 4. The program provides services for both emotional and physical disabilities to approximately 500 children, out of approximately 3200 eligible children. Testimony of Eleanor Tinto ("Tinto Test."). Thus, during fiscal year 1995, less than one percent of all EPSDT-eligible children were actually served by this program. *See* Pls.' Ex. 306, line 1.[75]

**D. Claim 7: EPSDT Notification**

**1. Notice to Medicaid Applicants**

152. IMA's official agency policy is to inform initial Medicaid applicants of the availability of EPSDT. Bayne Test., ¶ 10; Pls.' Ex. 3; *see also* Green Test., ¶ 9. This stated policy is reflected in the District's Medicaid Procedures Manual, and comprises a small part of the required training for new SSRs. Bayne Test. at 5; Rule 30(b)(6) Deposition of Felecia Greene–Holt, 11–15–94 ("Rule 30(b)(6) Greene–Holt Dep."), at 18 (testifying that in a 56–hour training course for SSRs,

---

**75.** Dr. Vowels testified regarding several other programs: the Handicapped Infant Intervention Project, which, according to Dr. Vowels, identifies, diagnoses, and treats children with handicaps; the federally funded Healthy Tomorrows Partnership for Children Program, which is designed to ensure that children in Ward 6 receive lead screening, immunization, and other health services; and the Disabilities and Injury Prevention Program, a federally funded program designed to reduce disabilities and injuries in the District. Vowels Test. at 2–6. Defendants provided no data regarding the number or percentage of EPSDT-eligible children served by these programs, however.

approximately one-half hour to an hour is spent on the EPSDT program as a whole).[76] The training course for new SSRs explains sections of the Medical Assistance Policy Manual. Rule 30(b)(6) Greene–Holt Dep. at 13; Pls.' Ex. 275. With respect to EPSDT, however, this manual merely states:

> The information provided must include the types of services that are available, where and how the services can be obtained, and the availability of assistance from the Department in securing these services.

Pls.' Ex. 270.

153. In informing Medicaid applicants about EPSDT, IMA workers are expected to use the EPSDT Desk Guide. The Desk Guide is a revised memorandum issued on October 16, 1991 to all AFDC and Medicaid staff, which was developed in accordance with HCFA and IMA guidelines by Ms. Sarah J. Davidson, EPSDT/Well–Child Program Coordinator for CHCF since 1985. Davidson Test., ¶ 12; Pls.' Ex. 3. The Desk Guide requires IMA workers to explain to each applicant during the interview: (1) the benefits of preventive health services, (2) how EPSDT services can be obtained, (3) how specific information can be obtained regarding the nearest providers participating in EPSDT (SSRs are to give eligible applicants a list of certified EPSDT providers), (4) the cost-free nature of EPSDT services, and (5) the availability of transportation and scheduling assistance. Pls.' Ex. 3 at 1; Defs.' Ex. 21. In explaining EPSDT to an applicant during the intake interview, SSRs should also use a particular HCFA-approved, illustrated booklet about EPSDT, entitled "Early and Periodic Screening, Diagnosis and Treatment." Green Test., ¶¶ 10 and 15; Davidson Test., ¶ 12; Pls.' Ex. 3 at 2; Defs.'

Ex. 87. Ms. Davidson testified that each IMA worker received a copy of this booklet, and that she told Ms. Green to make sure the booklet was used during each intake interview.

154. IMA SSRs are also supposed to provide applicants with a flier, available in both English and Spanish, entitled "Happiness is Good Health for Children—EPSDT is the Way." Green Test., ¶¶ 10 and 15; Davidson Test., ¶ 12; Pls.' Ex. 3 at 2; Defs.' Ex. 21. This flier describes EPSDT services, states that they are free, and provides a telephone number for an EPSDT hotline, but does not mention free transportation or scheduling assistance.[77]

155. These procedures are not always followed, however. Ms. Rosetta McNair, a supervisory IMA SSR, testified that there are "not really" specific things that IMA SSRs are supposed to say about EPSDT during intake interviews; instead, SSRs merely ensure that applicants understand EPSDT and its availability. Rule 30(b)(6) McNair Dep. at 8–9. Ms. Davidson formerly visited DHS service centers to ensure that SSRs were properly notifying applicants about EPSDT; however, she no longer does this. Rule 30(b)(6) Davidson Dep., 9–12–94, at 19–21.

156. Furthermore, neither the Medical Assistance Policy Manual—the basis for the SSR training course—nor the EPSDT Desk Guide identifies the types of services available through EPSDT or states that blind, deaf, and illiterate persons must be informed about EPSDT. The HCFA 1991 EPSDT Program Review found that the District had "no written procedures describing informing procedures for blind, deaf, or other non-English speaking individuals." Pls.' Ex. 173

---

76. There was a conflict between the testimony of Mr. Bayne and Ms. Green, that the EPSDT notification policy is also part of SSRs' refresher training, and that of Ms. Felecia Greene–Holt, a Medicaid training specialist with sole responsibility for conducting IMA's Medicaid training classes, that EPSDT is not usually dealt with in any refresher courses. Rule 30(b)(6) Greene–Holt Dep. at 23. The Court credits the testimony of Ms. Greene–Holt, who had more immediate knowledge of the subject matter. Furthermore, none of the IMA refresher courses offered during fiscal year 1993 related to giving EPSDT notice. Pls.' Ex. 47 at 1975–1976.

77. Defendants have also produced another flier entitled "Happiness is Good Health for Children—Keep it With EPSDT." This flier sets forth the immunization schedule established by the American Academy of Pediatrics, describes services available under EPSDT, and references the telephone number of the EPSDT Coordinator for questions regarding support services, such as scheduling and transportation. Defs.' Ex. 19. Ms. Davidson believes that this flier is currently being distributed at IMA service centers and at Head Start programs. Davidson Redirect Test.

at 9. In its EPSDT corrective action plan, the District reported to HCFA that it would, in June 1992, amend the EPSDT Desk Guide to include "procedures for informing blind, deaf, or other non-English speaking persons." Pls.' Ex. 5 at 4. The District, however, has failed to do this. The EPSDT Desk Guide has not been amended since October 16, 1991. *See* Pls.' Ex. 3; Rule 30(b)(6) Davidson Dep., 9–12–94, at 16–18. Moreover, Defendants are unaware of the fact that federal regulations require them to give effective EPSDT notice to illiterate persons. *Id.* at 68–69; *cf.* 42 C.F.R. § 441.56(a)(3) (1996).

157. Several parents received decision notices on their Medicaid applications that were printed in English. Those notices included the following announcement regarding EPSDT:

> The EPSDT program provides free health screening for children under the age of 21. These screenings are for regular health exams, immunizations, vision and hearing tests and dental care. You may get this check-up at the DHS public health clinic or from a private physician participating in our EPSDT program.

Because the announcement was only in English, many Spanish-speaking parents obviously did not fully understand it. *See* S. Alvarez Test. at 9, 11; Avelar Test. at 2–3; Guardado Test. at 3–4, 7; Hernandez Test. at 2–3, 5; Ayala Test. at 2–3; Moreno Test. at 3–5.

158. It is clear, moreover, that the EPSDT fliers described in Finding No. 154 are not even always distributed. Numerous parents of children on Medicaid have received no notice regarding EPSDT other than the English application decision notice and the English-language recertification notice, discussed below. S. Alvarez Test. at 9, 11; Argueta Test. at 5; J. Alvarez Test. at 2–4; Aparicio Test. at 1–2; Guardado Test. at 3–4, 7; Hernandez Test. at 2–3, 5; Ayala Test. at 2–3; Moreno Test. at 3–5; Rivas Test. at 3. Two parents, moreover, have never received any EPSDT notice from DHS at all. Oliva Test. at 2; Mendoza Test. at 2.

159. As noted above, there is only one person, Ms. Davidson, who handles EPSDT for the entire Medicaid population in the District of Columbia. Rule 30(b)(6) Davidson Dep., 9–12–94, at 51–52. Ms. Davidson receives approximately six telephone calls per month from persons who have received the EPSDT flyer and have questions or seek more information. *Id.* at 57. Ms. Davidson makes no calls to Medicaid recipients; she only speaks with Medicaid recipients who happen to call her. *Id.* at 54–55, 132–133.

160. Many parents of EPSDT-eligible children are unaware of the EPSDT program. Dr. Adams testified that although her patients' parents are "quite sophisticated and knowledgeable about the need for good medical care for their children . . . [t]hey do not know about EPSDT, by whatever name." Adams Test. at 9. Similarly, Dr. Charles' patients do not know about the EPSDT program when they first visit him. Charles Test. at 2. Dr. Paulson's Medicaid-eligible patients' parents "do not know anything about the EPSDT program by that or by any other name," Paulson Test. at 4, and Dr. Sherman's patients' parents are unfamiliar with the term EPSDT, Sherman Test.

161. At the 12 neighborhood clinics operated by DHS' Commission on Public Health ("CPH"), clinic clerks are supposed to explain EPSDT to eligible patients at their first visits. Kelley Test. at 3. However, Mr. Peter Coppola, a high-level officer in CPH's Ambulatory Health Care Administration who was formerly involved in managing the neighborhood clinics, Kelley Cross–Exam. Test., testified that he had no knowledge of clerks at the neighborhood health centers providing notice of EPSDT to patients. Rule 30(b)(6) Coppola Dep. at 15–16. No written information about EPSDT is provided at the DHS neighborhood health centers. *Id.* at 14.

162. After an SSR gives an applicant EPSDT information, the SSR is supposed to determine whether the applicant desires such services. If the applicant desires EPSDT services or EPSDT support services (scheduling and transportation assistance) or both, the SSR should indicate this on DHS Form 612. Pls.' Ex. 3 at 2. Additionally, an applicant's rejection of EPSDT services must be documented in the case record, either by the

SSR's indication on the Form 612 or the applicant's signature on the DHS Form 867A, indicating that the applicant was informed about EPSDT but does not desire such services. *Id.* The supervisor is required to ensure that both the DHS Form 612 and DHS Form 867A are completed for all intake applications. *Id.; see also* Davidson Test., ¶ 12; Green Test., ¶¶ 10 and 15.[78] Copies of DHS Form 612s should be placed in the applicants' case records and sent to the EPSDT coordinator. Pls.' Ex. 3 at 3.

163. Again, however, these recording procedures are not always followed. Defendants admit that five to ten percent of the Form 612s received by the EPSDT coordinator do not state that EPSDT notice has been given. Rule 30(b)(6) Davidson Dep., 9–12–94, at 138. When a Form 612 sent to CHCF does not include information about EPSDT notice having been given, CHCF has no method for tracking whether the form is eventually completed. · *Id.* at 46–48.

164. HCFA's 1991 EPSDT Program Review alerted Defendants to the importance of monitoring IMA staff to ensure that IMA's written procedures for informing applicants about EPSDT were being carried out. *See* Pls.' Ex. 173 at 7 (HCFA finding that Defendants needed to strengthen or further clarify procedures for "monitoring to ensure compliance with written procedures for informing"). HCFA further found:

> The review of a sample of 30 records at the Service Center located at 645 H Street found that in 10 cases, the records did not document the outcome of EPSDT informing.

*Id.* at 9.[79] HCFA recommended that Defendants "ensure that IMA staff document records as provided in the revised EPSDT Desk Guide." *Id.* This finding was noted in a 1992 memorandum from Janice Anderson to James Butts, then IMA Administrator. Pls.' Ex. 194. The memorandum advised that procedures in the EPSDT Desk Guide must be followed for completion of the DHS Form 612 and requested that IMA "designate staff ... to assist with the annual site visits to service centers by the EPSDT coordinator...." *Id.*[80]

165. On November 21, 1992, Ms. Davidson, the EPSDT coordinator, wrote to Ms. Doris Jackson, Chief of NPA Medicaid, concerning the fact that at seven DHS service centers, IMA "staff did not properly document EPSDT information on the appropriate DHS form." Pls.' Ex. 239. On January 11, 1993, in response to this memorandum, Ms. Jackson wrote to all DHS service center managers concerning "incomplete EPSDT forms," reminding the managers that

> [IMA] is responsible for notifying all customers who are under age 21 and eligible for AFDC or NPA/AFDC Medicaid about the availability of health services under the EPSDT program. The DHS form 612 must be properly completed or it will be returned to IMA.

Pls.' Exs. 237. In the District's April 1992 corrective action plan, submitted in response to HCFA's 1991 EPSDT Program Review,[81] the District reported to HCFA that it would, starting in June 1992, "make annual site visit[s] to each service center to review sample case records to ensure EPSDT documentation." Pls.' Ex. 5 at 3. However, as already noted, Defendants do not in fact make such annual visits and therefore have not fulfilled their promise to HCFA. Rule 30(b)(6) Davidson Dep., 9–12–94, at 144–145.

166. Plaintiffs retained CFES to study the extent to which SSRs record EPSDT

---

**78.** For applicants who mail in complete applications and who do not need an interview, IMA workers should mail EPSDT information. Davidson, Test., ¶ 15.

**79.** In 1991, DHS Form 612 replaced its precursor form regarding EPSDT notice, DHS Form 1544. Pls.' Ex. 3 at 1; Rule 30(b)(6) Davidson Dep., 9–12–94 at 17. Three years later, on November 14, 1994, Ms. Greene–Holt, the Medicaid training specialist for the District of Columbia and the one person responsible for conducting Medicaid training classes for SSRs, was unaware of this replacement, a fact which, it is fair to infer, suggests an absence of training on this issue. Rule 30(b)(6) Greene–Holt Dep. at 5–7, 13–14, 21, 29.

**80.** As noted above, the EPSDT coordinator no longer makes such site visits. Rule 30(b)(6) Davidson Dep., 9–12–94, at 19–21.

**81.** This review was conducted from September 30 to October 3, 1991. Pls.' Ex. 174.

notice to Medicaid applicants on DHS Form 612s. As to the NPA–Nonmultinational case files, 55.6% of the time (74 out of 133) there was no Form 612 or the Form 612 that was present did not contain any information regarding EPSDT; as to NPA–Multinational case files, 14.4% of the time (22 out of 153) there was no Form 612 or no Form 612 containing EPSDT information; and as to the AFDC case files, 61.1% of the time (116 out of 190), there was no Form 612 or no Form 612 containing EPSDT information. Siskin Test., ¶ 30 and Table 8.[82]

167. Defendants analyzed CFES' EPSDT findings and claimed many refutations. Defendants counted as refutations not only case files containing a completed Form 612 or its predecessor form,[83] but also case files containing any evidence that a Medicaid applicant or recipient was notified of EPSDT services, such as separate forms signed by the applicant or recipient or an IMA SSR's notes in the case file. Jesberg Cross–Exam. Test.[84] Defendants also counted as evidence of EPSDT notice the EPSDT form included with joint AFDC–Medicaid applications, which describes EPSDT, asks the applicant whether EPSDT services are desired, and contains a signature line for the applicant.[85] Finally, Defendants counted NPA Medicaid applications that were stamped with a signa-

ture line stating that the applicant had received oral and written information about EPSDT. *Id.* The Court finds that Defendants appropriately counted these other forms of EPSDT notice documentation in their refutations.

168. Using the same extrapolation formula discussed above, *see supra* § II.A.2.b, Defendants reduced Plaintiffs' findings to 23.7% of the NPA–Nonmultinational case files, 12.0% of the NPA–Multinational case files, and 7.0% of the AFDC case files. Klemm Test., Table 8A. The Court accepts these modifications to Plaintiffs' study.[86]

### 2. Notice to Medicaid Recipients

169. It is also IMA's official agency policy to reinform recipients who are not using EPSDT of the availability of EPSDT at the time of recertification. Bayne Test., ¶ 10; Pls.' Ex. 3; *see also* Green Test., ¶ 9. There is only one way in which IMA reinforms NPA Medicaid recipients about EPSDT. During the recertification process, IMA SSRs send a recertification form—DHS Form 1209—to Medicaid recipients. Green Test.; Rule 30(b)(6) Deposition of Joyce Cephas ("Rule 30(b)(6) Cephas Dep."), 4–21–95, at 6–7.[87] On Form 1209, there is a small

---

**82.** Plaintiffs provided two examples of IMA's failure to notify Medicaid applicants of EPSDT, both of which were included in CFES' study as examples of IMA's failure to provide EPSDT notification. *See* Pls.' Ex. 92, App. 5, at 4 and 6. First, Ms. T.S.R.'s case file contained no Form 612. Bobroff Test. at 11. Nor did Ms. T.S.R.'s case file contain any documentation of a discussion about EPSDT. *Id.* Second, Ms. Maria Moreno applied for Medicaid on October 2, 1991, and there is a Form 612 in her case file dated October 2, 1991, stating that Ms. Moreno did not want EPSDT. *Id.* at 12. However, Ms. Moreno reapplied for Medicaid on April 27, 1993 and August 2, 1994, and her case file contains no Form 612 corresponding to those application dates or any other documentation of a discussion about EPSDT during her reapplications. *Id.*

**83.** Plaintiffs conceded, after trial, that 21 of the case files in their study contained either a completed Form 612 or a completed form that was the precursor to the Form 612. Joint Stipulation at 1–2. In other words, Plaintiffs withdrew 21 of their alleged incidents of improper EPSDT notification. Because neither party identified the categories from which the 21 case files were drawn (NPA–Nonmultinational, NPA–Multinational or

AFDC), however, it is impossible to incorporate these withdrawn incidents into either side's percentages.

**84.** Plaintiffs also conceded, after trial, that 26 case files in their study contained various documents indicating that EPSDT was discussed with the applicant at some point. Joint Stipulation at 2. For the same reasons discussed above, however, the Court cannot incorporate this information into the parties' percentages.

**85.** Plaintiffs conceded, after trial, that 56 case files in their study contained completed notice sections from joint AFDC–Medicaid applications. Joint Stipulation at 2–3.

**86.** Additionally, the Court notes that Plaintiffs, in the Joint Stipulation, conceded that there was some documentation of EPSDT notice in 103, or almost half, of the 212 case files which Plaintiffs originally asserted lacked such documentation.

**87.** Ms. Green also testified that IMA staff are instructed to inform Medicaid recipients about EPSDT on the telephone. She did not explain how or when such instructions are given to staff, however. Green Test.

"yes-no" EPSDT check-off box *below* the signature line, at the end of the three-page form, which reads:

EPSDT CERTIFICATION (UNDER 21 YEARS)

CLIENT WISHES EPSDT SERVICES AT THIS TIME ___ YES ___ NO

It is fair to say that the term "EPSDT" is not exactly a household word. Nonetheless, there is no explanation of the term EPSDT anywhere on the form. Pls.' Ex. 81; Davidson Cross–Exam. Test. Apart from this check-off box, no written information about EPSDT is given to NPA Medicaid recipients at the time of recertification. Rule 30(b)(6) Cephas Dep. at 7.[88] If the recipient checks "yes" on this box, then the SSR who receives the form is supposed to complete a DHS Form 612, place a copy in the recipient's file, and mail a copy to the EPSDT coordinator. Pls.' Ex. 3 at 3. As already noted, however, even when the recipient checks "yes," she receives no reply from DHS, and DHS takes no action to deliver EPSDT services to the child. Rule 30(b)(6) Cephas Dep., 4–21–95, at 6–7; Rule 30(b)(6) Davidson Dep., 9–12–94, at 51–52; *see also* Aparicio Test. at 1–2.

170. CFES studied responses to the EPSDT check-off box on the recertification form, and found that for the NPA–Nonmultinational case files, neither the "yes" nor the "no" was checked on the EPSDT box 35.0% of the time; 63.3% checked that they did not want EPSDT; and only 1.7% checked that they did want EPSDT. *Id.* ¶ 31 and Table 9. For the NPA–Multinational case files, no box was checked 82.3% of the time; 10.1% checked that they did not want EPSDT; and only 7.6% checked that they did want EPSDT. *Id.*

171. The extremely low percentage of Medicaid recipients who expressed a desire for EPSDT services is evidence that IMA's use of the recertification form is an ineffective tool for reinforming Medicaid recipients about EPSDT. Dr. Adams testified that in her experience as a pediatrician, after she has explained the importance of preventive care and vaccinations, she has almost never had a parent or guardian decline EPSDT services. Adams Test. at 9. Similarly, both Dr. Paulson and Dr. Sherman testified that they rarely see parents refuse preventive health care for their children. Paulson Test. at 3; Sherman Test. at 5. Even Mr. Bayne conceded that he would expect less than 50% of Medicaid applicants to whom EPSDT is explained to decline EPSDT services for their children. Deposition of John M. Bayne, 4–18–95, at 165.

172. During the recertification process, no notice of EPSDT is given to non-English speaking recipients of NPA Medicaid. Rule 30(b)(6) Howard Dep., 4–25–95, at 3. Several class members testified that when they received recertification forms, which are available only in English, they did not understand the EPSDT boxes on those forms. *See* Argueta Test. at 5; *compare* J. Alvarez Test. at 2–4 (stating that she marked "yes" to indicate her preference for EPSDT services for her children); Guardado Test. at 3–4 (same); Hernandez Test. at 2–3 (same); and Rivas Test. at 3 (same). Because the only reinforming notice to NPA Medicaid recipients regarding EPSDT is in English and is written, Defendants do not reinform the illiterate or those who do not understand English about EPSDT.

### 3. Notice of Transportation and Scheduling Assistance

173. IMA SSRs are required to inform applicants about the availability of scheduling and transportation assistance "when requested and necessary." Davidson Test., ¶¶ 16, 21. However, many class members who have applied for or are receiving Medicaid have never been notified that transportation or scheduling assistance is available for EPSDT services. *See* Oliva Test. at 2; Mendoza Test. at 2; Turcios Test. at 3; Silva Supp. Test. at 1; J. Alvarez Supp.Test. at 2–3; S. Alvarez Supp.Test. at 2; Flores Supp.Test. at 2.

---

**88.** During the period from approximately 1989 to 1990, Defendants reinformed all families on Medicaid with children under the age of 21 about the availability of EPSDT, by mailing them information about EPSDT every six months. Since 1990, however, Defendants have not mailed EPSDT information to eligible families. Pls.' Ex. 235; Rule 30(b)(6) Davidson Dep., 9–12–94, at 38–39.

174. The EPSDT flier that IMA SSRs are supposed to give applicants does not mention transportation or scheduling assistance. Davidson Test., ¶ 12; Green Test., ¶¶ 10 and 15; Defs.' Ex. 21; Pls.' Ex. 61. Persons submitting joint applications for AFDC and Medicaid are not notified about the availability of transportation assistance for EPSDT. Rule 30(b)(6) Wallace Dep. at 17–18. Finally, there are no signs in the DHS neighborhood clinics informing Medicaid recipients that tokens may be available for transportation assistance, and there is no policy to inform patients verbally at the clinics that transportation assistance is available. Deposition of Dr. Marlene Kelley ("Kelley Dep."), 7–6–94, at 45–46.

#### 4. The Role of Managed Care Providers

175. Under DHS' current EPSDT notification policy, capitated providers do not receive copies of the Form 612s which may indicate a Medicaid applicant's desire for EPSDT. Offner Test. However, all managed care providers, under DHS' current policy, are supposed to inform parents of EPSDT-eligible children about EPSDT, and to schedule health appointments promptly so that children can obtain such services. Offner Cross–Exam. Test.[89]

176. The current contract between CHCF and capitated providers specifically requires each capitated provider to provide health education programs for its enrollees, in language understood by the population being served, regarding (1) the importance and availability of preventive care; (2) the importance and availability of childhood immunizations; (3) the importance of, right to, and procedure for scheduling EPSDT screening services for children covered by Medicaid; and (4) the importance and availability of prenatal and well baby care. Pls.' Ex. 77 at 10; J. Thompson Cross–Exam. Test.; Davidson Cross–Exam. Test. However, that contract does not specifically define EPSDT or attach the EPSDT statute or regulations or the District's periodicity schedule. J. Thompson Cross–Exam. Test.[90]

177. The current contract between CHCF and fee-for-service providers states:

[Providers must] [n]otify parents of children [enrolled in Medicaid] that children under the age of 21 are entitled to an annual examination and evaluation of their general physical and mental health and growth, development and nutritional status, and provide, or arrange for, such examinations for the eligible children whose parents request them. The children of those parents who request the examinations shall receive the examinations within 30 days of the date of the request.

Pls.' Ex. 75 at 11, ¶ III.E; *accord* Davidson Test., ¶ 20. This contract also fails to attach the EPSDT statute or regulations or the District's periodicity schedule.

178. Several managed care providers testified that they do notify parents of the importance and availability of EPSDT services during patient visits. *See* Adams Test.; Charles Test.; Paulson Test. at 2, 4; Sherman Test. at 5. There is no reason to assume that these particular providers are typical of all providers, however. Indeed, Mr. Offner conceded that in general, providers were doing a "terrible job" of informing eligible families about EPSDT. Offner Cross–Exam. Test. Nevertheless, Defendants are unaware of any quality control concerning the provision of EPSDT notice to Medicaid recipients under the managed care program. Rule 30(b)(6) Deposition of Ruth Wilson, 4–19–95, at 37.

---

**89.** Mr. Offner testified that he intends to consider implementing incentives to motivate parents in the AFDC and AFDC-related populations to bring their children in for visits. Offner Cross–Exam. Test. As noted above, he also testified at great length regarding a Request for Proposal ("RFP"), which was issued in April 1996 in connection with CHCF's plan to restructure the Medicaid Managed Care Program. *See* Offner Test. and Cross–Exam. Test.; Pls.' Ex. 305. After the trial, however, the Court learned that this RFP has been withdrawn. Pls.' Post–Trial Brief at 2, n. 1.

**90.** Ms. Davidson claimed that managed care providers must offer initial health screening services within 60 days of a recipient's enrollment; however, her only basis for this assertion was the undistributed, unofficial draft of the District of Columbia Medicaid Well–Child Program (EPSDT) Provider Manual. *See* Davidson Test., ¶ 20; Defs.' Ex. 20 at 5; Rule 30(b)(6) Davidson Dep., 1–23–95, 9–11.

### 5. Notice Through Coordination with Other Agencies

179. On August 13, 1990, HCFA requested that the District, in order to increase outreach about EPSDT, "consider entering into cooperative agreements with the Head Start programs and state and local education agencies." Pls.' Ex. 9 at 1. On June 10, 1992, HCFA wrote to the District concerning its April 1992 EPSDT corrective action plan, stating:

> The [corrective action] plan does not ... address the report recommendation concerning the utilization of school-based nurses to promote EPSDT. Please advise us of your plans to address this issue.

Pls.' Ex. 202 at 3.

180. There is still no formal collaboration between EPSDT and DCPS. Bradshaw Cross–Exam. Test. Although the District stated in its EPSDT corrective action plan that it would annually forward fliers to designated public school system officials for distribution to pupils, see Pls.' Ex. 5 at 18, DCPS teachers do not notify students or parents about EPSDT, and school nurses do not disseminate any written information at all regarding EPSDT to parents or students who are Medicaid recipients. Rule 30(b)(6) Deposition of Dr. Mary Ellen Bradshaw ("Bradshaw Dep.") at 27–28, 42–43, and 36; Kelley Dep. at 59–60.

181. In a March 1990 report to HCFA, CHCF stated that it would develop comprehensive outreach programs with "Housing, WIC [the Women, Infants, and Children nutrition program], [Title 20] Social Services Programs, Head Start, and the Coordinating Committee on Early Intervention Services." Pls.' Ex. 197, bates stamp no. 10153. CHCF has no formal outreach agreement with the District's public housing program. Rule 30(b)(6) Davidson Dep., 9–12–94, at 237. Housing authority sites do not distribute EPSDT fliers or conduct health education. Id. at 238. Similarly, CHCF has no formal outreach agreement with the District's WIC program, and WIC does not distribute EPSDT fliers. Id. at 227–229. CHCF has no formal outreach agreement with Title 20 Social Services; the EPSDT coordinator is merely on the mailing list of, and participates in workshops sponsored by, the District's Office of Early Childhood Development. Id. at 229–231.

182. CHCF does have a formal outreach agreement with the United Planning Organization, one of the three entities that run Head Start programs. However, that agreement needs to be updated to reflect the EPSDT requirements in the Omnibus Budget Reconciliation Act of 1989. Id. at 107–109, 210–211; Pls.' Exs. 9, 199 at 9. Ms. Davidson has distributed EPSDT information at Head Start programs, including those run by agencies other than UPO. Rule 30(b)(6) Davidson Dep., 9–12–94, at 109–110. Finally, as for the Coordinating Committee on Early Intervention Services, Dr. Vowels testified that "documents exist ... addressing the coordination of EPSDT with the Early Intervention Program"; however, no further evidence of any outreach agreement or activities has been provided. Rule 30(b)(6) Vowels Dep. at 27–28.

183. Ms. Davidson, the District's sole employee responsible for EPSDT coordination, attempts to notify people about EPSDT by distributing literature and speaking at health fairs and other community events. A federally required Title V (Maternal and Child Health Block Grant) cooperative agreement exists outlining coordination between CHCF and the Ambulatory Health Care Administration ("AHCA"), the Office of Maternal and Child Health ("OMCH"), the Commodity Supplemental Food Program ("CSFP"), the Women, Infants and Children ("WIC") program, and IMA. Davidson Test., ¶ 26.[91] Pursuant to this agreement, CHCF publicized the importance of immunizations during National Infant Immunization Week in April 1996. Id. ¶¶ 25–27. That same month, CHCF also issued Transmittal No. 96–04, which directed Medicaid primary care providers, obstetricians and gynecologists to promote immunization awareness during National Infant Immunization Week, to use ev-

---

91. The goal of this agreement is to reduce infant mortality and to promote child health in the District of Columbia. Pls.' Ex. 173 at 7. According to 1995 data, the District of Columbia has the highest infant mortality rate in the country. See Pls.' Ex. 256 at 52.

ery patient encounter as an opportunity to ensure that children are fully immunized, and to alert pregnant women to the Division of Immunization's New Moms initiative. *Id.* ¶ 30.

184. Other District agencies involved in children's health issues attempt to notify families with EPSDT-eligible children about the EPSDT services. For example, OMCH maintains two hotlines which provide information to callers about local health services and disseminate the Mom's Resource Book. Hatcher Test. at 6. In their EPSDT corrective action plan, Defendants reported to HCFA that they would, in May 1992, develop an EPSDT statement for inclusion in the Mom's Resource Book. Pls.' Ex. 5 at 9. Defendants never did this, however; the Mom's Resource Book still does not mention EPSDT. Pls.' Ex. 190; Rule 30(b)(6) Hatcher Dep., 4–26–95, at 4–5, 10.

### E. Reimbursement to Medicaid Recipients for Out–of–Pocket Medical Expenses

In their Complaint, Plaintiffs requested, *inter alia,* "[a]n order requiring [D]efendants to reimburse [P]laintiff class members for the funds expended by them to obtain health care services and medication as a result of [D]efendants' violations of federal law." Compl. at 27.

185. Defendants described their reimbursement methods in the following interrogatory response:

[CHCF] does not rei[m]burse D.C. Medicaid program recipients an[d] has an unwritten practice, as to any period when IMA fails timely to determine an applicant's NPA Medicaid eligibility and/or timely to notify the applicant of such a determination, of advising the participating provider to reimburse the recipient for any out-of-pocket medical expenditures and thereafter to submit a routine claim for the same expenditures to CHCF.

Pls.' Ex. 101 at 23.

186. This unofficial, unwritten practice, known to virtually no one, is also applicable when Medicaid recipients are forced to pay for medical care or prescriptions as a result

of EVS errors or IMA's failure to process their recertifications promptly. If a Medicaid recipient calls Ms. Davidson and informs her that she incurred a medical expense at a time when she should have been covered by Medicaid, Ms. Davidson checks the computer to verify the recipient's eligibility on the date in question. If the recipient was correct, Ms. Davidson calls the Medicaid provider and asks her to reimburse the Medicaid recipient for the charge and to submit a claim to CHCF for the bill. Rule 30(b)(6) Davidson Dep., 9–12–94, at 259–261, 265–266, 268–273; Davidson Cross–Exam. Test. Ms. Davidson has personally done this once or twice. Davidson Cross–Exam. Test. Ms. Sandra Hagen and Ms. Donna Bovell, two other officials at CHCF, also follow this practice. Rule 30(b)(6) Davidson Dep., 9–12–94, at 259–261.

187. Medicaid recipients are not notified about the unofficial policy under which they may be reimbursed for out-of-pocket expenses. *Id.* at 275. No CHCF employee has discussed the unofficial policy with IMA SSRs; there is no written policy directive to SSRs regarding the unofficial practice; and reimbursement of Medicaid recipients who incur out-of-pocket expenses is not addressed in the SSR training course. *Id.* at 275–276; Rule 30(b)(6) Greene–Holt Dep. at 33–34.

188. Numerous class members have incurred out-of-pocket medical expenses which should have been covered by Medicaid. J. Alvarez Supp.Test. at 2 (medicine for children); S. Alvarez Test. at 6 ($1400 and $1750 for delivery of her two children); Arce Test. at 3 (approximately $500 for medical care for children); Argueta Test. at 3, 5 ($21 on tuberculosis medicine for child); Guardado Test. at 1–2 (medical visits and vaccinations); Harden Test. at 2–3 (several hundred dollars on cardiac prescriptions); Lopez Test. at 2–3 ($70 in prescriptions for sick child); Rivas Test. at 4–5 ($30 for medical care for child; collection agency action for speech therapy bills for child); and Von Faust Test. at 3 ($832 for prescriptions; $109.80 for Medicare premiums).

### III. CONCLUSIONS OF LAW

Plaintiffs seek enforcement of various provisions of Title XIX of the Social Security

Act, 42 U.S.C. § 1396 *et seq.*, pursuant to 42 U.S.C. § 1983. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (1994). Under *Monell v. Dep't of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978), a local government may be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Furthermore, "[l]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91, 98 S.Ct. at 2036. To prevail, Plaintiffs must show a "persistent, pervasive practice, attributable to a course deliberately pursued by official policymakers," which caused a deprivation of Plaintiffs' legal rights. *Carter v. District of Columbia,* 795 F.2d 116, 125–126 (D.C.Cir. 1986).[92]

The District of Columbia has violated federal law in each of the four areas identified by Plaintiffs. By failing to process Medicaid applications for non-disabled, non-foster care NPA applicants within 45 days, by terminating or suspending eligible persons' benefits

without adequate notice, and by failing to provide EPSDT services or notify eligible families about the availability of such services, Defendants have denied Plaintiffs' rights under both federal and District of Columbia law, and, in some instances, under the Constitution.

## A. Claim 4: Unlawful Application Processing

■ The District of Columbia is required, under federal law, to "furnish[ ] [Medicaid] with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8) (1996). Implementing regulations further provide:

> The [state Medicaid] agency must establish time standards for determining eligibility and inform the applicant of what they are. These standards may not exceed—(1) Ninety days for applicants who apply for Medicaid on the basis of disability; and (2) Forty-five days for all other applicants.

42 C.F.R. § 435.911(a) (1995). The District of Columbia has adopted the 45–day deadline for processing non-disability Medicaid applications. D.C.Code Ann. § 3–205.26 (1994).

In *Alexander v. Hill,* 707 F.2d 780, 784 (4th Cir.1983), *cert. denied,* 464 U.S. 874, 104 S.Ct. 206, 78 L.Ed.2d 183 (1983), the Fourth Circuit upheld the sanctions imposed by the district court for each week of delay in processing Medicaid applications, and ruled that:

> The district court had wide discretion in fashioning a remedy which would achieve compliance with the law. *The law itself requires 100% compliance....* We are all expected to abide fully by the law, and expose ourselves to sanctions whenever we fail to do so.

---

**92.** Section 1983 provides a remedy for violations of federal statutory rights as well as constitutional rights. *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 105–106, 110 S.Ct. 444, 447–448, 107 L.Ed.2d 420 (1989); *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). At trial Defendants reasserted an argument they had made in an early Rule 12(b)(6) motion, that Plaintiffs' claims are not cognizable under § 1983. However, the judge to whom this case was then assigned, the Honorable Norma Holloway Johnson, rejected that argument, and ruled that the statutory provi-

sions at issue in this case are enforceable in a suit under § 1983. *Wellington v. District of Columbia,* 851 F.Supp. 1, 5–6 (D.D.C.1994). In the absence of "extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work manifest injustice,'" the Court declines to revisit Judge Johnson's decision. *Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988). That decision was neither "clearly erroneous" nor would it work "manifest injustice."

*Id.* (emphasis added) [93]; *see also Smith v. Miller,* 665 F.2d 172, 175 (7th Cir.1981) ("[w]hile a state's participation in the Medicaid program is purely voluntary and its acceptance of substantial funds uncoerced, once electing to participate, it must *fully comply* with federal statutes and regulations in its administration of the program") (emphasis added); *Fortin v. Comm'r of the Massachusetts Dep't of Public Welfare,* 692 F.2d 790, 794–795 (1st Cir.1982) (upholding district court's finding of "substantial noncompliance" with consent decree enjoining delays in welfare eligibility determinations, where state agency had attained compliance rates ranging roughly from 79% to 94.4%).

Over the past several years, IMA has repeatedly failed to process large numbers of Medicaid applications within 45 days of receipt. Defendants' own MEO reports, which, as noted above, actually undercount the number of applications which IMA fails to process within 45 days, demonstrate that at the end of December 1993, 60% of all pending applications in the Multinational Section and 54% of all pending applications in the NPA Intake Section had been pending for over 45 days. During the 12–month period from March 1995 until February 1996, the most recent months for which MEO reports are available, the average monthly percentages of applications pending for more than 45 days were still 19.8% for the Multinational Section and 10.6% for the NPA Intake Section. This means that during the period from March 1995 to February 1996, an average of at least 50 NPA–Nonmultinational applicants and 68 NPA–Multinational applicants each month did not receive decisions on their Medicaid applications within 45 days, in violation of federal and District of Columbia law. In human terms, this means that each month, an average of 118 sick and poor children and adults had no access to treatment, services, and medication provided under the Medicaid program.

Plaintiffs' random sample, which fully corroborates Defendants' MEO reports, also demonstrates that significant numbers of Medicaid applications are not processed within 45 days. That study, even when modified by Defendants' specific refutations, clearly reveals that non-foster care, non-disability NPA–Nonmultinational Medicaid applications are not processed within 45 days approximately 36% of the time, and NPA–Multinational Medicaid applications are not processed within 45 days approximately 58% of the time. Thus, the federal and local deadlines for application processing are being violated over 33% and over 50% of the time for these two categories of applicants, respectively.

Two major District of Columbia hospitals provided further evidence of IMA's failure to process Medicaid applications within 45 days. On March 28, 1996, 55 (over 40%) of the 136 Medicaid applications previously submitted to IMA by GUMC patients had been pending for more than 45 days. Similarly, on March 28, 1996, 49 (almost 50%) of the 107 Medicaid applications previously submitted to IMA by Providence Hospital patients had been pending for well over 45 days.

Many individual class members testified poignantly to the serious consequences caused by such delays. Mr. Von Faust, for example, who suffers from AIDS, waited six months for IMA to process his Medicaid application. During that time, he was forced to spend at least $832 of his own funds and to volunteer for experimental drug trials in order to obtain needed prescriptions and pain medications. For at least several months, he was unable to visit a physician at all. As his testimony vividly illustrated, Defendants' failure to process Medicaid applications within the requisite 45 days is not simply an abstract bureaucratic irregularity. Rather, it has concrete and often-times devastating effects on poor, sick, vulnerable people.

93. The Court recognizes that in *Alexander* the state and county officials had failed to comply with previous court orders over a period spanning several years. *Id.* at 782–783. The instant case differs somewhat from *Alexander* in that, while Defendants have been violating the law for at least four years, there have been no previous court orders requiring compliance in this case. Nevertheless, *Alexander's* holding that the federal statute itself demands 100% compliance was clearly not dependent upon the defendants' particular history of noncompliance with court orders.

As the Court discussed in Findings 32–34, high-level DHS managers have known about IMA's recurrent backlogs of NPA Medicaid applications for several years. In light of this knowledge, the Court concludes that Defendants' failure to rectify the problems in application processing constitutes a "course deliberately pursued by official policymakers." *See Carter,* 795 F.2d at 125–126.

Defendants offered various explanations at trial,[94] and described two initiatives IMA is currently undertaking to improve application processing in the Multinational Section. *See* Bayne Test., ¶¶ 15–26 and 31–32.[95] These efforts do not change the unavoidable findings of substantial noncompliance with federal and District of Columbia law. *Cf. Withrow v. Concannon,* 942 F.2d 1385, 1387–1388 (9th Cir.1991) (impracticability of perfect compliance with Medicaid timeliness regulations does not preclude an injunction requiring compliance with such regulations, when a "pattern of non-compliance has been shown to have existed"); *Fortin v. Comm'r of the Massachusetts Dep't of Public Welfare,* 692 F.2d 790, 796–797 (1st Cir.1982) (evidence of state's diligence and improvement in deciding welfare applicants' eligibility was insufficient to preclude finding of civil contempt, where state was still in substantial noncompliance with federal timeliness standards and prior consent decree). Based on Findings No. 1–34, the Court concludes that Defendants have been and continue to be depriving non-foster care, non-disabled NPA Medicaid applicants of their rights under 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.911(a), in violation of 42 U.S.C. § 1983, and of their rights under D.C. Code § 3–205.26.

### B. Claim 5: Unlawful Termination of Benefits

The District of Columbia is required, under federal law, to "give [Medicaid] recipients timely and adequate notice of proposed action to terminate, discontinue, or suspend their eligibility" and to provide an opportunity for a hearing if it takes such action. 42 C.F.R. §§ 435.919(a) and 431.200 (1995). The hearing procedures must "meet the due process standards set forth in *Goldberg v. Kelly,* 397 U.S. 254 [90 S.Ct. 1011, 25 L.Ed.2d 287] (1970) ..." *Id.* § 431.205(d). The notice must be mailed at least 10 days before the date of termination or suspension of eligibility, *id.* § 431.211, and it must contain "(a) [a] statement of what action [the District] intends to take, (b) [t]he reasons for the intended action, and (c) [t]he specific regulations that support ... the action," *id.* § 431.210. Finally, the District must "[c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible." *Id.* § 435.930(b).[96]

Notice and an opportunity for a hearing prior to termination of Medicaid benefits are also required by the Due Process Clause of the Fifth Amendment. *See Goldberg v. Kelly,* 397 U.S. 254, 265–67, 90 S.Ct. 1011, 1019–20, 25 L.Ed.2d 287 (1970) (holding that notice and evidentiary hearing are required before state may terminate welfare benefits); *Ortiz v. Eichler,* 794 F.2d 889, 893–94 (3d Cir.1986) (applying *Goldberg's* notice requirement to terminations of Medicaid benefits); *Stenson v. Blum,* 476 F.Supp. 1331, 1342 (S.D.N.Y.1979), *aff'd,* 628 F.2d 1345 (2d Cir.1980), *cert. denied,* 449 U.S. 885, 101 S.Ct. 239, 66 L.Ed.2d 111 (1980) (holding that notice and opportunity for hearing before termination of Medicaid benefits are required under Due Process Clause of Fifth and Fourteenth Amendments); *Catanzano v. Dowling,* 60 F.3d 113, 117 (2d Cir.1995) (holding that opportunity for fair hearing is required

---

**94.** One major cause for IMA's failure to process all applications within 45 days appears to be a shortage of qualified staff. On April 5, 1996, for example, the Multinational Section only had four SSRs handling about 180 applications per month. Bayne Test., ¶ 26.

**95.** In an attempt to alleviate its chronic staffing problem, IMA is currently cross-training SSRs so that they will be able to process applications for all entitlement programs administered by IMA, such as Medicaid, AFDC, and Food Stamps, and is concentrating staff in fewer service centers. Bayne Test., ¶¶ 31–32.

**96.** *See also* D.C.Code Ann. §§ 3–205.55(a) and 3–201.1 (1994) (requiring notice of "intended action to discontinue, withhold, terminate, suspend, [or] reduce" Medicaid to be "postmarked at least 15 days before the date upon which the action would become effective").

under Fourteenth Amendment when state agency terminates Medicaid benefits).

■ Over the past several years, IMA has repeatedly failed to give non-foster care NPA Medicaid recipients "timely and adequate" notice before terminating or suspending their Medicaid eligibility, and to "furnish Medicaid regularly" to eligible Medicaid recipients. Defendants' own MEO reports again provide the strongest evidence, and reveal that for many months during the period from January 1992 to February 1996, the Multinational Section allowed many Medicaid recipients' benefits to lapse by failing to process recertifications submitted by recipients whose eligibility was due to expire that month. In November 1993, for example, IMA failed to process 69, or 69.7%, of the 99 recertification forms submitted by recipients whose eligibility would expire at the end of that month. During the far more recent 12–month period from March 1995 through February 1996, IMA failed to process an average of 37 per month, or 25%, of the recertification forms pending for recipients whose eligibility would expire at the end of the month. Therefore, substantial numbers of Medicaid recipients in the Multinational Section have suffered, and continue to suffer, lapses or terminations in benefits. These lapses or terminations violate 42 C.F.R. § 435.930(b), which requires Defendants to "[c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible."

■ Many of the lapses or terminations also violate 42 C.F.R. § 435.919 and the Due Process Clause of the Fifth Amendment, because they are not preceded by any form of notice whatsoever. When IMA fails to process recipients' recertification forms before the end of their eligibility periods, the only recipients who are notified of an impending lapse or termination of benefits are those recipients who did not submit their recertification forms until 30 or fewer days remained in their eligibility periods. These recipients, as discussed in Findings 36 and 43, receive the ACEDS 30–day termination notice. *See, e.g.,* Pls.' Ex. 113. Neither party produced evidence on the number or percentage of Medicaid recipients who fall into this category; thus, it is difficult to determine what

percentage of Medicaid recipients suffered deprivations under § 435.919 and the Due Process Clause. However, recipients in this category still suffer a deprivation of their right, under federal law, to receive Medicaid until they are specifically found ineligible. *See* 42 C.F.R. § 435.930(b) (1995). Thus, considering the most recent one-year period for which Defendants' MEO reports are available, the monthly average of NPA–Multinational Medicaid recipients who suffered illegal lapses in benefits was still 37, or 25%.

Plaintiffs' statistical sample, again, corroborates Defendants' own MEO reports by demonstrating that IMA frequently terminates Medicaid benefits or allows them to lapse either without providing adequate notice or without specifically finding those recipients ineligible for Medicaid. Defendants concede that in about 34.4% of the non-disability NPA–Nonmultinational cases, 47.2% of the NPA–Multinational cases, and 26.4% of the disability NPA cases, IMA unlawfully terminated or allowed Medicaid eligibility to lapse. Thus, depending on the category of Medicaid recipients, disabled, sick, and poor children and adults are illegally losing their Medicaid benefits 25% to almost 50% of the time.

Individual class members testified to the adverse consequences caused by IMA's unlawful terminations of benefits. For example, in January 1996, two-year old Maria Lopez, who has a heart defect, experienced a delay of approximately one month in receiving a necessary catheter procedure. This was because IMA failed to process Maria's recertification form before December 31, 1995, the end of Maria's Medicaid eligibility period, even though her mother had submitted the recertification form in October 1995.

Defendants have also suspended eligibility for countless Medicaid recipients in all categories, including AFDC, SSI, and NPA, without notice, by failing to correct persistent, long-standing problems with EVS. As discussed extensively in Findings No. 71–94, EVS frequently provides incorrect informa-

tion about patients' Medicaid eligibility.[97] Many patients whom EVS incorrectly categorizes as non-eligible are then unable to obtain necessary prescriptions and medical services.

■ As Findings No. 83–86 clearly show, Defendants have been keenly aware of EVS' unreliability since as early as February 1993. In April 1996, shortly before trial in this case, Defendants hired computer consultants to provide short-term solutions to some of the problems. However, Defendants have yet to take any concrete steps, such as the most basic one of issuing an RFP, toward replacing the EVS system or permanently remedying its persistent defects.

Furthermore, for at least the past several years, Defendants have been well aware of IMA's failures in processing recertifications for all Medicaid recipients whose eligibility was scheduled to expire. Defendants' own MEO reports clearly recorded these failures from as early as 1992 to the current year, 1996.

Based on Findings No. 35–94, the Court concludes that Defendants have been and continue to be depriving non-foster care NPA Medicaid recipients (including NPA-disability recipients) of their rights under the Due Process Clause of the Fifth Amendment, 42 C.F.R. §§ 431.210, 431.211, 435.919, and 435.930(b), in violation of 42 U.S.C. § 1983, and D.C.Code Ann. § 3–205.55(a).

## C. Claim 6: Failure to Provide EPSDT Services

■ As described above, the District must provide or arrange for the following EPSDT services to persons under age 21 who are Medicaid-eligible and who request such services: (1) screening services, including comprehensive health and developmental histories, comprehensive unclothed physical examinations, appropriate immunizations, laboratory tests (including appropriate lead blood level assessments), and

health education; (2) vision services, including diagnosis and treatment for vision defects; (3) dental services, including "relief of pain and infections, restoration of teeth, and maintenance of dental health"; (4) hearing services, including diagnosis and treatment for defects in hearing; and (5) "such other necessary health care ... to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered by the State plan." 42 U.S.C. §§ 1396d(r)(1)(B) and 1396a(a)(43)(B) (1996). These screening services must be provided at "intervals which meet reasonable standards of medical and dental practice." Id. § 1396d(r)(1)(A)(i).

Under § 441.56(b) of Title 42 of the Code of Federal Regulations, the District is also required to provide, to eligible EPSDT recipients who request it, appropriate vision and hearing testing, and "[d]ental screening ... furnished by a direct referral to a dentist for children beginning at 3 years of age." 42 C.F.R. § 441.56(b)(1)(iii)—(vi) (1996).

The District must provide to eligible EPSDT recipients any diagnostic and treatment services included in its state plan, as well as diagnosis and treatment of vision and hearing defects, dental care, and appropriate immunizations, even if these services are not included in the state plan. Id. § 441.56(c). Furthermore, the District must provide to EPSDT-eligible children any service which states are permitted to cover under Medicaid and which is necessary to treat or ameliorate a defect, physical and mental illness, or a condition identified by a screen, regardless of whether that service is otherwise included in its state plan. HCFA State Medicaid Manual, § 5310 (August 3, 1995), at 6257 (Pls.' Ex. 232).

The HCFA State Medicaid Manual describes the District's "Program Monitoring,

---

97. Some providers, such as Providence Hospital, have learned through experience not to trust EVS and to verify all EVS information through the Managed Care Helpline or DHS staff. However, as discussed in Finding No. 81, Defendants have no method of informing all Medicaid pro- viders about the alternatives to EVS, and do not even know whether Medicaid providers are obligated to use a back-up system when Medicaid-eligible patients inform them that EVS is incorrect.

Planning and Evaluation" obligations as follows:

> Assure that a participating child is periodically screened and treated in conformity with the [state periodicity] schedule and State set timeliness standards. To comply with this requirement, design and employ policies and methods to assure that children receive rescreening and treatment when due. If the family requests assistance with necessary transportation and scheduling to receive Medicaid services, provide it.
>
> Set standards for the timely provision of screening and treatment services which meet reasonable standards of medical and dental practice, as determined after consultation with recognized medical and dental organizations involved in child health care.
>
> Design and employ methods to assure that children receive (1) those screening services initially or periodically requested or due under the periodicity schedule and (2) treatment for all conditions identified as a result of examination or diagnosis.

HCFA State Medicaid Manual, § 5310 (August 3, 1995), at 6270–6271 (Pls.' Ex. 232).

### 1. Failure to Ensure that EPSDT–Eligible Children Receive Complete EPSDT Screening Services

In *Bond v. Stanton*, 655 F.2d 766, 770–772 (7th Cir.1981), *cert. denied*, 454 U.S. 1063, 102 S.Ct. 614, 70 L.Ed.2d 601 (1981), the United States Court of Appeals for the Seventh Circuit found that Indiana's EPSDT program violated federal law, because, *inter alia*, it failed to monitor whether EPSDT-eligible children received complete screening services. The court found that Indiana had "no way of knowing whether a child ha[d] received a complete screen," and had no system of "required or consistent feedback from the Medicaid provider who performs the screen back to the caseworker handling that recipient's file." *Id.* at 770–771.

As in *Bond*, the Defendants in this case do not monitor whether EPSDT-eligible chil-

dren receive complete screening services in accordance with the District's periodicity schedule. They take no action in response to completed DHS Form 612s or recertification forms, even when those forms clearly indicate that parents want EPSDT services for their children. Defendants no longer conduct site visits to monitor providers serving EPSDT-eligible children. Moreover, although providers in the Medicaid Managed Care Program should submit data to CHCF regarding EPSDT services they provide to children, Defendants have no system for enforcing those data collection requirements or for utilizing that data to ensure that EPSDT-eligible children are receiving complete screening services as required under federal law. Finally, Defendants have no data collection requirements or other organized system for receiving feedback from providers who do not participate in the Medicaid Managed Care Program, such as providers at the DHS neighborhood clinics.

In sum, although the District has attempted to establish "standards for the timely provision of screening and treatment services which meet reasonable standards of medical and dental practice," by devising a periodicity schedule in accordance with the American Academy of Pediatrics guidelines, it has no method for "[a]ssur[ing] that [ ] participating child[ren] [are] periodically screened and treated in conformity with [the periodicity] schedule." *See* HCFA State Medicaid Manual, § 5310 (August 3, 1995), at 6270–6271 (Pls.' Ex. 232).[98]

The consequences of Defendants' failure to establish a system whereby complete EPSDT screening services are provided to eligible children are reflected in the District's failure to meet federal EPSDT participation goals. Pursuant to § 1396d(r) of Title 42 of the United States Code, HCFA "develop[ed] and set annual participation goals ... for participation of individuals who are covered by [the District's] state plan ... in early and periodic, screening, diagnostic, and treatment services." 42 U.S.C. § 1396d(r) (1996). The District was required to report its results in

---

**98.** Additionally, as Findings No. 122–127 make clear, the District's method of assigning Medicaid recipients to managed care providers has

deterred many EPSDT-eligible children from receiving any EPSDT services at all.

attaining those goals to HCFA. *Id.* § 1396a(a)(43)(D).

As discussed in Findings No. 96–98, the District failed to meet its participation goals for every year from 1992 to 1995. Moreover, the District's participation ratios were significantly below the national average during the years for which national figures are available. Additionally, the participation ratio does not even provide any indication of how many children in the District received all of the EPSDT screening services that they should have received, because the participation ratio does not account for the fact that some children, *i.e.*, those children under two years old, should have more than one EPSDT screening service per year.

Based on Findings No. 108–109, the Court also concludes that Defendants have failed to provide or arrange for dental services for EPSDT-eligible children, in violation of federal law and federal guidelines. *See* 42 U.S.C. § 1396d(r)(3) (1996); HCFA State Medicaid Manual, § 5123.2G (August 3, 1995), at 6264 (Pls.' Ex. 232) (requiring direct referrals to dentists for every child in accordance with state periodicity schedule, and noting that for older children, dental examinations should occur with greater frequency than physical examinations).

The Court further concludes, based on Findings No. 104–106, that Defendants have failed to provide or arrange for lead blood toxicity testing for EPSDT-eligible children, in violation of federal law and federal guidelines. *See* 42 U.S.C. § 1396d(r)(1)(B)(iv) (1996) and HCFA State Medicaid Manual, § 5123.2D (August 3, 1995) at 6263 (Pls.' Ex. 232).

Finally, based on Findings No. 117–118, Defendants do not ensure that providers of EPSDT services are "qualified and willing to provide EPSDT services," in violation of 42 C.F.R. § 441.61(b). *See also Bond,* 655 F.2d at 770 (finding that Indiana's failure to "discern[ ] which Medicaid providers are willing and able to provide [EPSDT] screens" and its assumption that "all medical providers can and will provide the necessary services" violated 45 C.F.R. § 205.146(c)(2), the predecessor to 42 C.F.R. § 441.61(b)).

## 2. Failure to Ensure that EPSDT–Eligible Children Receive Necessary Follow–Up Diagnosis and Treatment

In *Bond,* the court also found that Indiana's EPSDT program violated federal law because it failed to monitor whether EPSDT-eligible children received follow-up corrective treatment. The court ruled:

> It appears that the defendants rely on the providers to perform the treatment or refer the patients, or on the recipient to request help from the caseworker. In our view, the statute requires more. The state must assure that arrangements are made for treating detected health problems. Without feedback from the Medicaid provider who performs the screen, the caseworker cannot know who needs treatment and who is getting it. Monitoring of this aspect of the problem is mandatory in order to prevent future health problems as Congress intended.

*Bond,* 655 F.2d at 771. Like the state of Indiana in *Bond,* the District has no method for ensuring that EPSDT-eligible children receive diagnosis and treatment for health problems detected during screening services. Although Defendants do receive limited data from managed care providers who perform EPSDT screens, they do nothing with this data. Thus, Defendants never learn whether EPSDT-eligible children in need of follow-up care receive such care, even though they are required to "arrange[ ] for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by ... child health screening services." 42 U.S.C. § 1396a(a)(43)(C) (1996). In short, the District "cannot assure that it provides [ ] screen[s] sufficiently comprehensive for the purpose intended or that it pursues those health problems detected with the necessary treatment." *Cf. Bond,* 655 F.2d at 771–772.

Furthermore, based on Findings No. 134–140, the Court concludes that the District's Medicaid Managed Care Program impedes EPSDT–eligible children from receiving referrals for treatment for conditions discovered during EPSDT screening services, because managed care providers do not know

to which specialists they may refer their patients.

The District is required to report to HCFA "the number of children referred for corrective treatment (the need for which is disclosed by such child health screening services)." 42 U.S.C. § 1396a(a)(43)(D)(ii) (1996); *see also* HCFA State Medicaid Manual, § 2700.4 (November 1993), at 2–219.1 (Pls.' Ex. 166). Based on Findings No. 137–139, the Court also concludes that Defendants failed to follow federal requirements in reporting line 8 on the FY 1993 HCFA Form 416 and line 12 on the FY 1994 HCFA Form 416.

Finally, federal HCFA guidelines require states to provide case management services if a child requires them to gain access to "services required to diagnose and/or treat a condition found during a screening service." HCFA Regional Medicaid Letter No. 13–90 (Pls.' Ex. 240); *cf.* 42 U.S.C. § 1396n(g) (1996). Based on Findings No. 128–133, the Court concludes that Defendants do not provide case management services in situations where children require such services in order to obtain necessary, follow-up diagnosis and treatment.

### 3. Failure to Provide Necessary Scheduling and Transportation Assistance

Defendants are required to offer EPSDT recipients transportation and scheduling assistance before "each due date of a child's periodic examination," and to provide such assistance when recipients request it and when necessary. 42 C.F.R. 441.62 (1996); HCFA State Medicaid Manual, § 5150 (August 3, 1995) at 6266 (Pls.' Ex. 232). Based on Findings No. 141–149, it is crystal clear that Defendants do not provide adequate transportation or scheduling assistance to EPSDT-eligible children.

For the foregoing reasons, based on Findings No. 95–151, the Court concludes that Defendants have violated 42 U.S.C. §§ 1396d(r) and 1396a(a)(43)(B)–(C) (1996), 42 C.F.R. § 441.56(b) (1996), and the accompanying HCFA guidelines, by failing to provide EPSDT services to eligible children in the District of Columbia.

The Court further concludes that these violations have occurred pursuant to a "persistent, pervasive practice, attributable to a course deliberately pursued by official policymakers." *See Carter,* 795 F.2d at 125–126. Since as early as 1985, Defendants have deliberately assigned only one person, Ms. Sarah Davidson, to run the entire EPSDT program. By compiling reports for HCFA on participant ratios, Defendants have clearly seen that a grossly insufficient number of EPSDT-eligible children are receiving at least one EPSDT screening service per year. Since 1992, Defendants have deliberately taken no action to ensure that all Medicaid providers know about EPSDT requirements. Similarly, Defendants do not monitor whether EPSDT-eligible children receive screening services in accordance with the District's periodicity schedule, and they have failed to monitor whether managed care providers deliver complete EPSDT screening services to children in accordance with that schedule, despite formal, written warnings from HCFA to do so as early as 1991. Thus, Plaintiffs are entitled to relief under 42 U.S.C. § 1983.

### D. Claim 7: Failure to Notify Eligible Families About EPSDT

■ The District of Columbia is required to "inform[ ] all persons in [the District] ... who have been determined to be eligible for medical assistance ... of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) of this title and the need for age-appropriate immunizations against vaccine-preventable diseases ..." 42 U.S.C. § 1396a(a)(43)(A) (1996). Implementing regulations further specify that the District must (1) provide for a combination of written and oral methods "designed to inform effectively all EPSDT eligible individuals (or their families) about the EPSDT program"; (2) using "clear and non-technical language," provide information about the benefits of preventive health care, the services available under the EPSDT program and where and how to obtain those services, the cost-free nature of EPSDT services, and the availability of necessary scheduling and transportation assistance; (3) "effectively inform those individuals who are blind or deaf, or who cannot

read or understand the English language" [99]; and (4) "[p]rovide assurance to HCFA that processes are in place to effectively inform individuals as required under this paragraph, generally, within 60 days of the individual's initial Medicaid eligibility determination and in the case of families which have not utilized EPSDT services, annually thereafter." 42 C.F.R. § 441.56(a) (1996). The District has some flexibility in determining how information can be most effectively conveyed, but it must assure "that every EPSDT eligible receives the basic information necessary to gain access to EPSDT services." HCFA State Medicaid Manual, § 5121 (August 3, 1995) at 6258 (Pls.' Ex. 232).

As discussed in Findings No. 163–168, IMA frequently fails to document whether Medicaid applicants are notified about EPSDT. Plaintiffs' random sample, as modified by Defendants, clearly shows that IMA did not document whether Medicaid applicants were notified about EPSDT in 55.6% (74 out of 133) of the NPA–Nonmultinational case files active in 1994, and 14.4% (22 out of 153) of the NPA–Multinational case files active in 1994. In light of these percentages, the undisputed testimony of numerous class members regarding lack of EPSDT notice, the evidence of inadequate training to IMA SSRs regarding EPSDT notification procedures, and the lack of any monitoring by Defendants of managed care providers regarding EPSDT notice, the Court concludes that IMA fails to notify substantial numbers of eligible Medicaid applicants about EPSDT, in violation of 42 U.S.C. § 1396a(a)(43)(A) (1996) and 42 C.F.R. § 441.56(a) (1996).

Furthermore, based on Findings No. 169–172, the Court concludes that Defendants have failed to reinform annually those eligible individuals who have not used EPSDT services, in violation of 42 C.F.R. § 441.56(a)(4) (1996).

Based on Findings No. 173–174, the Court also concludes that Defendants do not provide adequate notice concerning the availability of necessary scheduling and transportation assistance in connection with EPSDT services.

Finally, based on Findings No. 156–158, the Court concludes that Defendants do not effectively inform eligible persons who are blind or deaf, or who cannot read or understand English, about EPSDT, in violation of 42 C.F.R. § 441.56(a)(3) (1996).

Federal regulations provide that the District "should make use of . . . public health, mental health, and education programs and related programs, such as Head Start, Title XX (Social Services) programs, and the Special Supplemental Food Program for Women, Infants and Children ("WIC"), to ensure an effective child health program." 42 C.F.R. § 441.61(c) (1996). The HCFA State Medicaid Manual further provides:

> Coordination [between a state's EPSDT program and other related agencies] includes child health initiatives with other related programs, such as Head Start, [WIC], school health programs of state and local education agencies . . . and social services programs under title XX. . . .
>
> Written agreements are essential to effective working relationships between the Medicaid agency and agencies
>
> charge with planning, administering or providing health care to low-income families. . . . Agreements are formal documents signed by each agency's representative or written statements of understanding between units of a single department.

HCFA State Medicaid Manual, § 5230 (August 3, 1995) at 6267 (Pls.' Ex. 232). HCFA has also urged the District to coordinate with public housing programs. *See id.* at 6269.

Based on Findings No. 179–184, the Court concludes that Defendants do not adequately coordinate the EPSDT program with DCPS, Headstart programs, WIC, Title XX programs, and the Part H Early Intervention Program. This lack of coordination is further evidence that Defendants have failed to notify eligible persons about EPSDT.

---

**99.** For assistance in meeting this requirement, "states must contact agencies with established procedures for working with such individuals, e.g., state or local education departments, employment security offices, handicapped programs." HCFA State Medicaid Manual, § 5121 (August 3, 1995) at 6258 (Pls.' Ex. 232).

. In summary, based on Findings No. 152–184, the Court concludes that Defendants have violated 42 U.S.C. § 1396a(a)(43)(A) (1996), 42 C.F.R. § 441.56(a), and the accompanying HCFA guidelines, by failing to provide effective notice of EPSDT to children in the District of Columbia who are eligible for those services.

The Court further finds that these violations have occurred pursuant to a persistent, pervasive practice, attributable to official policymakers. As Findings No. 164–165 demonstrate, since as early as 1991, Defendants have been aware of the importance of documenting EPSDT notice to Medicaid applicants and monitoring IMA staff to ensure that its written policies regarding EPSDT notice were in fact carried out. Defendants have consistently failed to monitor whether IMA staff inform patients about EPSDT services, despite HCFA recommendations to do so in the 1991 EPSDT Program Review, or to take other appropriate action to ensure that eligible families are informed about EPSDT.

Moreover, Defendants have ignored HCFA's clear admonition, in the 1991 EPSDT Program Review, regarding the lack of written procedures for informing blind, deaf, and non-English speaking individuals about EPSDT, and they have deliberately used only one small box, placed *after* the signature line, on the detailed recertification form (which is only available in English), to reinform Medicaid recipients about EPSDT. Finally, since 1985, Defendants have employed only one person to administer the EPSDT program. This evidence clearly establishes a "course deliberately pursued by official policymakers," which has caused a deprivation of Plaintiffs' rights under federal law. *Cf. Carter v. District of Columbia,* 795 F.2d 116, 122 (D.C.Cir.1986).

### E. Reimbursement for Class Members' Out–of–Pocket Expenses

Plaintiffs are entitled to reimbursement for out-of-pocket expenses they incurred when they were actually Medicaid-eligible. *See* 42 C.F.R. § 431.246 (1995) ("[t]he agency must promptly make corrective payments, retroactive to the date an incorrect action was taken ... if (a) the hearing decision is favorable to the applicant or recipient; or (b) [t]he agency decides in the applicant's or recipient's favor before the hearing"); HCFA State Medicaid Manual, § 6320 (August 1991) (explaining "longstanding HCFA policy [to] make direct reimbursement available to all individuals who pay for medical services between the date of an erroneous determination of ineligibility for Medicaid and the date the determination is reversed"); *Greenstein v. Bane,* 833 F.Supp. 1054, 1077 (S.D.N.Y.1993) (holding that Medicaid-eligible individuals were entitled to reimbursement for actual out-of-pocket medical expenses incurred as a result of agency error, because the "statutory right to a fair hearing must include within it the right to effective redress"); *Blanchard v. Forrest,* 71 F.3d 1163, 1167 (5th Cir.1996) (holding that Louisiana could not require Medicaid recipients seeking reimbursement for medical expenses incurred in the three months prior to submission of a Medicaid application to seek refunds from providers, who could then seek reimbursement from the state, because such a policy left "the availability of such coverage to the discretion of the provider who ha[d] interests adverse to the recipient[s]").

The more difficult question is whether Plaintiffs may request such reimbursement in this action, in light of the fact that no class member who incurred such expenses requested a hearing pursuant to § 431.220 of Title 42 of the Code of Federal Regulations. Fair hearings are available to any Medicaid recipient who "believes the agency has taken an action erroneously." 42 C.F.R. § 431.220(a)(2) (1995). Thus, any class member who was forced to incur medical expenses as a result of Defendants' errors could have requested a DHS fair hearing to seek reimbursement for those expenses.[100]

---

**100.** Section 3170 of the District of Columbia Medicaid Assistance Procedures Handbook, entitled "Implementation of the Final Fair Hearing Decision," provides:

When the eligibility worker receives the notification from the Office of Fair Hearings of the final fair hearing decision, the worker must implement the decision immediately. Following is a summary of corrective actions:

Defendants, however, have repeatedly asserted that their Medicaid State Plan· prohibits them from "reimburs[ing] Medicaid eligible individuals directly for their payments for medical services; only providers may be reimbursed directly for their services." Defs.' Prop. Findings· of Fact and Concls. of Law at 17; Joint Pretrial Statement at 20. Thus, even if class members had requested fair hearings, the District's Medicaid State Plan would have precluded reimbursement for out-of-pocket expenses. Since that remedy was not available to them, Plaintiffs are not now barred from asserting a right to such reimbursement in this action by their failure to request fair hearings. *Cf. Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 523, 110 S.Ct. 2510, 2524, 110 L.Ed.2d 455 (1990) ("The availability of state administrative procedures ... does not foreclose resort to § 1983.").

Moreover, Defendants' blanket refusal to reimburse recipients directly contravenes 42 C.F.R. § 431.246 (1995), as interpreted by HCFA in § 6320 of its State Medicaid Manual. In that section, HCFA explained that

the policy of direct reimbursement to recipients is an exception to the vendor payment principle in § 1905 of the [Social Security] Act, which prohibits payments to recipients except in specific circumstances.... *States may make direct reimbursement to individuals who paid for covered services after an erroneous determination of ineligibility which is reversed on appeal.* The purpose of this exception to the vendor payment principle is to correct the inequitable situation that results from an erroneous determination made by the agency.

HCFA State Medicaid Manual, §§ 6320.1–6320.2 (August 1991); *see also Greenstein,* 833 F.Supp. at 1069 (considering § 6320 of the HCFA State Medicaid Manual as "official interpretation" of 42 C.F.R. § 431.245).

If eligibility has already been denied, terminated, or reduced, and the fair hearing decision reverses the worker's original determination, coverage must be reinstated back to the date of the erroneous decision. If the recipient states that he or she paid for some medical expenses during the interim that should have been paid by [Medicaid], the worker should refer the case

■ In accordance with *Greenstein, Blanchard,* and HCFA's clear guidance on this issue, the Court concludes that Defendants must devise and publicize a formal method for reimbursing individuals who paid for covered Medicaid services when they were actually Medicaid-eligible, in accordance with applicable federal regulations and HCFA guidelines. Defendants can no longer rely upon their current, unofficial practice of asking providers to refund Medicaid recipients' money and submit claims to CHCF. Class members shall have the right to request fair hearings on the issue of reimbursement. If Defendants find that class members did indeed incur medical expenses at a time when they were Medicaid-eligible, and that they incurred such expenses due to Defendants' erroneous eligibility determinations, *e.g.,* incorrect EVS reports or IMA's failure to timely process recertifications or applications, then Defendants must find a way to reimburse those class members for the out-of-pocket expenses they incurred. If Defendants' State Plan conflicts with this ruling, it must be amended.

## IV. CONCLUSION

For all of the foregoing reasons, the Court holds that Defendants have violated 42 U.S.C. § 1983 by depriving Plaintiffs of their rights under federal law and the United States Constitution. Accordingly, it is this 15th day of October, 1996,

ORDERED that Defendants are hereby adjudged liable under 42 U.S.C. § 1983 for violating the federal and constitutional rights of Medicaid applicants and recipients in the District of Columbia; and it is further

ORDERED that there shall be a status conference on **November 21, 1996** for the purpose of discussing the relief phase of this case; and it is further

situation to the Office of Health Care Financing for appropriate billing adjustments.
District of Columbia Medical Assistance Procedures Handbook, § 3170 (May 1, 1983) (Defs.' · Ex. 3). Neither party has offered a definition or example of "appropriate billing adjustments," or clarified whether such adjustments include direct reimbursement to the recipient.

ORDERED that five days before the status conference, the parties shall submit proposals for relief in this case.[101]

---

101. The Court prefers that the parties meet and confer well in advance of the status conference in order to submit joint proposed remedies on at least some of the claims in this case.